IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

_____
                                        )
DE TECHNOLOGIES, INC.,                  )
                                        )
                    Plaintiff,          )        Civil Action No. 7:04 CV 00628
                                        )
v.                                      )
                                        )
DELL INC.,                              )
                                        )
                    Defendant.          )
_____       )

## **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

Douglas J. Williams, Esq.
Jon R. Trembath, Esq.
Christopher J. Sorenson, Esq.
Thomas Leach, Esq.
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

George W. Jordan III, Esq.
MERCHANT & GOULD P.C.
133 Peachtree Street, N.E., Suite 4900
Atlanta, Georgia   30303-1821
Telephone:  (404) 954-5100
Facsimile:  (404) 954-5099

Attorneys for Plaintiff
DE TECHNOLOGIES, INC.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 2

        A.      The Parties .............................................................................................. 2

        B.      The Innovation ........................................................................................ 2

        C.      The Patents ............................................................................................. 6

III.    CLAIM TERMS PROPOSED FOR CONSTRUCTION AND THEIR
        DEFINITIONS .................................................................................................. 10

        A.      The Law of Claim Construction .......................................................... 11

                1.      Claim Terms Are Presumed To Mean What They Say .............. 11

                2.      The Court Must Look To The Specification Or The Prosecution History
                        To Confirm The Ordinary Meaning Of A Claim Term ............... 12

                        a.      The Specification .......................................................... 12

                        b.      The Prosecution History ................................................ 13

                        c.      Extrinsic Evidence Is Normally Not Relevant To Claim
                                Construction .................................................................. 14

        B.      Transaction Program .......................................................................... 15

        C.      Integrate ............................................................................................... 18

        D.      Goods Classification System .............................................................. 18

        E.      Total Cost Of The Transaction That Includes A Price Of The Product ................. 19

        F.      Commercial Invoice ............................................................................ 20

IV.     MEANS-PLUS-FUNCTION CLAIMS PROPOSED FOR CONSTRUCTION
        AND THEIR DEFINITIONS .............................................................................. 21

        A.      Means For Running A Transaction Program So As To Integrate Components ..... 22

        B.      Means For Determining A Language In Which To View Catalogue
                Information On Products ...................................................................... 22

        C.      Means For Determining A Currency In Which To Obtain Price Information ....... 23

D.     Means For Receiving A Selection Of A Product To Be Purchased And  A Product To Be Purchased And A Destination For Shipping Such Product To Be Purchased ........................................................................................ 23

E.     Means For Accessing At Least One Local Or Remote Database For (i) Price Information For The Product To Be Purchased; (ii) A Product Code For An International Goods Classification System Pertinent To Such Product; and (iii) International Shipping Information Related To An Origination Point Of Such Product And Said Destination ..................................................... 25

F.     Means For Calculating Costs Involved In Moving Such Product To Said Destination Based Upon Said Destination And Such Product .............................. 26

G.     Means For Receiving An Order For Such Product Thereby Triggering An Electronic Process For Confirming Existence Of Available Funds ...................... 26

H.     Means For Generating An Electronic Record, Such Record Including The Content Of A Commercial Invoice, To Facilitate Passage Of Such Product To Said Destination ................................................................................... 27

I.     Means For Authorizing Electronic Payment Of Expenses Required Along A Selected Shipping Route ......................................................................... 27

J.     Means For Storing And Analyzing Data Based Upon Each Customer Accessing The System To Develop A Purchasing Profile For Each Customer ..... 28

V.     **CONCLUSION** ................................................................................. 28

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Al-Site Corp. v. VSI International, Inc.*,
   174 F.3d 1308 (Fed. Cir. 1999)..................................................................................8

*Anchor Wall System v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003)................................................................................14

*Astrazeneca AB v. Mutual Pharm. Co.*,
   384 F.3d 1333 (Fed. Cir. 2004)................................................................................14

*B. Braun Medical v. Abbott Laboratoriess*,
   124 F.3d 1419 (Fed. Cir. 1997)................................................................................21

*Brookhill-Wilk*,
   334 F.3d at 1300 ......................................................................................................15

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004)..................................................................................14

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industrial, Inc.*,
   145 F.3d 1303 (Fed. Cir. 1998)..................................................................................8

*Gart v. Logitech, Inc.*,
   254 F.3d 1334 (Fed. Cir. 2001)................................................................................13

*Group One v. Hallmark Cards, Inc.*,
   No. 04-1296, -1297, 2005 U.S. App. LEXIS 8613, at *10 (Fed. Cir. May 16,
   2005) ........................................................................................................................24

*Hoffer v. Microsoft Corp.*,
   No. 04-1103, 2005 U.S. App. LEXIS 6965 (Fed. Cir. April 22, 2005)................24, 25

*Generation II Orthotics, Inc. v. Medical Tech., Inc.*,
   263 F.3d 1356 (Fed. Cir. 2001)................................................................................21

*Johnson Worldwide Associates v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999).................................................1, 11, 13, 16, 17, 18, 20

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)............................................................................13, 15

*Markman*,
   52 F.3d at 980 ....................................................................................................13, 14

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)..................................................................................................1

*Micro Chemical, Inc. v. Great Plains Chemical Co.*,
194 F.3d 1250 (Fed. Cir. 1999)....................................................................8, 21

*Omega Engineering, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir.  2003).................................................................13, 14

*Personalized Media Communications, Inc. v. International Trade Commission*,
161 F.3d 696 (Fed. Cir. 1998)...........................................................................25

*Phillips v. AWH Corp.*,
376 F.3d 1382 (Fed. Cir. 2004).........................................................................14

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999).........................................................................14

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001)........................................................11, 12, 13, 15

*CCS Fitness,*,
288 F.3d at 1366 ........................................................................................12, 14

*Scimed Life System, Inc. v. Adv. Cardiovascular System, Inc.*,
242 F.3d 1337 (Fed. Cir. 2001).........................................................................12

*Serrano v. Telular Corp.*,
111 F.3d 1578 (Fed. Cir. 1997)....................................................................21, 22

*Specialty Composites v. Cabot Corp.*,
845 F.2d 981 (Fed. Cir. 1988)...........................................................................13

*Teleflex, Inc. v. Ficosa North America Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)..........................................1, 2, 3, 11, 12, 13

*Texas Digital*,
308 F.3d at 1203 .....................................................................................15, 19, 20

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)....................................................................12, 13, 14,

*Whittaker Corp. v. UNR Industrial, Inc.*,
911 F.2d 709 (Fed. Cir. 1990)...........................................................................11

## FEDERAL STATUTES

35 U.S.C. §111(b) .................................................................................................6

35 U.S.C. §112 ................................................................................8, 9, 10, 13

35 U.S.C. § 154 ...................................................................................................10

## I.    __INTRODUCTION__

This suit involves a charge by DE Technologies, Inc. ("DE Tech") that Dell infringes two of its patents, United States Patent No. 6,460,020 (" '020 Patent") and U.S. Patent No. 6,845,364 (" '364 Patent").  DE Tech's predecessor was the first known entity to implement the technology at the heart of both patents, with the publication of an experimental web-based shopping portal in early 1996.  The site attracted Dell's attention.  Beginning in 1997 and continuing through 2000, Dell accessed at least 36 pages on the site.  It comes as no surprise that Dell, without authority or right, now makes use of DE Tech's patented inventions through its website, www.dell.com, and other systems integrated with its website.  Dell now procures and its customers purchase, from virtually anywhere in the world, Dell's products in a manner that infringes claims 1, 4, 11-15 and 17 of the '020 Patent, and claims 1-8 of the '364 Patent.

In considering DE Tech's charge against Dell, it is necessary for the Court to first determine the meaning of some, but not all, of the words in the patent claims at issue.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390-91 (1996).  Under the patent laws, that property right must be defined before DE Tech can explain and prove Dell's trespass.  *Markman*, 517 U.S. at 390-91.  Construction of the words in a patent claim has long been within the exclusive province of the Court.  *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999).  The Federal Circuit indulges a "heavy presumption" that a claim term carries its "ordinary and customary meaning."  *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citing *CCS Fitness, Inc. v. Brunswik Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  Once the claims are construed, DE Tech will show, element by element, how Dell's systems infringe.

Thus, pursuant to paragraph 18 of the Scheduling Order of February 8, 2005, DE Tech respectfully moves the Court to construe some, but certainly not all, of the claim terms of both patents.

## II.     BACKGROUND

### A.     The Parties

DE Tech is a small company with patents covering a revolutionary process for facilitating the order and shipment of goods across international borders using a transaction system known as the Borderless Order Entry System (hereafter "BOES").  DE Tech's BOES technology allows a buyer to order goods for international shipment electronically by use of a computer-based transaction program that consolidates numerous conventional international procurement procedures into an integrated, frictionless system.  DE Tech's innovative BOES technology has been awarded patent protection around the world, including the '020 and '364 Patents.

Dell is the world's largest personal computer vendor.  In a recent SEC filing, Dell declared that a key tenet of its business strategy is to foster direct relationships with its customers, a strategy that "eliminates wholesale and retail dealers that add unnecessary time and cost or diminish Dell's understanding of customer expectations." Ex. 3[1], p. 1.   According to Dell, "[a]t www.dell.com, customers may review, configure and price systems within Dell's entire product line; order systems online; and track orders from manufacturing through shipping." *Id.* at 1.  Dell also reported recently that its international sales increased 21% in its current first fiscal quarter, and that international sales have grown to represent 42% of Dell's total revenue. Ex. 4, p. 1.  DE Tech's BOES technology is key to Dell's international sales.

### B.     The Innovation

DE Tech's patents pioneer the ability to seamlessly conduct many aspects of an international transaction over a computer network.  Ex. 2, 8:47.[2]  The inventors realized, at a

---

[1] As used herein, "Ex." refers to exhibits to the Declaration of Chris Sorenson, dated May 18, 2005, filed in support of DE Technologies, Inc.'s Opening Claim Construction Brief .

[2] The '020 Patent and '364 Patent are provided for the Court's convenience as Exs. 1-2.  For each patent, there are pages of text arranged with two columns per page following a cover page and drawing pages.  In accordance with patent convention, reference to column number and lines in the patent are stated as [column]:[lines].  The "claims"

2

time when commercial application of the Internet was nothing more than an idea, that computer networks could revolutionize the process for the international shipment of goods. The invention, at its core, allows for a one-stop marketplace without international borders – one where customers virtually anywhere in the world are able to purchase a product online with advanced knowledge of various components of the specified transaction. Ex. 2, 2:60-63.

Customers purchasing goods internationally before BOES faced unexpected charges, weeks of structuring the transaction, and untimely information on the status of the transaction. *Id.* at 2:54-58. Companies selling goods internationally also faced time-consuming paper-driven fund transfers, no direct access to funds for the transaction, no universally acceptable manner of transferring funds, a mountain of paperwork to forward, and the need to provide hard copies of commercial invoices to customs officials. *Id.* 12:61-67. This complex and antiquated system not only created layers and layers of unnecessary transactional cost,[3] but served as a significant obstacle for individuals and small businesses to conduct international trade. The antiquated system required the assistance of international trade experts with specialized knowledge of the process to participate in international trade in a meaningful way. With BOES, such obstacles are minimized, providing a more level playing field for all international e-commerce participants.

---

that are the subject of this Claim Construction appear in columns 17-18 of the '020 Patent and columns 15-16 of the '364 Patent. Ex. 1, Appendix I; Ex. 2, Table A.
[3] A stark example of the layers and cost involved in a typical international transaction is provided in Appendix I of the '020 Patent and Table A of the '364 Patent.

3

The following diagram illustrates the antiquated conventional process:



The antiquated system was multi-layered and required numerous documents to facilitate the transaction.

 With BOES technology, companies procuring goods and customers purchasing them "can go shopping by computer almost anywhere in the world and be provided with full shipping charges for the delivery of selected goods so that the shipping costs are paid as part of the overall price of the goods selected." Ex. 1, 3: 5-10.  Armed with the agreed upon "real price" of the good purchased, a buyer is able to negotiate the transaction, knowing the exact cost of taking ownership of the good at a designated location.  With electronic evidence of ownership, a

product is able to move through the necessary channels as it crosses an international border with ease and efficiency.

The following table illustrates the efficiencies allowed by BOES technology:



BOES, through electronic integration of the processes involved on a computer network, allows for a streamlined and more efficient process, one that permits individuals and business to effectively compete in the global marketplace.  BOES lends a key utility to the World Wide Web and to the Internet.

In early 1996, DE Tech had an experimental web site running on the World Wide Web providing this basic functionality.  Mauer Decl.,[4] ¶ 2  DE Tech's web site attracted attention throughout the industry, and especially interested Dell.  During the time periods between 1997 and 2000, Dell accessed at least 36 page views on the site.  *Id*., ¶ 4.  During a one-month period

---

[4] Declaration of Doug Mauer, filed herewith.

in 1998, Dell viewed at least 23 pages of the site.  During one visit in 1998, a Dell employee viewed 13 pages.  *Id*., ¶ 5.  Today, Dell is an example of an international company who has captured the true benefit of the global marketplace that the Internet allows, utilizing BOES technology to both procure and sell its wares around the world.

### C.    The Patents

Both patents stem from a common provisional application,[5] filed on December 30, 1996.  Exs. 1 and 2.  The '020 Patent issued on October 1, 2002, after nearly seven years of rigorous examination by the United States Patent Office ("PTO").  Ex. 1.  Claim 1 of the '020 Patent is the first independent claim[6] of the '020 patent, demarcating the scope of one of the inventions described in the claims of the patent.  The claim, in table form (with a summary on the left) is provided below.  The words in the claim that DE Tech asks the Court to construe, common to the remaining claims at issue, are underlined and highlighted.

| A PROCESS | A computer implemented process for carrying out an international commercial transaction comprising: |
|---|---|
| INTEGRATING | running a <mark>transaction program</mark> on a computer system so as to <mark>integrate</mark> processes including: |
| LANGUAGE SELECTION | (a)    selecting a language from a menu in which to view catalog information on products; |
| CURRENCY SELECTION | (b)    selecting a currency from a menu in which to obtain price information; |
| PRODUCT SELECTION | (c)    selecting a product to be purchased and a destination for shipping such product to be purchased; |

---

[5] A provisional application is an application for patent filed in the USPTO under 35 U.S.C. §111(b).  Such an application provides the means to establish an early effective filing date without having to follow all the formalities required for a non-provisional application.

[6] An "independent claim" is a claim that does not refer to (or incorporate) any other claim of the patent, as contrasted with a "dependent claim," which incorporates the limitations of another claim in the patent.  Ex. 5, p. 23 (Fed. Cir. Prelim. Jury Instruction No. 7.2).  Throughout this brief, DE Tech will refer to pages from the Model Patent Jury Instructions published by the Federal Circuit Bar Association, and will attach copies of the referenced pages.  These Instructions include a summary of many terms used in patent litigation, with the accompanying authority for each definition.  The instructions provide a useful concordance for many aspects of patent law beyond the scope of this brief.

| DATABASE ACCESS FOR | (d) | accessing at least one local or remote database for obtaining |
|---|---|---|
| PRICE | (i) | price information for the product to be purchased; and |
| PRODUCT CODE | (ii) | a product code for an international ==goods classification system== pertinent to such product; and |
| SHIPPING INFORMATION | (iii) | international shipping information related to an origination point of such product and said destination; |
| COST TO MOVE | (e) | calculating costs involved in moving such product to said destination based upon said destination and such product; |
| TOTAL COST | (f) | determining a ==total cost of the transaction== that includes a price of the product; |
| ORDER AND CREDIT CHECK | (g) | receiving an order for such product thereby triggering an electronic process for confirming existence of available funds; and |
| ELECTRONIC RECORD | (h) | upon confirmation of availability of said funds, accepting said order, generating an electronic record, such record including the content of a ==commercial invoice==, to facilitate passage of such product to said destination. |

Ex. 1, 17:2-33.  The '364 Patent issued on January 18, 2005, after a similarly rigorous review, with claims broader than the claims allowed in the '020 Patent, as illustrated below:

| A PROCESS | A computer implemented process for carrying out an international commercial transaction comprising: | |
|---|---|---|
| INTEGRATING | running a ==transaction program== on a computer system so as to ==integrate== processes including: | |
| ~~LANGUAGE SELECTION~~ | | |
| ~~CURRENCY SELECTION~~ | | |
| RECEIPT OF PRODUCT SELECTION AND DESTINATION | (a) | receiving a selection of a product to be purchased and a destination for shipping such product to be purchased; |
| DATABASE ACCESS FOR | (b) | accessing at least one local or remote database for |
| PRICE | (i) | price information for the product to be purchased; and |
| PRODUCT CODE | (ii) | a product code for an international ==goods classification system== pertinent to such product; and |

7

| SHIPPING INFORMATION | | (iii) international shipping information related to an origination point of such product and said destination; |
|---|---|---|
| COST TO MOVE | (c) | calculating costs involved in moving such product to said destination based upon said destination and such product; |
| ~~TOTAL COST~~ | | |
| ORDER AND CREDIT CHECK | (d) | receiving an order for such product thereby triggering an electronic process for confirming existence of available funds; and |
| ELECTRONIC RECORD | (e) | upon confirmation of availability of said funds, generating an electronic record, such record including the content of a commercial invoice, to facilitate passage of such product to said destination. |

Ex. 2, 15:13-16:2.  Unlike Claim 1 of the '020 Patent, Claim 1 of the '364 Patent does not require language selection, currency selection, or the step of calculating the total cost, as illustrated above.

The '020 Patent also includes claims that are drafted in accordance with 35 U.S.C. §112 ¶6, commonly known as means-plus-function claims.  Ex. 1, 18:10-61 (Claims 13-17).  Means-plus-function claims are permitted so that a patentee may express a claim limitation by reciting a function to be performed, rather than reciting specific structure for performing that function.  35 U.S.C. § 112, ¶6.  If the word "means" appears in a claim element in association with a function, it is presumed that § 112, ¶6 applies.  *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999).  A means-plus-function limitation encompasses all structure in the specification corresponding to that element and equivalent structures.  35 U.S.C. § 112, ¶6; *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).[7]

The Federal Circuit Bar Association's Model Jury Instructions provide a common and useful example of how means-plus -function claims work:

---

[7] By incorporating equivalents of disclosed structures into the literal scope of a functional claim limitation, a means-plus-function limitation protects a patentee's property rights by not allowing infringers to escape liability for slight, but insubstantial improvements to the invention.  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1310 (Fed. Cir. 1998).

> Some patent claim limitations may describe a "means" for performing a function, rather than describing the structure that performs the function. For example, let's say that a patent describes a table in which the legs are glued to the tabletop. One way to claim the table is to recite the tabletop, four legs and glue between the legs and the tabletop. Another way to claim the table is to recite the tabletop and the legs, but, rather than recite the glue, recite a "means for securing the legs to the tabletop". This second type of claim limitation is called a "means-plus- function" limitation. It describes a means for performing the function of securing the legs to the tabletop, rather than expressly reciting the glue.

Ex. 6, p. 25.  When a mean-plus-language limitation is involved, the literal scope of the claim is expanded to include the structure described in the patent specification[8] for performing the function stated in the claim, and also any structure that is equivalent to the described structures. Ex. 6, p. 25  Using the table example, the claim would cover a table using glue to secure the legs to the tabletop, but also any equivalent structure that performs the function of securing the legs to the tabletop.  *Id.*

By way of example, Claim 13 of the '020 Patent has several limitations drafted in means-plus-function format, which require construction by the Court in this matter. Ex. 1, 18:10-61. One means-plus-function limitation in Claim 13 is described as a "means for running a transaction program so as to integrate components including:"  *Id.*, 18:14-15.  Dell and DE Tech agree that this is a mean-function limitation, governed by 35 U.S.C. §112 ¶16.  Using the table metaphor, in this claim, the table is a transaction program (or more than one such program) that integrates components of the claimed computer system.  The glue is structure identified in the specification that allows the transaction program to run.  Thus, as explained in more detail below, the structure necessary to run a transaction program "so as to" integrate components of the computer system is "a computer network," described in the specification as "the World Wide Web or private networks."  Ex. 1, 3:60-4:1.  DE Tech's property rights extend to equivalents of such networks by operation of 35 U.S.C. §112 ¶ 6.

---

[8] The "Specification" is a common way to refer to the portion of the printed patent beginning with the abstract, and ending with the numbered claims, which appear at the end of the patent.  Ex. 7, p. 5.  (Fed. Cir. Prelim. Jury Instruction  No. 2.3).

The terms underlined and shaded in the tables on pages 10-12 of this brief are the terms that DE Tech has identified for construction, not including the means-plus-function limitations. Construction of these five central terms will also lend understanding to the means-plus-function limitations that are proposed for construction by DE Tech, as the terms are repeated in the means-plus-function limitations. In the remaining body of this memorandum, DE Tech explains the legal authority and analysis that supports its construction of these central claim limitations, followed by an analysis of DE Tech's proposed construction of the means-plus-function limitations.

## III.   CLAIM TERMS PROPOSED FOR CONSTRUCTION AND THEIR DEFINITIONS

The '020 and '364 Patents are grants to DE Tech of the exclusive right, for a limited time, to exclude Dell from making, using, selling or offering to sell the claimed invention throughout the United States. 35 U.S.C. § 154. This property right is derived from the United States Constitution itself. *See* Article I, § 8, cl. 8. The inventors of both patents fully realized and solved the problems inherent in the antiquated international transaction system, and did not need to employ esoteric terms to fully and completely describe their invention. Consequently, as explained in this section, five central claim terms of DE Tech's patents need only be attributed their ordinary and customary meaning to adequately demarcate DE Tech's invention:

1.   **Transaction Program**: Instructions that can be executed by a computer system to facilitate an international sale or purchase.

2.   **Integrate:** To combine different processes or components into a functional system.

3.   **Goods Classification System:** a system for grouping products based on common attributes used for import or export purposes such as without limitation the Harmonized Tariff System (HTS).

4.   **Total cost of the Transaction That Includes a Price of the Product:** the entire price paid by the buyer for obtaining the selected product at the selected destination.

5.   **Commercial Invoice:** a document that defines the basic terms of an international transaction including at least the description and total value of the goods.

These terms are straightforward, and DE Tech's proposed construction of each is not complicated. Dell, in contrast, has identified no less than 15 different clauses and phrases (not including the means-plus-function limitations) that it contends need construction by the Court. Ex. 8. No doubt, Dell's complicated and often irrational view of the simple scope of DE Tech's invention is influenced by the non-infringement and invalidity defenses it has yet to disclose[9] to DE Tech. Regardless, the law of claim construction is clear. A summary follows.

### A.   The Law of Claim Construction

### 1.   Claim Terms Are Presumed To Mean What They Say

The Federal Circuit has long directed courts to presume that claim terms mean what they say. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). The Federal Circuit indulges a "heavy presumption" that a claim term carries its "ordinary and customary meaning." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citing *CCS Fitness,* 288 F.3d at 1366). Ordinary and customary meaning must be determined from the standpoint of a person of ordinary skill in the art. *Teleflex*, 299 F.3d at 1325; *Rexnord*, 274 F.3d at 1342.

To overcome the presumption, a party must demonstrate that the patentee intended to "deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using <u>words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope</u>." *Teleflex*, 299 F.3d at 1327 (emphasis added). Thus, for the vast majority of claim terms, claim construction begins – and ends – with the "ordinary and customary meaning" to one of ordinary skill in the art. *Id.* at

---

[9] Because Dell has stubbornly refused to disclose the factual basis for its invalidity contentions in particular, DE Tech reserves the right to amend or supplement its construction contentions if such art is disclosed, and if such art has an effect on the proper construction of the claims at issue. Indeed, one tenet of claim construction doctrine is that claims should be construed to preserve their validity, where possible. *See, e.g., Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed. Cir. 1990). Full disclosure of any art or contentions relating to that art would certainly be necessary for the parties and the Court to fully comply with this tenet.

1325.  Construction of the claims at issue here should also begin and end with the determination of what one of ordinary skill in the art would have understood the claims to mean.

>       **2.      The Court Must Look To The Specification Or The Prosecution History To Confirm The Ordinary Meaning Of A Claim Term**

To the extent a particular term is actually disputed, the next step is "confirmatory" in nature, allowing a court to examine the patent specification or the prosecution history to confirm that the patentee's use of the disputed term is consistent with its plain and ordinary meaning. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342-43 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

>                  **a.      The Specification**

When looking to the specification, an accused infringer cannot overcome the heavy presumption that a claim term carries its ordinary and customary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history."  *CCS Fitness*, 288 F.3d at 1366 (citation omitted).  Instead, an accused infringer must show that the patentee acted as his own lexicographer by clearly setting forth a definition of a claim term in the specification that is contrary to its ordinary meaning.  *Vitronics*, 90 F.3d at 1582; *CCS Fitness*, 288 F.3d at 1366; *Rexnord*, 274 F.3d at 1342.

A patentee may also deviate from ordinary meaning by including in the specification "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex*, 299 F.3d at 1325; *See Scimed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341-44 (Fed. Cir. 2001) (limiting claim term based in part on statements in the specification indicating "all embodiments" of the claimed invention used a particular structure). "[A]bsent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean the scope of the invention is limited to that context."  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004) (citing *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d, 1346, 1355 (Fed. Cir.

2003)).  "Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).  That is, mere inferences drawn from the description of an embodiment of the invention cannot limit the scope of the patent claims. *Johnson Worldwide*, 175 F.3d at 992.  The specification thus is only relevant if it provides clear lexicography or disavowal of the ordinary and customary meaning.  *See Liebel-Flarsheim*, 358 F.3d at 908 (finding no language in the specification that constituted a clear disclaimer).

A patentee is also not required to describe in the specification every conceivable and possible future embodiment of his invention.  *Rexnord*, 274 F.3d at 1344.  Otherwise, there would be no need for claims.  *Id.*  The number of embodiments is not determinative of the meaning of claim terms.  *Teleflex*, 299 F.3d at 1327.  As opposed to every contemplated embodiment, a specification need only include the preferred embodiment of the patentee.  *See* 35 U.S.C. § 112, ¶1 (indicating a patent specification must set forth the "best mode" contemplated by the inventor of carrying out his invention).  Broad claims supported by the specification should not be limited to the preferred embodiment. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir. 2001).

### b.      The Prosecution History

To further confirm the customary and ordinary meaning, the court must consider the prosecution history. *Vitronics*, 90 F.3d at 1582.  The prosecution history contains the record of all the correspondence between the inventor and the PTO.  *Markman*, 52 F.3d at 980.  "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).  The Federal Circuit requires that a surrender based on the prosecution history be "clear and unmistakable." *Omega Eng'g*, 334 F.3d at 1325-26; *Anchor Wall Sys. v. Rockwood*

*Retaining Walls, Inc.*, 340 F.3d 1298, 1307 (Fed. Cir. 2003) (citing *Omega*).   Ambiguous prosecution statements are not limiting.  *Omega Eng'g*, 334 F.3d. at 1324.

**c.     Extrinsic Evidence Is Normally Not Relevant To Claim Construction**

Reliance on extrinsic evidence (e.g., expert testimony,[10] inventor testimony and treatises) is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence.  *Vitronics*, 90 F.3d at 1583-85 (finding extrinsic evidence was improperly relied upon to contradict the manifest meaning of the claims).   "Such instances will rarely, if ever, occur."  *Id.* at 1585.  In most circumstances, an analysis of the intrinsic evidence alone will resolve any ambiguity.  *Id.* at 1583.   Extrinsic evidence cannot be relied upon to vary or contradict the clear meaning of claim terms.  *Markman*, 52 F.3d at 981.[11]  The public is entitled to rely upon intrinsic evidence – the public record – in ascertaining the scope of a patentee's claimed invention.  *Vitronics*, 90 F.3d at 1583.  Allowing extrinsic evidence to alter the public record would make that right meaningless.  *Id.*

Though dictionaries are technically extrinsic evidence, courts are free to consult dictionaries to determining the ordinary and customary meanings of terms "so long as the dictionary definition does not contradict any definition found or ascertained by a reading of the patent documents."[12]  *Vitronics*, 90 F.3d at 1584 n.6.  If multiple dictionary definitions are

---

[10] The Federal Circuit has warned that opinion testimony on claim construction should be treated with the utmost caution. *Vitronics*, 90 F.3d at 1585.  *See CCS Fitness*, 288 F.3d at 1368 (finding the battle between expert testimony and inventor testimony as "inconclusive.").  Though DE Tech does not need expert testimony – or other extrinsic evidence for that matter – to support its proposed claim constructions, DE Tech reserves the right to offer expert testimony to rebut any expert testimony offered by Dell on claim construction.

[11] Courts may review extrinsic evidence to assist them in understanding technology from the perspective of those skilled in the art.  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).  Accordingly, DE Tech offers to present a technical tutorial on the patented technology at the *Markman* hearing before the parties argue their proposed claim constructions.

[12] The precise role of dictionaries in claim construction is an open issue that the Federal Circuit recently decided to consider *en banc*.  *See Phillips v. AWH Corp.*, 376 F.3d 1382 (Fed. Cir. 2004).  One Federal Circuit panel has expressed in *dicta* that dictionary definitions do not trump the intrinsic record.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (finding the proffered dictionary definitions were largely unhelpful).  *See Astrazeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1338 n.3 (Fed. Cir. 2004) (noting resolution of the issue may be approaching).  This open issue is not an impediment to claim construction in this case given the scope of the primary terms in the asserted claims do not turn on dictionary definitions.

14

consistent with the intrinsic evidence, the claim term must be construed to encompass all such meanings. *Texas Digital*, 308 F.3d at 1203; *Brookhill-Wilk*, 334 F.3d at 1300.

> **B.    Transaction Program** means "instructions that can be executed by a computer system to facilitate an international sale or purchase."

The term "transaction program" should be assigned its ordinary and customary meaning, because the intrinsic evidence does not contain a clear definition or disavowal of the term.[13]  *See Liebel-Flarsheim*, 358 F.3d at 909.  "Transact" is to "carry on or conduct (business, negotiations, activities, etc.) to a conclusion or settlement."  Ex. 9 (RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 2008 (2d ed. 1987)).  "Transaction" is "an instance or process of transacting something."  *Id.*  In the context of the DE Tech Patents, the ordinary and customary activity or transaction conducted is an international sale or purchase.[14]  The term "program" is synonymous with "software."  Ex. 10 (MICROSOFT PRESS COMPUTER DICTIONARY 319 (2d ed. 1994)).  "Software" is defined as "instructions that cause the hardware – the machines – to do work."  *Id.* at 365.  This definition is consistent with the recitation in Claim 1 of both DE Tech Patents that the "transaction program" is run on a computer system (the hardware) in a manner that integrates other processes (the work).  Ex. 1, 17:2-3; Ex. 2, 15:13-16.   The ordinary and customary meaning of a "transaction program" is thus instructions that can be executed by a computer system to facilitate an international sale or purchase.  *See Rexnord*, 274 F.3d at 1344 (using a dictionary definition to define the ordinary meaning of a claim term).

Dell's proposed construction seeks to limit the "transaction program" to a single program, which reads limitations into the claim language that do not exist.  Claim 1 of the '020 Patent, with the additional words urged by Dell, would read as follows (with added terms underlined, deleted terms in strike-through):

---

[13] The prosecution history is completely silent on the ordinary and customary meaning of a "transaction program."

[14] "[I]t is one object of the present invention to consolidate all the disparate components of an <u>international sale</u> . . ."  Ex. 1, 2:60-62.  "In particular, the present invention is directed to the <u>facilitation</u> of international purchasing of goods over the internet/intranet, addressing all aspects of such transactions."  Ex. 1, 1:10-12.  "Yet another object of the present invention is to provide a transaction system whereby a buyer can go shopping by computer almost anywhere in the world to <u>facilitate</u> direct consumer sales or business to business sales."  Ex. 1, 3:28-31.

**[Dell's Proposed]**

**Claim 1**:        A computer implemented process for carrying out an international commercial transaction comprising:

running a ~~transaction~~ single computer program on a computer system so as to integrate such single computer program with the following processes including:

Ex. 8 (Dell's Preliminary Claim Constructions).  Dell's construction violates a central tenet of claim construction.  The description of an embodiment of the invention cannot limit the scope of the patent claims.  *Johnson Worldwide*, 175 F.3d at 992.  Here, the specification of both patents does not clearly disavow the use of multiple transaction programs to operate the system claimed. Instead, <u>one</u> of the objects of the invention recited in the specification indicates that "one program" can be used in one embodiment of the invention.[15]  This description of one embodiment is not a claim limitation.  Indeed, the patentee explicitly so advised the public (including Dell) in the specification that:

> Although a number of embodiments of the present invention have been disclosed by way of example, the present invention is not to be limited thereby. Rather, the present invention should be interpreted as including all variations, permutations, adaptations, configurations that would occur to one skilled in this art who has been taught the present invention as construed only by the following claims.

Ex. 1, 13:3-9; Ex. 2, 15:5-11.  The use of 'transaction program' interchangeably with "transaction system" throughout the specification also shows that the invention encompasses one or more transaction programs.  See, e.g., Ex. 1, 3:4-4: 2.  Dell's importation of "a single program" from the specification is explicitly prohibited by Federal Circuit, and should not be allowed here.

Dell's position also asks the Court to depart from clear precedent that the "claims mean what they say."  *Johnson Worldwide*, 175 F.3d at 989.  In "patent parlance," what a claim says sometimes warrants some explanation.  In Claim 1 of both the '020 and '394 Patents, the term

---

[15] "Therefore, it is one object of the present invention to consolidate all disparate components of an international sale into <u>one program</u> whereby a buyer can go shopping by computer almost anywhere in the world."  Ex. 1, 2:60-63.

16

"transaction program" does not exist in a vacuum.  Instead, it follows a preamble[16] that

concludes with the word "comprising," followed by the indefinite article "a" that introduces

"transaction program," one of the two subjects of the claim sentence.  Claim 1 from both the '020

and '364 Patents reads as follows:

> **'020 Claim 1**:  A computer implemented process for carrying out an international
> commercial transaction **comprising**:
>
> running **a** transaction program on a computer system so as to integrate processes
> including . . .
>
> **'364 Claim 1:** A computerized process for carrying out an international transaction
> **comprising**:
>
> running **a** transaction program on a computer system so as to integrate processes
> including . . .

Ex. 1, 17:2-3; Ex. 2, 15:13-16.  The claims were drafted and allowed as open-ended claims,

meaning that both subjects of the sentence--"transaction program" and "computer system"--do

not carry a numerical limitation.  The Federal Circuit has "repeatedly emphasized that an

indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended

claims containing the transitional phrase 'comprising.'"  *KCJ Corp. v. Kineic Concepts, Inc.*, 223

F.3d 1351, 1356 (Fed. Cir. 2000).   Where a claim of this nature does not specify the number of

elements disclosed (as with claim 1 of the '020 and '364 Patents) "the article 'a' or 'an' receives a

singular interpretation only in rare circumstances when the patentee evinces a clear intent to so

limit the article."  *Id.*(emphasis added).  There is no such evidence here.  Limiting "transaction

program" in such a manner contradicts the plain language of the claims, which does not limit the

transaction program to a single program.

---

[16] The "preamble" of a claim sentence is the clause that introduces the limitations that follow.  For Claim 1 of the '020 patent, the preamble is "A computer implemented process for carrying out an international commercial transaction comprising:" Ex. 1, 17:2-3; Ex. 2, 15:13-16.

17

**C.** **Integrate** means "to combine different processes or components into a functional system."

There is also no indication in the intrinsic evidence that DE Tech clearly disclaimed the ordinary and customary meaning of "integrate," or acted as its own lexicographer in giving the term another meaning.   For example, DE Tech's characterization of the claims during prosecution of the '020 Patent as involving an "integrated computerized approach to conducting international trade transactions" is consistent with the ordinary and customary meaning of "integrate." Ex. 19, p. 14.

In the context of computers, "integration" is the "combining of different activities, programs, or hardware components into a functional unit."   Ex. 10 (MICROSOFT PRESS COMPUTER DICTIONARY 216 (2d ed. 1994)).  Within the asserted claims, the term "integrate" is used with respect to processes and components.[17]  The "unit" resulting from the integration is a system for facilitating a transaction.[18]  Thus, the ordinary and customary meaning of "integrate" is "to combine different processes or components into a functional system."

**D.** **Goods Classification System** means "a system for grouping products based on common attributes used for import or export purposes such as without limitation the Harmonized Tariff System (HTS)."

Again, the intrinsic evidence provides no indication that the applicant assigned any meaning to "good classification system" other than its ordinary and customary meaning to one skilled in the art.   "Classification" is defined as the "act of classifying."  RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 381 (2d ed. 1987).  "Classify" is defined as "to arrange or organize by classes."  *Id.*  A "class" is defined as a "number of persons or things regarded as forming a group by reason of common attributes . . . ." [19]  *Id.*  In the DE Tech Patents, common

---

[17] *See* Ex. 1, 17:4-5 (referring to processes); 18:14-15 (referring to components).  *See also* Ex. 2, 15:15-16 (referring to processes).

[18] "The system integrates all of the aforementioned databases . . . ." Ex. 1, 4:26-27.  *See* Ex. 1, 13:11-15 (referring to "INTEGRATED EXPORT TRANSACTION" and "INTEGRATED IMPORT TRANSACTION").

[19] The omitted language consists of "characteristics, qualities or traits" which are synonymous with attributes.

attributes are used for import/export purposes.[20]   The intrinsic evidence shows that the Harmonized Tariff System (HTS) is an example of a "goods classification system."[21]   For example, the specification refers to "Harmonized Tariff Schedules or import country specific schedules" with respect to a commodity description allowing for assessment of taxes and fees.[22] Similarly, the specification expressly teaches the use of "commodity codes different from those of the harmonized tables."[23]   Thus, the ordinary and customary meaning of a "goods classification system" is "a system for grouping products based on common attributes used for import or export purposes such as (but not limited to) the Harmonized Tariff System (HTS)."

> **E.**   **Total cost of the transaction that includes a price of the product** means "the entire price paid by the buyer for obtaining the selected product at the selected destination."

The construction of this phrase begins with defining "total," which means "constituting or comprising the whole."  Ex. 9 (RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 2000 (2d ed. 1987)).  As discussed above, in the context of the DE Tech Patents, the ordinary and customary activity or transaction conducted is an international sale or purchase.  Claim 1 recites that the "total cost of the transaction" includes a price of the product.[24]  Because the price of the product is a cost paid by a buyer, the total cost of the transaction is also a cost paid by the buyer. Because there are various common meanings for a "total cost of the transaction," one must look to the intrinsic evidence for the correct meaning to apply.  *See Texas Digital*, 308 F.3d at 1203 (noting intrinsic evidence tends to point away from improper meanings).

---

[20] Ex. 1, 4:1-11; 6:55-60; 11:1-4.
[21] An inventor declaration submitted to the PTO described a commercialized embodiment using an HTS-based code: "[T]he last six digits reflect a Harmonized Tariff Schedule (HTS) or *international goods classification system* for the item."  Ex. 11, Second Supplemental Declaration of Ed Pool of April 11, 2002, ¶7, at 3.  In addition, "Harmonized Tariff Schedules" are referenced in Appendix I describing an illustrative international transaction.  *See* Ex. 1, 13:54; 14:2.
[22] *See* Ex. 1, 13:66-14:5.
[23] *See* Ex. 1, 6:61-62.
[24] Ex. 1, 17:24-25.

In step 134, the specification teaches that all costs are calculated to provide a "total cost" to obtain the selected product at the selected destination.[25]  The specification treats "real price" and "full cost" in the same fashion, confirming the exact meaning of "total cost."[26]  "Total cost of the transaction" thus means the entire price paid by the buyer for obtaining the selected product at the selected destination.

> **F.     Commercial Invoice** means "a document that defines the basic terms of an international transaction including at least the description and total value of the goods."

"Commercial invoice" is a term of art in international trade.  As explained to the PTO during the prosecution of the '020 Patent, a "commercial invoice" is a "bill for the goods from the seller to the buyer . . . used by governments to control imports [and exports]."[27]  "These invoices are often used by governments to determine the true value of goods when assessing custom duties."[28]  A commercial invoice can take a variety of shapes and forms.   Those skilled in the art understand that the description and value of the goods are used by customs for import and export purposes.   The sample commercial invoice that DE Tech submitted to the PTO is but one example.[29]  Varied use of a term in the art demonstrates the breadth of the term.  *See Johnson Worldwide*, 175 F.3d at 991 (noting the same for terms in the specification). The glossary from the trade treatise that DE Tech submitted to the PTO (Ex. 13), the sample invoice from the same treatise (Ex. 14), as well as various other commercial invoices (Ex. 15),[30] show varied uses of "commercial invoice" in the art.   The term "commercial invoice" is therefore properly construed as "a document that defines the basic terms of international transaction including at least the description and total value of the products."

---

[25] Ex. 1, 10:31-35.
[26] *See* Ex. 1, 7:6-11 (referring to a price to deliver selected products to a specified point); 9:1-6 (relating "full cost" to a foreign transaction).
[27] *See* Ex. 12, Declaration of Ed Pool of April 18, 2001, at ¶8.
[28] Ex. 13, A Basic Guide to Exporting, at www.unzo.com/basicguide/c10.html (April 12, 2001), Information Disclosure Statement of Oct. 16, 2001.
[29] *See Id.*, Ex. 14.  DET05302-5303.
[30] The sample invoices, attached as Exhibit 15 to the Declaration of Christopher J. Sorenson, are only offered to confirm that the intrinsic evidence accurately reflects the ordinary and customary meaning of "commercial invoice."

20

## IV.   MEANS-PLUS-FUNCTION CLAIMS PROPOSED FOR CONSTRUCTION AND THEIR DEFINITIONS

The remaining claims in need of construction are means-plus-function limitations found in the '020 Patent.  Construction of means-plus-function claims is relatively straightforward, and involves two distinct steps.  The first step is to identify the recited function of the limitation. *Micro Chem.*, 194 F.3d at 1258.  The statute does not permit adoption of a function different from that explicitly recited in the claim.  *Id.*; *Generation II Orthotics, Inc. v. Med. Tech., Inc.*, 263 F.3d 1356, 1364-65 (Fed. Cir. 2001) ("When construing the functional statement in a means-plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim.").  The second step is to identify the corresponding structure in the specification that is necessary to perform that function. *Id.*

The statute does not permit incorporation of structure from the specification beyond that necessary to perform the claimed function. *Id.*  Structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.  *B. Braun Med. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).  The duty to link or associate structure to function is the *quid pro quo* for the convenience of employing a means-plus-function limitation.  When multiple embodiments in the specification correspond to the claimed function, the proper application of the statute is to read the claim element to embrace each of those embodiments.  *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997); *Micro Chem.*, 194 F.3d at 1258 (citing *Serrano*).

As shown below, the corresponding structures for the asserted means-plus-function clauses overall consist of a computer network, a computer program, a menu and one or more databases.

21

**A.**     **Means for running a transaction program so as to integrate components:** this is a means-plus-function limitation.  The recited function is running a transaction program in a manner that integrates components including means-plus-function limitations (a)-(g).  The corresponding structure is a <u>computer network or its equivalent</u>.

Claim 13 recites a "means for running a transaction program so as to integrate components."  The function of this clause is the operation of a transaction program in a manner that integrates the components listed in the body of the claim.  The specification associates operation of the transaction program with a computer network through references to "internet web site or private site,"[31] "World Wide Web or private networks,[32] "internet using computer by computer communications,"[33] "shopping by computer"[34] and "network of computers."[35]  The specification thereby reflects that the structure necessary for the operation of a transaction program is not limited to a particular type of computer network, but includes equivalents of a computer network.  *See Serrano*, 111 F.3d at 1583 (holding a means-plus-function clause must be read to encompass each corresponding embodiment).

**B.**     **Means for determining a language in which to view catalogue information on products:**  this is a means-plus-function limitation.  The recited function is determining a language in which to view catalogue information on a product.  The corresponding structure is a <u>computer program or its equivalent and (1) a database or its equivalent or (2) a menu or its equivalent</u>.

Claim 13, element (a) provides the first component that is integrated by the transaction program, the language determination step.  The element recites a "means for determining a language in which to view catalogue information on products."  Ex. 1, 18:16-17.  The function identified is the determination of a language in which to view catalogue information on a product.  The structure identified in the specification necessary to perform this function is a computer program and a database or a computer program and a menu.[36]

---

[31] Ex. 1, 3:37-43.
[32] Ex. 1, 3:60-4:1.
[33] Ex. 1, 3:38-41.
[34] Ex. 1, 2:60-63; 3:1-31.
[35] Ex. 1, 18:10-11.
[36] Ex. 1, 3:43-44; 4:3-4, 47-54; 12:46-52.

    **C.**      **Means for determining a currency in which to obtain price information:** this is a means-plus-function limitation. The recited function is determining a currency in which to obtain price information. The corresponding structure is <u>(1) a computer program or its equivalent and a database or its equivalent, or (2) a</u> <u>computer program or its equivalent adapted to receive a language, country, or</u> <u>currency choice or its equivalent.</u>

Claim 13, element (b) is the next component that is integrated by the transaction program -- the currency determination step. The element identifies the function of "determining a currency in which to obtain price information." The specification, in turn discloses two alternative structures to perform this function. The first is a computer program or its equivalent and a database[37] or its equivalent. The second is a computer program or its equivalent adapted to receive a language, country, or currency choice or its equivalent.[38]

    **D.**      **Means for receiving a selection of a product to be purchased . . . and a destination for shipping such product to be purchased:** this is a means-plus-function limitation. The recited function is receiving a selection of a product to be purchased and a destination for shipping such product to be purchased. The corresponding structure is a <u>computer program or its equivalent.</u>

A further integrated component recited is claim 13, element (c), a "means for receiving a selection of a product to be purchased  . . . and a destination for shipping such product to be purchased." (cite)(text added during patent printing omitted). The function of this element is the receipt of a selection of the product and a shipping destination. The specification teaches that a customer selects a product in step 108 and selects a destination for the product in step 126.[39] Given the transaction program controls the website accessed by the customer for these selections in the disclosed embodiment,[40] a computer program is the necessary structure to receive these selections.

---

[37] Ex. 1, 4:1-6 (identifying a "currency information database." ).
[38] Ex. 1, 4:33-36 (language choice); 5:12-16 (country choice); 5:58-63 (currency choice); 6:30-32 (currency choice); Fig. 1A (step 112).
[39] Ex. 1, 5:34-36; 7:28-30.
[40] Ex. 1, 3:41-49.

23

Dell suggests the duplicate language "product to be purchased" is a fatal ambiguity that precludes those skilled in the art from understanding what is claimed.  The clause "product to be purchased," was not in the text of the claim element allowed by the examiner, however.  Ex. 16, p. 4.  In the final amendment to the claims, filed on February 13, 2002, the element that was ultimately allowed read as follows:

> (c)    means for receiving a selection of a product to be purchased and a
>        destination for shipping such product to be purchased

Ex. 16, p. 4.  The additional clause "and product to be purchased" was added by the patent office during publication.  District Courts have the authority to correct such an error retroactively where the error is evident from the face of the patent.  *Group One v. Hallmark Cards, Inc.*, No. 04-1296, -1297, 2005 U.S. App. LEXIS 8613, at \*10 (Fed. Cir. May 16, 2005) (attached hereto for the Court's convenience as Ex. 17).  An error is "evident on the face of the patent" where: 1) the proposed correction is not subject to reasonable debate based on consideration of the claim language and the specification; and 2) the prosecution history does not suggest a different interpretation of the claim.  *Id.* (citing *Novo Indus., L. P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

The facts before the Court present the exact situation where a Court is allowed to retroactively correct such an error.  The Federal Circuit has recently confirmed that "[a]bsent evidence of culpability or intent to deceive by delaying formal correction, a patent should not be invalidated based on an obvious administrative error," and reversed a district court's refusal to correct such an error.  *Hoffer v. Microsoft Corp.*, No. 04-1103, 2005 U.S App. LEXIS 6965, at \*11 (Fed. Cir. April 22, 2005) (attached hereto for the Court's convenience as Ex. 18).  In *Hoffer*, an error in the manner that the claims in a patent were numbered gave rise to an "indefiniteness" invalidity challenge by the accused infringer, since one claim depended from another that was not in the patent.  *Id.* at \*10.  A certificate of correction was filed and issued by the Patent Office after the litigation began, but the district court declined to accept the correction, "deeming it

24

tardily made," and stating "it was powerless to correct the error." *Id.* The district court held the claim at issue to be invalid. *Id.* The Federal Circuit did not agree, holding that "[w]hen a harmless error in a patent is not subject to reasonable debate, it can be corrected by the court, as for other legal documents." *Id. at * 11.*

Here, like in *Hoffer,* the addition of the clause "product to be purchased" was an error clear on the face of the patent. Indeed, Dell correctly noted, from its review of the patent, that there is no structure in the specification that would allow the function of physically "receiving...a product to be purchased" to be performed. Ex. 18. There is no discussion or disclosure of any structure necessary to receive an actual physical product to be purchased, and one of ordinary skill in the art would recognize this fact. *See Personalized Media Communications, Inc. v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) (explaining the issue is whether those skilled in the art would understand what is claimed when the claims are read in light of the specification). The printing error is, therefore, clear on its face. Further, review of the prosecution history confirms that the "product to be purchased" clause was a printing error by the USPTO. Ex. 16, p. 4. There was no claim submitted for consideration with the "product to be purchased" clause included, and thus no consideration by either the examiner of the applicant of the clause.

The clause "and product to be purchased" should therefore be omitted from the text of the claim language, and not considered by the Court in deriving its construction of limitation 13(c).

**E.     Means for accessing at least one local or remote database for (i) price information for the product to be purchased; (ii) a product code for an international goods classification system pertinent to such product; and (iii) international shipping information related to an origination point of such product and said destination:** this is a means-plus-function limitation. The recited function is accessing at least one local or remote database for (i) price information for the product to be purchased; (ii) a product code for an international goods classification system pertinent to such product; and (iii) international shipping information related to an origination point of such product and said destination. The corresponding structure is a <u>computer program or its equivalent adapted to perform the recited function.</u>

25

Claim 13, element (d) recites a "means for accessing at least one local or remote database for (i) price information for the product to be purchased; [and] (ii) a product code for an international goods classification system pertinent to such product; and (iii) international shipping information related to an origination point of such product and said destination."  The stated function is accessing at least one local or remote database to obtain a price, product code, and shipping information that is the subject of the purchase.  The specification associates the transaction program or system with accessing the recited databases.[41]   Thus, the essential structure for performing the function is a computer program adapted to perform the recited function.

       **F.**     **Means for calculating costs involved in moving such product to said destination based upon said destination and such product:** this is a means-plus-function limitation.  The recited function is calculating costs involved in moving such product to said destination based upon said destination and such product.  The corresponding structure is a <u>computer program or its equivalent</u>.

Claim 13, element (e) recites a further integrated component:  "means for calculating costs involved in moving such product to said destination based upon said destination and such product."  The function is to calculate costs involved in moving the selected product to its destination based on the destination and the product selected.  The structure recited that is necessary for performing the function of calculating such costs is, simply, a computer program.[42]

       **G.**     **Means for receiving an order for such product thereby triggering an electronic process for confirming existence of available funds:** this is a means-plus-function limitation.  The recited function is receiving an order for such product thereby triggering an electronic process for confirming existence of available funds.  The corresponding structure is a <u>computer program run on a network computer or an equivalent of the program</u>.

---

[41] Ex. 1, 3:66-4:1 (transaction program controls access with databases); 4:1-15 (transaction program interacts with databases); 4:23-26 (communication links between transaction program, customer and databases).
[42] Ex. 1, 8:30-33, 45-50.  Each step labeled in Fig. 1A as "select" is a step performed by the customer.  The remaining steps in Figs. 1A-1B are performed by the transaction program in the disclosed embodiments.  Step 134 for calculation costs is one such step.

Claim 13, element (f) is the funds verification step.  The limitation recites a "means for receiving an order for such product thereby triggering an electronic process for confirming existence of available funds."  The function identified is "receiving an order for such product thereby triggering an electronic process for confirming existence of available funds."  The corresponding structure is a computer program.[43]

H.  **Means for generating an electronic record, such record including the content of a commercial invoice, to facilitate passage of such product to said destination:** this is a means-plus-function limitation.  The recited function is generating an electronic record, such record including the content of a commercial invoice, to facilitate passage of the product to its destination.  The corresponding structure is a <u>computer program or its equivalent that performs the recited function</u>.

Element (g) of Claim 13 recites a "means for generating an electronic record, such record including the content of a commercial invoice, to facilitate passage of such product to said destination."  The electronic record is generated in step 165 by the transaction program or system.[44]  The structure, therefore, is a computer program or its equivalent that is adapted to perform the function of generating an electronic record, such record including the content of a commercial invoice, to facilitate passage of the product to its destination.

I.  **Means for authorizing electronic payment of expenses required along a selected shipping route:** this is a means-plus-function limitation.  The recited function is authorizing electronic payment of expenses required along a selected shipping route.  The corresponding structure is a <u>computer program or its equivalent</u>.

Claim 14 recites a "means for authorizing electronic payment of expenses required along a selected shipping route."  One example of such expenses is fees to customs.  The specification clearly associates a computer program (e.g., the transaction program) with the recited function.[45]

---

[43] Ex. 1, 9:9-10.
[44] Ex. 1, 10:22-27, 38.
[45] See Ex. 1, 11:36-42 (transaction system and automatic fund transfer); 12:58-61 (ditto); 12:17-22 (agent).

**J.    Means for storing and analyzing data based upon each customer accessing the system to develop a purchasing profile for each customer**: this is a means-plus-function limitation.  The recited function is storing and analyzing data based upon each customer accessing the system to develop a purchasing profile.  The corresponding structure is a <u>computer program or its equivalent adapted to perform the recited analyzing function and a database or its equivalent</u>.

Claim 17 recites a "means for storing and analyzing data based upon each customer accessing the system to develop a purchasing profile for each customer."  In step 140, customer information is used to create a customer profile to be stored in a database.  Because this step is performed by the transaction program, the structure necessary to perform the recited function is a computer program (e.g., the transaction program) and a database.

## V.    CONCLUSION

The DE Tech Patents introduced the world to a frictionless electronic system that integrates and streamlines international transactions.  Dell's construction seeks to rewrite the claims that the patentee sought and the PTO granted.  The Court should adopt DE Tech's proposed construction of the all claims at issue and reject Dell's attempts to engraft spurious limitations onto the claims.

Dated:  May 18, 2005

  s/Matthew P. Pritts
William B. Poff, Esq.
Matthew P. Pritts, Esq.
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1400
Roanoke, VA  24038-4125
Telephone:  (540) 983-7649
Facsimile:  (540) 983-7711

Douglas J. Williams, Esq.
Jon R. Trembath, Esq.
Christopher J. Sorenson, Esq.
Thomas Leach, Esq.
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

George W. Jordan III, Esq.
MERCHANT & GOULD P.C.
133 Peachtree Street, N.E., Suite 4900
Atlanta, Georgia   30303-1821
Telephone:  (404) 954-5100
Facsimile:  (404) 954-5099

Attorneys for Plaintiff
DE TECHNOLOGIES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2005, a true and accurate copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: William R. Rakes, Esq., Gentry Locke Rakes & Moore, LLP, 800 SunTrust Plaza, 10 Franklin Rd. S.E., P.O. Box 40013, Roanoke, Virginia, 24022, and John M. Faust, Esq., Vinson & Elkins, LLP, 1455 Pennsylvania Ave., N.W., Suite 600, Washington, D.C. 20004, and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Willem G. Schuurman, Esq.
Roderick B. Williams, Esq.
H. Kenneth Prol,Esq.
Matt Wermager, Esq.
Christopher V. Ryan, Esq.
VINSON & ELKINS, LLP
The Terrace 7
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568

Michael A. Valek, Esq.
VINSON & ELKINS, LLP
1455 Pennsylvania Ave., N.W., Suite 600
Washington, D.C. 20004

s/ Matthew P. Pritts
William B. Poff (VSB No. 03477)
Matthew P. Pritts (VSB No. 34628)
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1400
Roanoke, VA  24038-4125
Telephone:  (540) 983-7649
Fax:         (540) 983-7711

{#0919411-1, 107799-00001-01}