# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

---

| | | |
|---|---|---|
| _____ | ) | |
| DE TECHNOLOGIES, INC., | ) | |
| | ) | Civil Action No. 7:04-CV-00628 |
| Plaintiff, | ) | |
| | ) | Honorable Glen E. Conrad |
| v. | ) | |
| | ) | |
| DELL INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## REPLY BRIEF OF DE TECHNOLOGIES, INC. IN OPPOSITION TO DELL INC.'S OPENING CLAIM CONSTRUCTION BRIEF

William B. Poff (VSB No. 03477)
Matthew P. Pritts (VSB No. 34628)
WOODS ROGERS PLC
10 Jefferson Street, Suite 1400
Roanoke, VA 24038-4125
Telephone: (540) 983-7649
Fax: (540) 983-7711

Christopher P. Sullivan (*pro hac vice*)
David E. Marder (*pro hac vice*)
Marc N. Henschke (*pro hac vice*)
Jonathan D. Mutch (*pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 Boylston Street, 25th Floor
Boston, MA 02199
Telephone: (617) 267-2300
Fax: (617) 267-8288

Dirk D. Thomas (*pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
1801 K Street N.W., Suite 1200
Washington, DC 20006
Telephone: (202) 775-0725
Fax: (202) 223-8604

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................... iv

I.  PRELIMINARY STATEMENT ........................................................................ 1

II.  ARGUMENT ..................................................................................................... 4

THIS COURT SHOULD REJECT EACH OF DELL'S PROPOSED CLAIM
CONSTRUCTIONS AS CONTRARY TO STANDARD RULES OF CLAIM
INTERPRETATION AND TO THE INTRINSIC EVIDENCE OF RECORD ................ 4

    A.    Dell Has Misconstrued Each Of The Disputed Claim Terms Appearing In
    The Independent Method Claims Of The '020 Patent And/Or The '364
    Patent ....................................................................................................... 4

        1.    "Running A Transaction Program On A Computer System So As
        To Integrate Processes" ['020 Patent, Claim 1; '364 Patent, Claim
        1] ................................................................................................ 4

            a.    Dell Misconstrues The Term "A Transaction Program" As
            Being Limited To "A *Single* Transaction Program" ....................... 5

            b.    Dell Misconstrues The Term "Integrate" As Meaning
            "Controls And Executes" ..................................................... 11

        2.    "Selecting A Language From A Menu" And "Selecting A
        Currency From A Menu" ['020 Patent, Claim 1] ..................................... 18

            a.    Dell Misconstrues The Term "Menu" As Being Limited To
            Lists "Displayed To The User" ...................................................... 19

            b.    Dell Misconstrues The Term "Menu" As Being Limited To
            Lists Of "Language Or Currency Options" ................................. 22

        3.    "An International Goods Classification System" ['020 Patent,
        Claim 1; '364 Patent, Claim 1] ................................................................. 25

        4.    "International Shipping Information" ['020 Patent, Claim 1; '364
        Patent, Claim 1] ....................................................................................... 26

            a.    Dell Improperly Restricts The Term "International
            Shipping Information" To "Information Identifying Each
            Leg Of The Transport Route" ...................................................... 28

b.    Dell Improperly Restricts The Term "International Shipping Information" To "Information Identifying The Costs Associated With Each Leg Of The Transport Route"......... 30

5.    "Calculating Costs Involved In Moving Such Product To Said Destination based Upon Said Destination And Such Product" ['020 Patent, Claim 1; '364 Patent, Claim 1] .................................................... 32

a.    Dell Misconstrues The Term "Calculating" As Being Limited To "Mathematically Determining"................................. 33

b.    Dell Improperly Reads In A Particularized List of Cost Calculations From The Patent Specification.............................. 34

6.    "Determining A Total Cost Of The Transaction That Includes The Price Of The Product" ['020 Patent, Claim 1]......................................... 37

7.    "Upon Confirmation Of Availability Of Said Funds, Accepting Said Order, Generating An Electronic Record" ['020 Patent, Claim 1] .......................................................................................................... 39

a.    Dell Misconstrues The Term "Upon" As Being Limited To "Immediately Following" ............................................ 40

b.    Dell Misconstrues The Claim Language As Requiring That *Only* The Transaction Program Can Accept Orders And Generate Electronic Records......................................................... 42

8.    "Commercial Invoice" ['020 Patent, Claim 1; '364 Patent, Claim 1] .......................................................................................................... 42

a.    Dell Misconstrues The Term "Commercial Invoice" As Requiring Information Responsive To "All Applicable Customs Regulations"................................................................. 44

b.    Dell Improperly Seeks To Read U.S. Import Regulations Into Claim Language Applicable To All International Transactions ..................................................................................... 47

B.    Dell Has Misconstrued Each Of The Additional Disputed Claim Terms Appearing In The Dependent Method Claims Of The '364 Patent ..................... 48

1.    "Moving Said Electronic Record Via EMF Communications Links From Point To Point" ['364 Patent, Claim 2]............................................ 48

2.    "Authorization Data" ['364 Patent, Claim 3] ........................................... 49

3.    "Transfer Of Payment" ['364 Patent, Claim 4] ........................................ 50

C.   Dell Has Misconstrued Each Of The Means-Plus-Function Claim Terms Appearing In The Independent Apparatus Claims Of The '020 Patent ............... 51

    1.   "Means For Running A Transaction Program" ['020 Patent, Claim 13] ................................................................................................ 53

    2.   "Means For Determining A Language Or Currency" ['020 Patent, Claim 13] ................................................................................................ 54

    3.   "Means For Receiving A Selection Of A Product" ['020 Patent, Claim 13] ................................................................................................ 55

    4.   "Means For Accessing At Least One Local Or Remote Database" ['020 Patent, Claim 13] ................................................................... 57

    5.   "Means For Calculating Costs Involved In Moving Such Product" ['020 Patent, Claim 13] ................................................................... 57

    6.   "Means For Receiving An Order" ['020 Patent, Claim 13] .................... 58

    7.   "Upon Confirmation Of Availability Of Funds, Means For Generating An Electronic Record" ['020 Patent, Claim 13] ................... 59

    8.   "Means For Authorizing Electronic Payment Of Expenses Required Along A Selected Shipping Route" ['020 Patent, Claim 14] ................................................................................................ 60

    9.   "Means For Storing And Analyzing Data Based Upon Each Customer Accessing The System" ['020 Patent, Claim 17] .................... 60

III.   CONCLUSION .............................................................................................. 62

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Abtox, Inc. v. Exitron Corp., 122 F.3d 1019 (Fed. Cir. 1997) ....................................... 7

ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082 (Fed. Cir. 2003)................................. 12

Advanced Cardiovascular System, Inc. v. Medtronic, Inc., 265 F.3d 1294 (Fed. Cir. 2001)............................................................................................................................ 37

Altiris, Inc. v. Symantec Corp., 318 F.3d 1363 (Fed. Cir. 2003) ........................ 6, 8, 11

Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298 (Fed. Cir. 2003) .........................................................................................................passim

Atmel Corp. v. Information Storage Device, Inc., 198 F.3d 1374 (Fed. Cir. 1999).............. 52, 61

Beachcombers International, Inc. v. Wilde Wood Creative Products, Inc., 31 F.3d 1154 (Fed. Cir. 1994)................................................................................................. 27

Brown v. 3M, 265 F.3d 1349 (Fed. Cir. 2001) ............................................................. 26

Budde v. Harley-Davidson, Inc., 250 F.3d 1369 (Fed. Cir. 2001) ............................... 61

Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182 (Fed. Cir. 1998) ................ passim

Crystal Semiconductor Corp. v. Tritech Microelectronics, Inc., 246 F.3d 1336 (Fed. Cir. 2001) ................................................................................................................. 7

CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146 (Fed. Cir. 1997) ......................... 18

Davies v. United States, 31 Fed. Cl. 769 (Fed. Cl. Crt. 1994).................................... 54

Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291 (Fed. Cir. 2005).............................................................................................. 54, 61

E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430 (Fed. Cir. 1988) ..............................................................................................................passim

Elkay Manufacturing Co. v. Ebco Manufacturing Co., 192 F.3d 973 (Fed. Cir. 1999) ............. 8, 9

Exxon Research and Engineering Co. v. United States, 265 F.3d 1371 (Fed. Cir. 2001)........... 61

Generation II Orthotics, Inc. v. Medical Technology, Inc., 263 F.3d 1356 (Fed. Cir. 2001)........................................................................................ 51, 53, 57, 59, 60

Group One Ltd. v. Hallmark Cards, Inc., 407 F.3d 1297 (Fed. Cir. 2005).................................. 56

Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575 (Fed Cir. 1996).................... *passim*

Hoffer v. Microsoft Corp., 405 F.3d 1326 (Fed. Cir. 2005) .................................................. 55, 56

Innova/Pure Water v. Safari Water Filtration, 381 F.3d 1111 (Fed. Cir. 2004) ..... 2, 13, 31, 38, 55

In re Prater, 415 F.2d 1393 (CCPA 1969) ................................................................................. 54

KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351 (Fed. Cir. 2000).................................. 5, 6, 8

Kistler Instrumente AG. v. United States, 628 F.2d 1303 (Ct. Cl. 1980).................................... 11

Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898 (Fed. Cir. 2004).......................................... 9

Mars, Inc. v. H.J. Heinz Co., L.P., 377 F.3d 1369 (Fed. Cir. 2004)............................................ 17

McCarthy v. Lehigh Valley R. R. Co., 160 U.S. 110 (1895)........................... 2, 21, 23, 30, 36, 47

Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 194 F.3d 1250 (Fed. Cir. 1999).. *passim*

Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261 (Fed. Cir. 1986)................................... 39

North American Vaccine, Inc. v. American Cyanamid Co., 7 F.3d 1571 (Fed. Cir. 1993) ........... 7

Northrop Gruman Corp. v. Intel Corp., 325 F.3d 1346 (Fed. Cir. 2003) ...................................... 9

Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314 (Fed. Cir. 2003) ................................. 2

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)......................................................*passim*

ResQNet.Com, Inc. v. Lansa, Inc., 346 F.3d 1374 (Fed. Cir. 2003) ........................................... 37

Rexnord Corp. v. Laitram Corp., 274 F.3d. 1336 (Fed. Cir. 2001) ....................................... 13, 18

Rhine v. Casio, Inc., 183 F.3d 1342 (Fed. Cir. 1999)................................................................. 11

Robotic Vision Systems, Inc. v. View Engineering, Inc., 189 F.3d 1370 (Fed. Cir. 1999) ... 20, 23

S3 Inc. v. Nuidia Corp., 259 F.3d 1364 (Fed. Cir. 2001) ........................................................... 61

Salazar v. Procter & Gamble Co., 414 F.3d 1342 (Fed. Cir. 2005)............................................ 17

Scanner Technologies Corp. v. ICOS Vision Systems Corp., N.V., 365 F.2d 1299 (Fed. Cir. 2004).................................................................................................................... 5, 6, 7, 8

Scimed Life Systems v. Cardiovascular, 242 F.3d 1337 (Fed. Cir. 2001) ....... 2, 21, 23, 30, 36, 47

Serrano v. Telular Corp., 111 F.3d 1578 (Fed. Cir. 1997)......................................... 52, 57, 59, 60

SRI Internat. v. Matsushita Electric Corp. Of Amer., 775 F.2d 1107 (Fed. Cir. 1985)................. 1

Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316 (Fed. Cir. 2001) ....................... 27

Vitronics Corp. v. Conceptronics, Inc., 90 F.3d 1576 (Fed. Cir. 1996) ............................... *passim*

Vivid Technologies, Inc. v. American Science & Engineering, Inc., 200 F.3d 795 (Fed. Cir. 1999).................................................................................................... 39

Wenger Mfg., Inc. v. Coating Machines Systems, Inc., 239 F.3d 1225 (Fed. Cir. 2001) ...... 52, 57

Wright Medical Technology, Inc. v. Osteonics Corp., 122 F.3d 1440 (Fed. Cir. 1997) ........ 19, 23


**Miscellaneous Authorities**

19 C.F.R. § 141:86-89.................................................................................................. 47

Robert C. Faber, Landis On Mechanics Of Patent Claim Drafting (5th ed. 2004)........................ 6

Microsoft Computer Dictionary (5th ed. 2002) ................................................. 4, 11, 15

Manual Of Patent Examining Procedure (8th ed. 2004).................................... 17, 53, 54

The American Heritage Dictionary Of The English Language (4th ed. 2000)............................ 33

The Merriam-Webster Dictionary (New ed. 2004)....................................................... 20

**I.**

<u>**PRELIMINARY STATEMENT**</u>

DE Tech hereby submits its Reply Brief in opposition to the Opening Claim Construction Brief ("Dell Br.") that Dell filed with this Court on June 14, 2005.  In addition to the claim elements that DE Tech previously construed in its own Opening Claim Construction Brief ("DE Tech Br."), Dell now has placed numerous additional claim elements at issue, all of which DE Tech comprehensively addresses below.[1]

Dell's opening papers turn any proper approach to claim construction completely on its head.  As a matter of law, claim construction is required to be an objective exercise that takes place separate and apart from the question of whether any particular method or device might later be found to infringe.  As the Federal Circuit has explained, a "claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, and *not* in light of the accused device."  <u>SRI Internat. v. Matsushita Electric Corp. Of Amer.</u>, 775 F.2d 1107, 1118 (Fed. Cir. 1985).  Indeed, it "is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement."  <u>Id.</u> at 1118.  Far from embracing such an objective approach, however, Dell's proposed claim constructions read like a litigation-inspired wish list designed to advance its future non-infringement arguments.  Simply put, Dell's endless attempts to improperly narrow and limit the claim language are in no way linked to the intrinsic record, but rather to its own inside knowledge of how its accused website operates.

Not surprisingly, by departing so drastically from what the law requires, Dell has committed significant and recurring legal errors.  After initial briefing herein was completed, the Federal Circuit handed down its long-awaited *en banc* decision in <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005) which provides the latest word on proper claim construction.  As a

---

[1]  For the convenience of the Court, DE Tech submits concurrently herewith a claim construction chart that allows for a direct side-by-side comparison of the parties' competing interpretations of all claim elements in dispute.  <u>See</u> (Exh. 1 to Declaration Of Marc N. Henschke In Support Of DE Technologies, Inc.'s Claim Construction Reply Brief ("Henschke Decl.")).

review of Phillips shows, Dell has repeatedly violated at least three principal canons of claim construction.

First, Phillips confirms that patent claim language is to be given the "ordinary and customary meaning" that it would have had "to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1313. The only exceptions to this rule arise where the intrinsic record demonstrates that: **(i)** the inventor acted as his own lexicographer by giving a "special definition … to a claim term … that differs from the meaning it would otherwise possess;" or **(ii)** that the inventor made an "intentional disclaimer or disavowal of claim scope" that would narrow a claim term's usual meaning. Id. at 1316. As the Federal Circuit has consistently held, anyone seeking to invoke these exceptions faces a heavy evidentiary burden. See, e.g., Vitronics Corp. v. Conceptronics, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (special definition of claim term must be "clearly stated in the patent specification or file history."); Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314, 1324-26 (Fed. Cir. 2003) (disavowal of claim scope in intrinsic record must be "unequivocal" and "both clear and unmistakable."). In its opening papers, Dell repeatedly ignores these fundamental claim construction principles by urging this Court to impart novel meanings to various claim terms absent any proof from the intrinsic record that one of the above exceptions would apply.

Second, Phillips also confirms the "'bedrock principle' of patent law that 'the claims of the patent define the invention to which the patentee is entitled the right to exclude.'" Phillips, 415 F.3d at 1312 (*quoting* Innova/Pure Water v. Safari Water Filtration, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). It follows from this principle that any attempts to import into the claim language additional requirements borrowed from elsewhere in the intrinsic record are forbidden because "'once [we] begin to include elements not mentioned in the claim, in order to limit such claim … we should never know where to stop.'" Id. (*quoting* McCarthy v. Lehigh Valley R. R. Co., 160 U.S. 110, 116 (1895)). Indeed, "'one of the cardinal sins of patent law … is reading a limitation from the [specification's] written description into the claims.'" Id. at 1320 (*quoting* Scimed Life Systems v. Cardiovascular, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Accord E.I.

DuPont De Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("adding an extraneous limitation appearing in the specification … [into patent claims is] improper" as a matter of law).  Similarly, "although the specification often describes very specific embodiments of the invention," the Federal Circuit has "repeatedly warned against confining the claims to those embodiments."  Phillips, 415 F.3d at 1323.  Accord Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998) (importing a limitation from "patent's description of the preferred embodiment" into its claims "is precisely … [the] type of claim construction that our prior case law counsels" against).  Here, Dell repeatedly asks this Court to disregard these binding rules of claim construction by reading features from particular preferred embodiments into the claim language as narrowing limitations.

Third, Phillips expressly reaffirms earlier decisions such as Vitronics that stand for the proposition that it is legally improper to construe claim language so narrowly that it would no longer encompass some or all of the preferred embodiments disclosed by the inventors in the patent specification.  Phillips, 415 F.3d at 1312.  As the Federal Circuit has explained, "it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in the field would read the specification in such a way."  Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1581 (Fed. Cir. 1996).  Accordingly, "it is axiomatic that a claim construction that excludes a preferred embodiment … 'is rarely, if ever, correct and would require persuasive evidentiary support'" before it could be adopted.  Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298, 1308 (Fed. Cir. 2003) (citing Vitronics, 90 F.3d at 1583).  Without ever offering such evidentiary support, Dell repeatedly insists that this Court adopt claim constructions that would be "rarely, if ever, correct" because they would exclude from claim coverage the inventors' own representative examples of their invention.

As DE Tech demonstrates below, in stark contrast to Dell's misguided approach, its own proposed claim constructions are free from legal error and well supported by the intrinsic record.  Accordingly, this Court should adopt DE Tech's constructions in their entirety.

**II.**

**ARGUMENT**

**THIS COURT SHOULD REJECT EACH OF DELL'S PROPOSED CLAIM
CONSTRUCTIONS AS CONTRARY TO STANDARD RULES OF CLAIM
INTERPRETATION AND TO THE INTRINSIC EVIDENCE OF RECORD**

A.   **Dell Has Misconstrued Each Of The Disputed Claim Terms Appearing In The
Independent Method Claims Of The '020 Patent And/Or The '364 Patent**

DE Tech demonstrates below that each of Dell's proposed constructions for Claim 1 of

the '020 patent and Claim 1 of the '364 patent are incorrect as a matter of law.  Because these

claims share nearly identical language, DE Tech's discussion of the '020 patent is intended to be

equally applicable to the '364 patent.

   1.   **"Running A Transaction Program On A Computer System So As To
Integrate Processes" ['020 Patent, Claim 1; '364 Patent, Claim 1]**

A comparison between the parties' respective claim construction briefs reveals that they

share substantial common ground with respect to interpreting the key terms set forth above.  For

example, the parties agree that the term "transaction program" can basically be defined as a

"computer software program," and each cites to the <u>Microsoft Computer Dictionary</u> in support of

this proposition.  <u>Compare</u> (DE Tech Br., p. 15) <u>with</u> (Dell Br., p. 9).[2]  Moreover, the parties also

concur that the core definition of the term "integrate" is to "combine into a whole."  <u>Compare</u>

(DE Tech Br., p. 18) ("to combine different processes or components into a functional system");

<u>with</u> (Dell Br., pp. 8, 10 n.8) ("combining the recited process steps into a unified whole").

Given this common ground that now appears to exist,[3] and in view of the plain meaning

of the claim terms, DE Tech proposes the following as its final claim construction for the first

element of Claim 1 of the '020 patent:

---

[2]  Unlike DE Tech, Dell goes on to provide further levels of detail regarding certain types of computer software
programs.  (Dell Br., p. 9).  Here such details are superfluous, however, because the parties' present debate is not
about *what* a "transaction program" is, but rather about *how many* such programs can permissibly comprise the
patented invention.

[3]  In its opening brief, DE Tech suggested that the term "software program" could be defined with even greater
granularity as a set of instructions executable by a computer.  (DE Tech Br., p. 15).  This "definition within a
definition" now appears unnecessary, however, in light of the parties' basic agreement that a "transaction program"
should be understood as a type of "computer software program."

> *… running one or more than one transaction-related software program[s] on a*
> *computer system so as to combine the recited processes (a) to (h) into a functional*
> *system for carrying out international commercial transactions … .*

Judging from its opening brief, Dell disagrees with this construction in two significant respects.

First, Dell argues that the scope of the patent claims should be narrowly limited to the use of "a

*single*" transaction software program as opposed to the use of "one or more than one" such

programs.  Second, Dell argues that the meaning of the term "integrate" should be further

narrowed to include a requirement that the claimed transaction software program "control and

execute" all of the recited processes.  As demonstrated below, however, both of these arguments

are incorrect as a matter of law, and accordingly this Court should adopt DE Tech's proposed

claim construction in its entirety.

> **a.      Dell Misconstrues The Term "A Transaction Program"**
> **As Being Limited To "A *Single* Transaction Program"**

In its opening claim construction brief, Dell argues that the term "a transaction program"

should be construed as limiting the scope of the invention to use of "a *single* transaction

program" for performing the required step of integrating the recited processes.  (Dell Br., p. 8).

According to Dell, the fact that the indefinite article "a" precedes the words "transaction

program" in DE Tech's claim language "requires a singular construction."  (Id.).  As

demonstrated below, however, Dell's proposed reading is incorrect as a matter of law.  Indeed,

the ordinary and customary meaning of indefinite articles like "a" is precisely the opposite of

what Dell has suggested, and Dell has identified no instances in the specification or prosecution

history where the inventors "clearly and unequivocally" imparted a novel meaning to the term

"a," or otherwise disclaimed coverage over systems in which *multiple* transaction programs

might work together to achieve the claimed integration.

As an initial matter, for purposes of interpreting patent claim language, the ordinary and

customary meaning of indefinite articles such as "a" or "an" is "one or more."  See, e.g., KCJ

Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1357 (Fed. Cir. 2000) ("under the general rules

of claim construction … the customary meaning of 'a' [is] one or more."); Scanner Technologies

Corp. v. ICOS Vision Systems Corp., N.V., 365 F.2d 1299, 1306 (Fed. Cir. 2004) ("we give the

article 'an' its ordinary meaning of 'one or more'").  This is a "conventional rule" of claim construction that has been "uniformly applied" in the Federal Circuit.  <u>KCJ</u>, 223 F.3d at 1356.[4]  Indeed, as the courts have repeatedly cautioned, "the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article."  <u>Id.</u>.

This "conventional rule" that the terms "a" and "an" should be interpreted as plural constructs applies with particular force where, as here,[5] patent claims have been drafted in an open-ended format using a transitional word such as "comprising":

> This court has repeatedly emphasized that an indefinite article "a" or "an" in patent parlance carries the meaning of "one or more" in open-ended claims containing the transitional phrase "comprising."

<u>KCJ</u>, 223 F.3d at 1356.  <u>Accord</u> <u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1373 (Fed. Cir. 2003) (same).  As the courts have explained, "use of the transitional phrase 'comprising' itself indicates that the elements or steps following the transition may be supplemented by additional elements or steps and still fall within the scope of the claim."  <u>Scanner Technologies</u>, 365 F.3d at 1305.  Indeed, so clearly does this "conventional rule" apply to open-ended patent claims that the Federal Circuit has recently confirmed that *an actual legal presumption* arises:  "the very use of the transition 'comprising' in conjunction with the article 'a' or 'an' … creates the presumption that the article is construed to mean one or more elements or steps, unless there is evidence of

---

[4]  Consistent with Federal Circuit precedent, patent prosecutors are taught to follow this "conventional rule" when drafting the claim language used in patent applications.  <u>See</u>, <u>e.g.</u>, Robert C. Faber, <u>Landis On Mechanics Of Patent Claim Drafting</u> § 3:8 (5th ed. 2004) ("Where one or more [elements] will [achieve the claimed] function, then one merely claims either 'a' or 'an' element (singular) and this covers one or more than one.").  (Exh. 2 to Henschke Decl.).

[5]  Here, Claim 1 of the '020 Patent recites "A computer implemented process for carrying out an international commercial transaction <u>comprising</u>: running <u>a</u> transaction program on a computer system so as to integrate processes … ."  Similarly, Claim 1 of the '364 Patent recites "A computerized process for carrying out an international transaction <u>comprising</u>: running <u>a</u> transaction program on a computer system so as to integrate processes … ."  Thus, DE Tech's patent claims are written in precisely the same format as those at issue in the dispositive <u>KCJ</u> and <u>Scanner Technologies</u> decisions.  <u>Cf.</u> <u>KCJ</u>, 223 F3d at 1353 ("An air flotation, ventilated mattress apparatus <u>comprising</u>: means defining <u>a</u> lower, continuous inflatable chamber … ."); <u>Scanner Technologies</u>, 365 F.3d at 1301 ("A three dimensional inspection apparatus … the apparatus <u>comprising</u>: <u>an</u> illumination apparatus … .") (emphases added).

6

clear intent to limit the claims."  Id. at 1305-06.  Accord Crystal Semiconductor Corp. v. Tritech Microelectronics, Inc., 246 F.3d 1336, 1348 (Fed. Cir. 2001) (same).

Dell now seeks to avoid the consequences of this "conventional rule" and its accompanying legal presumption by relying principally upon North American Vaccine, Inc. v. American Cyanamid Co., 7 F.3d 1571 (Fed. Cir. 1993).  (Dell Br., p. 11).  But the courts have already foreclosed any such reliance.  Indeed, as the Federal Circuit ruled in Scanner Technologies, because the disputed patent claim in North American Vaccine "did not include the open transitional phrase 'comprising,'" its holding is "not relevant" and is wholly "inapposite" to cases like the present one where indefinite articles have been used in conjunction with "comprising" language.  365 F.3d at 1305-06.  Dell also makes passing reference to Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023-24 (Fed. Cir. 1997).  (Dell Br., p. 8).  In Abtox, the court was compelled to give a singular construction to the term "a metallic gas-confining chamber" because other claim elements had expressly been "defined in relation to" there being only a single chamber, and these other elements would have been vitiated if the claim were read to more broadly cover multiple chambers.  Id..  By contrast, with respect to DE Tech's patents, the remaining claim elements are facially impartial to whether one or multiple transaction programs are used to integrate the recited processes.

Moving beyond the claim language, Dell fails to identify any evidence from elsewhere in the intrinsic record that would trump the ordinary and customary meaning of the indefinite article "a" (i.e., "one or more").  On the one hand, for example, Dell does not even *attempt* to argue that the inventors acted as their own lexicographers by defining the term "a" in some novel fashion.  (See, supra, p. 2).  On the other hand, while Dell does endeavor to show that the inventors somehow disclaimed patent coverage over multiple transaction programs, it points to nowhere in the specification or prosecution history evidencing the requisite "clear and unmistakable" disavowal of claim scope.  (Id.).

With respect to the patent specification, Dell raises two disclaimer arguments that are incorrect as a matter of law.  First, Dell accomplishes nothing by showing that there are

purportedly "37 instances" in which the specification uses the same indefinite articles such as "a," "an," or "the" that appear in the claim language.  (Dell Br., pp. 11-12; Valek Decl. at Exh. 12).[6]  Indeed, the Federal Circuit has consistently held that such redundant usage in the specification is wholly insufficient to establish an inventor's "clear intent to limit the invention to a singular embodiment."  KCJ, 223 F.3d at 1356-57 (use of article "a" in specification "provides no support" for argument that inventor disclaimed coverage of multiple chambers).  Accord Scanner Technologies, 365 F.3d at 1305 (use of article "a" in specification constitutes "no evidence of a clear intent on the part of patentee to limit the claim language at issue to a single illumination source"); Elkay Manufacturing Co. v. Ebco Manufacturing Co., 192 F.3d 973, 978 (Fed. Cir. 1999) ("numerous references to 'a feed tube' and 'the feed tube' in the written description" can "not conclusively establish" disclaimer of coverage over multiple feed tubes); Altiris, 318 F.3d at 1372-73 ("the singular form of flag … used in … the specification" cannot qualify as a statement of disclaimer "inviting, much less requiring, us to limit the claim" to coverage over single flags).

       Second, Dell argues that because *one out of the nine* objects of the invention recited in the specification uses the phrase "one program," it must follow that the inventors have disavowed patent coverage over anything broader than "a single transaction program."  (Dell Br., pp. 2-3, 11-12) (*citing* '020 Patent at 2:60-64).[7]  Yet even assuming, *arguendo*, that the term "one" needs to be interpreted as a singular construct, Dell's argument would still contravene

_____

[6]  In fact, Dell's evidence of "37 instances" is largely irrelevant on its face given that the overwhelming majority of these instances involve the use of indefinite articles to modify the terms "transaction system" or "system" rather than the term "transaction program" that is actually in dispute.  See (Exh. 12 to Declaration Of Michael Valek In Support Of Dell Inc.'s Opening Claim Construction Brief ("Valek Decl.")).  Ironically, Dell acknowledges the irrelevance of its own evidence by arguing that it is "clear that 'system' does not mean the same thing as 'program,'" and therefore that it would be inappropriate to "use these terms interchangeably."  (Dell Br., pp. 12-13).  In any event, Dell goes on to contend that the term "system" represents a much broader concept than the term "program," since it entails a combination of multiple computers, networks, and databases.  (Id.).  Thus, even if "system" was interpreted as a singular construct, that would in no way preclude the possibility that multiple transaction programs could reside on such a broad-based system.

[7]  Notably, consistent with Dell's own reasoning, almost all of the remaining objects of the invention can lend no support to its disclaimer argument because they are directed to a "transaction system" rather than to the disputed "transaction program."  See ('020 Patent at 2:60-3:36).  Cf., supra, n. 6.

standard canons of claim construction.  Indeed, as a  matter of Federal Circuit law, where a "patent sets forth multiple objectives to be served" by an invention, its claim language "should not be read restrictively to require that … [any particular claim must] in each case serve all of the recited" objectives.  Phillips, 415 F.3d at 1326-27 (*citing* Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 908 (Fed. Cir. 2004) ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives.")).  Accord Northrop Gruman Corp. v. Intel Corp., 325 F.3d 1346, 1355 (Fed. Cir. 2003) (any particular "one of several objectives" does not "constitute[] a limitation on the scope of the invention" and "does not suggest that the invention must always be used in a manner that achieves that objective.").

Turning to the prosecution history, Dell advances a two-part argument which could well be viewed as an effort to confuse and mislead this Court.  First, Dell seeks to give the false impression that during the prosecution of its patents before the PTO, the applicant unequivocally surrendered coverage over systems that use multiple transaction programs.  (Dell Br., pp. 4-5, 13-15).  According to Dell, such a disclaimer arose from "nearly identical facts" to those considered by the Federal Circuit in the Elkay case.  (Id., pp. 14-15).  In Elkay, the patentee had expressly argued to the PTO that its invention was novel in comparison to a particular prior art reference (*i.e.*, the Krug patent) because its claims required there to be a *single* feed tube and flow path, whereas Krug disclosed the use of *multiple* separate feed tubes and flow paths.  192 F.3d at 978-79.  Accordingly, the court "conclude[d] that during prosecution Elkay disavowed a potential interpretation of the feed tube limitations in claims 1 and 7 … that would include separate feed tubes or flow paths."  Id..  Dell now argues that here, just like the patentee in Elkay, DE Tech "distinguished [prior art references such as Schell and Cahn to the PTO] on the basis of a claim limitation that recites a single structure [*i.e.*, 'a' transaction program]."  (Dell Br., pp. 15, 13).

Simply put -- and as Dell is well aware -- this attempted analogy to the Elkay case is completely meritless.  In short, there was never an instance during the prosecution of DE Tech's

patents where the patentee distinguished its invention from the prior art "on the basis of" an assertion that the "*a transaction program*" language was exclusive of multiple transaction programs. Not once did the applicant even remotely suggest to the PTO that the *point of novelty* that made their invention patentable over the prior art was that it required a single transaction program as opposed to a plurality of such programs. With respect to the Schell and Cahn prior art references cited by Dell, for example, the applicant actually distinguished its invention on grounds that it integrated certain processes that they were lacking such as the confirmation of the availability of funds, and the generation of "electronic title" and/or "commercial invoice" documents.[8] Accordingly, DE Tech hereby challenges Dell to identify in its reply brief any instance in the prosecution history where a patentability distinction was drawn by anyone between single and multiple transaction programs, much less overtly asserted by the applicant as a basis for allowance.

The second part to Dell's specious prosecution history argument is to suggest that the applicant's supposed disclaimer of multiple transaction programs ultimately persuaded the PTO to grant their patent claims. (Dell Br., pp. 4-5, 14-15). According to Dell, what was of "crucial importance" to the inventors' final amendments to their proposed claim language was the addition of the phrase "a transaction program," since the examiner ostensibly "pointed to this feature as the basis for allowance." (Id.). But nothing could be farther from the truth. The examiner clearly could not have viewed the mere presence of "a transaction program" as a distinguishing point of novelty because many variations of these programs were already well known features in the prior art of record. For example, the examiner repeatedly characterized the

---

[8] DE Tech has filed concurrently herewith under separate cover a hard copy of the complete prosecution history file for the '020 patent attached as Exhibit A to the Declaration Of Matthew P. Pritts ("Pritts Decl."). This prosecution history contains five separate Responses to Office Actions in which the applicant made arguments to the PTO attempting to overcome the examiner's various initial rejections of their proposed patent claims. See First Resp. (5006-17); Second Resp. (5043-50); Third Resp. (5088-5107); Fourth Resp. (5317-50); Fifth Resp. (5390-96; 5403-09; 5424-48). The applicant's arguments for distinguishing over Schell and Cahn are principally set forth in their Third and Fourth Responses. As this Court can readily confirm, nowhere do these arguments include any distinctions being drawn between the use of single and multiple transaction programs. Indeed, this Court would search the entire prosecution history files for both the '020 and '364 patents in vain for such distinctions having been drawn by anyone at any time, and Dell has identified no such instances.

Schell reference noted above as disclosing "a software program … for handling order entry, order processing, inventory management, accounting and reporting functions … [and] import/export processing" that facilitated "transactions over the Internet." (Valek Decl. at Exh 14, p. 24039; Exh. 15, p. 24120). In reality, a point of novelty that placed DE Tech's patents into a condition for allowance was the inventive step of "integrating" in which the claimed transaction program uniquely combined each of the recited processes into a functional system.

Finally, as a weak fallback position, Dell urges that even if this Court proves unwilling to adopt its "a *single* transaction program" construction, the relevant claim language should alternatively be interpreted as requiring "*at least one* transaction program." (Dell Br., pp. 15, 8). Here, however, any such alternative reading would be of no assistance to Dell. As the Federal Circuit has often explained, in patent law "[u]se of the phrase 'at least one' means that there could be only one or more than one." Rhine v. Casio, Inc., 183 F.3d 1342, 1345 (Fed. Cir. 1999) (*citing* Kistler Instrumente AG. V. United States, 628 F.2d 1303, 1318 (Ct. Cl. 1980) ("Anyone with even the most rudimentary understanding of the English language understands" that "at least one … mean[s] one or more"). As noted above, this "one or more than one" construction is precisely the interpretation that *DE Tech* is advocating.[9]

  **b.**  **Dell Misconstrues The Term "Integrate" As Meaning "Controls And Executes"**

Dell also argues that the above claim language should be interpreted as requiring that the transaction program itself be what "controls and executes[10] the recited processes" involved in international sales transactions. (Dell Br., p. 8). Because the term "controls and executes"

---

[9] Dell also makes the bizarre suggestion that even if the "a transaction program" language were interpreted as a plural construct, there would still always need to be a single transaction program present that "individually integrates the recited process steps" all by itself. (Dell Br., p. 15). Needless to say, that is not the law. A claim construction that properly embraced the concept of "one or more than one" would clearly cover situations where multiple transaction programs could work together to achieve the claimed "integration." See, e.g., Altiris, 318 F.3d at 1373-74 ("a boot selection flag" claim language "encompasses the use of multiple flags to [achieve the claimed function] of select[ing] the boot cycle.").

[10] In relation to computer software such as a transaction program, the term "executes" means "to perform." See Microsoft Computer Dictionary 200 (5th ed. 2002). (Exh. 3 to Henschke Decl.). Thus, Dell is arguing that the transaction program must itself perform all of the various processes listed in Claim 1 of the '020 patent and Claim 1 of the '364 patent.

nowhere appears in the patent claims, Dell is forced to rely upon the presence of the word
"integrate" as its hook for reading this term into the claim language.  Indeed, according to Dell,
given the mere fact that the claimed transaction program "integrates the recited processes," it
simply logically "follows that the program must control and execute each process step."  (Id., p.
10).  As demonstrated below, however, Dell's proposed construction is incorrect as a matter of
law.  The ordinary and customary meaning of the word "integrate" (*i.e.*, "combining into a
functional whole") does not encompass the concept of controlling and executing, and Dell has
identified no instances from the intrinsic record where the inventors "clearly and unequivocally"
imparted a novel meaning to the term "integrate," or otherwise disclaimed coverage over systems
in which transaction programs do something other than controlling and executing all relevant
processes.  (See, supra, p. 2).

       As an initial matter, this Court need look no further than the claim language itself to
conclude that Dell's proposed interpretation is legally untenable.  The Federal Circuit has
consistently explained that "the claims themselves provide substantial guidance as to the
meaning of particular claim terms."  Phillips, 415 F.3d at 1314.  Indeed, "the context in which a
term is used in the asserted claim can be highly instructive," and "[o]ther claims of the patent,
both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of
a claim term."  Id..  Here, as explained below, Dell's claim construction is wholly incompatible
both with certain other elements recited in Claim 1 of the '020 patent, and with elements recited
in  Claim 13 of the '020 patent.

       First, "[w]hile certain claim terms may be at the center of the claim construction debate,
the context of the surrounding words of the claim also must be considered in determining the
ordinary and customary meanings of those terms."  ACTV, Inc. v. Walt Disney Co., 346
F.3d 1082, 1088 (Fed. Cir. 2003).  With respect to Claim 1 of the '020 patent, the substance of
certain other claim elements precludes Dell's argument that the transaction program itself must
be what "controls and executes" each of the recited processes.  For example, element (c) of
Claim 1 recites the process of "selecting a product to be purchased and a destination for shipping

such product … ." ('020 Patent at 17:10-11).  Obviously, as mandated by any conceivable reading of the patent, it is the *purchasing customer* who performs the process of selecting the products and shipping destinations, *not* the transaction program.  Moreover, Dell similarly argues (albeit incorrectly) that it is likewise the purchasing customer rather than the transaction program who performs the processes recited in elements (a) and (b) of the '020 patent calling for "selecting a  language" and "selecting a currency."  (Dell Br., pp. 16-20) ('020 Patent at 17:6-9).  Thus, it becomes clear that Dell's contrary attempt to argue that the transaction program must be the sole executor of all recited processes is unsustainable.

Second, it is axiomatic that "a claim term should be construed consistently with its appearance … in other claim terms of the same patent."  Rexnord Corp. v. Laitram Corp., 274 F.3d. 1336, 1342 (Fed. Cir. 2001).  Accord Innova/Pure Water, 381 F.3d at 1119 ("Unless otherwise compelled, when different claims of a patent use the same language, we give that language the same effect in each claim.").  Dell acknowledges this axiom in its opening brief, and accordingly it is forced to give the word "integrate" the same "controls and executes" reading in the context of apparatus Claim 13 as it does for method Claim 1 of the '020 patent.  (Dell Br., pp. 28 n.10, 39).  However, this "controls and executes" construction is simply not viable when applied to the recited components (*i.e.*, "means") of Claim 13, thereby demonstrating its fundamental incorrectness.  For example, element (d) of Claim 13 recites a structural "means for accessing at least one local or remote database," which Dell defines to be "the transaction program."  ('020 Patent at 18:24-25) (Dell Br., p. 47).  Yet because the claim as a whole already requires there to be a transaction program, this would lead to the illogical result that Claim 13 requires there to be a transaction program which controls and executes a transaction program -- *i.e.*, that controls and executes itself.

Equally illogical would be the implications for element (f) of Claim 13 which recites a "means for receiving an order" for a product.  ('020 Patent at 18:37-39).  Dell argues (albeit incorrectly) that this means limitation should be defined as a physical "area on a menu screen," leading to the nonsensical proposition that the transaction program would need to somehow

13

"execute" (*i.e.*, "perform") a structural component. (Dell Br., p. 51). Finally, and perhaps most absurdly, Dell contends (again incorrectly) that the means for "determining a language" and for "determining a currency" recited in elements (a) and (b) of Claim 13 are properly defined to be the purchasing customer. ('020 Patent at 18:15-18) (Dell Br., pp. 40, 42). Accordingly, the end result of Dell's reasoning is the complete *non sequitur* that the transaction program would need to "control and execute" a human being.

Should any further claim construction analysis even be necessary, it is clear that Dell is proposing an interpretation of the word "integrate" that is contrary to its ordinary and customary meaning. As DE Tech has previously shown, the ordinary meaning of "integrate" is "to combine different processes or components into a functional system." (DE Tech Br., p. 18). Dell now admits as much by citing to several general dictionary definitions for the term "integrate," all of which endorse DE Tech's notion of "combining into a whole," and none of which disclose the concept of "controlling or executing" proposed by Dell. (Dell Br., p. 10 n.8) (Exhs. 8-11 to Valek Decl.). Dell might have tried to overcome these facts by arguing that the inventors, acting as their own lexicographers, expressly defined the term "integrate" in the patent specification to mean "executes and controls the recited processes." (See, supra, p. 2). Instead, however, Dell undercuts any prospect for making such an argument by conceding that "the word integration is never [even] used in [the specification in] connection with the invention." (Dell Br. p. 10 n.7). Moreover, the word "execute" never appears in the specification at all, and the word "control" is used only sparingly and in a different context.[11]

Nor can Dell be heard to argue that the inventors somehow *implicitly* redefined the term "integrate" in the patent specification to specially mean "controls and executes." To the contrary, on those rare occasions where the term "integrate" appears in the specification at all, it is used in its ordinary and customary sense of "combines into a functional whole." For example,

---

[11] The specification nowhere states that the transaction program "controls" each of the recited processes. Instead, the specification discloses only the unremarkable propositions that the transaction program "controls" its *own web site*, and its *own interactions* with certain of the databases. See ('020 Patent at 3:40-42; 3:66-4:1).

in discussing the order management system disclosed in the prior art Wojcik patent, the inventors use the term "integrate" to describe how subsystems were combined into a functional whole so as to "cooperate with" each other "to create an efficient data flow."  See ('020 Patent at 2:16-28). Similarly, with respect to their own invention, the inventors suggest that "integration" occurs when various databases are combined into a functional transaction system, including databases owned by "external operators" over which the transaction program clearly exerts no control.  (Id. at 4:26-31).  See also (Id. at 13:45-49).

Even more fatal to Dell's cause, the specification of the '020 patent actually teaches away from Dell's proposed construction by disclosing preferred embodiments that feature other software programs that operate outside the "control" of the transaction program, and that "execute" certain of the recited processes themselves in lieu of those processes being performed by the transaction program.  These teachings emerge from the following three propositions:

First, as Dell acknowledges in its opening brief, the specification teaches that the invention reads on a broad "transaction system" comprised of a plurality of "computers, networks, and databases."  (Dell Br., p. 13) (citing '020 Patent at 3:60-4:2).  It would be obvious to one of ordinary skill in the art that other software programs aside from the transaction program would need to reside on this system to assist in operating these various computers, networks, and databases.  For example, the specification makes clear that with respect to the seven different databases utilized by the preferred embodiments, each has its own software program[s] associated with an accompanying "processing center." [12]  See ('020 Patent at 4:55-59; 5:63-65; 6:56-57; 7:19-20; 8:15-16; 9:24-26; 12:48-50).  See also (Henschke Decl. at Exh. 4, ¶ 7) ("international carriage company's software" resides on transaction system).

Second, according to certain preferred embodiments, at least some of these other software programs can be "external" to any sphere of "control" being exerted by the transaction program.

_____

[12]  In the computer world, the word "process" ordinarily and customarily implies the existence and/or use of a software program.  See, e.g., Microsoft Computer Dictionary 423 (5th ed. 2002) ("process": "n. A [software] program or part of a program;" "vb. To manipulate data with a [software] program.") (Exh. 3 to Henschke Decl.).

Indeed, the patentees envisioned a potential use for their invention in which a "systems operator" would maintain a web site for hosting international commercial transactions.  See (3:41-44; 4:26-31).  Such a web site would be connected to "external" database software programs that would be owned, managed, and maintained by third party entities unrelated to the "systems operator." (Id. at 4:26-31, 64-66; 7:19-21; 9:20-34).  For example, the "fourth database" software program used for handling product orders can belong to one of the retail vendors who participates on the host web site.  (Id. at 7:19-21).  Similarly, the "sixth database" software program used for confirming customer credit can belong to a commercial bank, credit card company, or clearing house.  (Id. at 9:52-55).  Far from "controlling" these external software programs, the transaction program would merely "access" them in order to request information or assistance.  (Id. at 3:63-66; 4:67; 7:20; 9:25).

Third, the specification teaches that these other software programs -- including the external ones outside the "control" of the transaction program -- may permissibly "execute" (i.e., "perform") certain of the processes recited in the patent claims.  For example, the "fourth database" software program, in lieu of the transaction program itself, can perform the process of receiving and handling a customer order as contemplated in element (g) of Claim 1.  See ('020 Patent at 9:7-20; 17:27-29).  Moreover, the process of generating an electronic record of sale required by element (h) of Claim 1 can likewise be performed by this "fourth database" software program instead of by the transaction program.  (Id. at 10:25-27; 17:30-34).[13]  Similarly, the "sixth database" software program, rather than the transaction program, can confirm the availability of customer funds as further required by element (h) of Claim 1.  (Id. at 9:21-35). Accordingly, it is abundantly clear that the specification not only fails to support, but in fact contradicts, Dell's proposed construction that the transaction program must always be what

---

[13]  As the applicant argued during the prosecution history, the fact that a retail vendor's "fourth database" software program can permissibly perform this function instead of the transaction program itself reflects a degree of "flexibility [that] is a significant advantage of the present invention."  See (Valek Decl. at Exh. 22, p. 24020).  See also ('020 Patent at 6:63-65) ("third database" software program can access other databases to obtain product code information per element (d)(ii) of Claim 1).

"controls and executes" all processes recited in the patent claims.  In short, the transaction program *can permissibly* perform these functions, but it is not *required* to do so.

Finally, with respect to the prosecution history, Dell attempts to premise a disclaimer argument *not* upon any "clear and unmistakable" disavowal of claim scope made by the inventors, but rather upon unilateral statements made by the *PTO examiner* when issuing his "Notice of Allowance."  (Dell Br., pp. 13-14).  According to Dell, because "DE Tech did not respond to the Examiner's" ambiguous juxtaposing of the words "executed" and "integrate," DE Tech has "agreed to this construction" by virtue of its silence. [14]  Simply put, Dell has badly misstated the law.  As the Federal Circuit has recently confirmed, "an examiner's unilateral statements in a Notice of Allowance" cannot "constitute a clear and unambiguous disavowal of claim scope" by a patent applicant.  Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1347 (Fed. Cir. 2005).  Accordingly, "the law precludes drawing inferences from an applicant's decision to decline comment on an Examiner's Statement of Reasons for Allowance," and an "applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to" the applicant's acquiescence in the surrender of any subject matter covered by its patent.  Id. at 1345.[15]

---

[14]  In referring to "steps … being executed," it is unclear whether the '020 patent examiner was referencing the steps inherent in "integration" alone, or whether he was also characterizing the list of recited processes as additional "steps."  (Dell Br., p. 14).  Notably, Dell itself argues that the patent claims "are all directed to a single step" -- *i.e.*, "integration" -- which "is the only step of the claim."  (Id., pp. 10, 8).  Thus, even if the applicant could be held legally accountable for the statements of the examiner (which it cannot be), no disclaimer would arise because "'[i]t is inappropriate to limit a broad definition of a claim term based on prosecution history that is itself ambiguous.'"  Mars, Inc. v. H.J. Heinz Co., L.P., 377 F.3d 1369, 1377 (Fed. Cir. 2004) (citation omitted).  Adding to this ambiguity are the facts that the '020 examiner never used the term "controls," and that the '364 examiner never used the terms "controls" or "executes."  (Dell Br., p. 14).

[15]  This binding Federal Circuit precedent mirrors the principles followed by PTO examiners under their Manual Of Patent Examining Procedure (the "MPEP").  As the attachments to Dell's own brief confirm, MPEP § 1302.14 provides as follows:  "The examiner's statement of reasons for allowance is the personal opinion of the examiner as to why the claims are allowable.  The examiner's statement should not create an *estoppel*.  Only applicant's statements should create an *estoppel*.  The failure of applicant to comment on the examiner's reasons for allowance should not be treated as acquiescence to the examiner's statement."  See (Valek Decl. at Exh. 18, pp. 1300-17-18).

## 2.   "Selecting A Language From A Menu" And "Selecting A Currency From A Menu" ['020 Patent, Claim 1]

DE Tech did not address the above claim language in its opening brief, believing that its interpretation involved "little more than the application of the widely accepted meaning of commonly understood words."  Phillips, 415 F.3d at 1314.  But given Dell's subsequent misconstrual of these claim terms, a corrective response is now required.  See (Dell Br., pp. 16-20).  As a matter of law, because both of these claim terms use the exact same "selecting … from a menu" language, they are required to be construed in the same manner.  See, e.g., Rexnord, 274 F.3d at 1342 ("a claim term should be construed consistently with its appearance in other places in the same claim"); CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1159 (Fed. Cir. 1997) ("we are obliged to construe … [claim terms] consistently throughout the claims.").  Accordingly, DE Tech proposes the following parallel claim constructions for elements (a) and (b) of Claim 1 of the '020 patent:

> *… direct selection of a language by a customer from a list of language options, or default selection of a language by a customer and/or by a computer system from a list of information other than language options …*

and

> *… direct selection of a currency by a customer from a list of currency options, or default selection of a currency by a customer and/or by a computer system from a list of information other than currency options … .*

Dell appears to disagree with the above constructions in two significant respects.  First, Dell argues that the term "menu" must be narrowly defined as covering only those lists of options that are "displayed to the user" (*i.e.*, to the customer).  (Dell Br., pp. 16, 18).  Moreover, implicit in Dell's narrow definition is the further requirement that it must therefore be the customer who performs the act of "selecting."  (Id. at p. 18).  As demonstrated below, however, Dell's argument is legally flawed because the intrinsic record makes clear that the patent claims also cover situations where the *transaction program itself* does the "selecting" of languages or currencies from menus that are *not* displayed to the customer.  Second, Dell contends that languages and currencies must be "directly selected" from menus respectively comprised of

18

either a "list of language options" or a "list of currency options."  (Id. at pp. 16, 18).  But contrary to Dell's contention, the following discussion will show that the intrinsic record clearly allows for lists to be comprised of information other than language or currency options (i.e., "default criteria").  In other words, selection of "Japan" from a list of countries, for example, could cause the computer system to automatically default to the use of "yen" as the appropriate currency.  For these reasons, this Court should adopt DE Tech's proposed claim construction in its entirety, and reject Dell's contrary interpretation as legally untenable.

a.    **Dell Misconstrues The Term "Menu" As Being Limited To Lists "Displayed To The User"**

As DE Tech has previously shown, "[o]ther claims of the patent, both asserted and unasserted, can be … valuable sources of enlightenment as to the meaning of a [disputed] claim term."  (See, supra, p. 12) (quoting Phillips, 415 F.3d at 1314).  Here, Dell's narrow reading of the term "menu" as being limited to lists "displayed to the user" -- which in turn implies that the act of "selecting" must necessarily be performed by the customer -- is irreconcilable with the substance of both dependent method Claim 3 and independent apparatus Claim 13 of the '020 patent.  Accordingly, this Court need not even proceed to a full-blown claim construction analysis to conclude that Dell's proposed interpretation is legally impermissible.

First, with respect to dependent method Claim 3, it is axiomatic that a court "must not interpret an independent claim in a way that is inconsistent with a claim which depends from it." Wright Medical Technology, Inc. v. Osteonics Corp., 122 F.3d 1440, 1445 (Fed. Cir. 1997). Dependent Claim 3 clearly provides that the act of "select[ing] the currency" is performed by the transaction program itself from a list comprised of customer profile information that is maintained internally within the transaction system.  See ('020 Patent at 17:38-42).[16] Accordingly, as a matter of law, Dell cannot properly construe independent Claim 1 as requiring

---

[16]  Maintenance of customer profile information by the transaction system is further described elsewhere in the '020 patent's specification and in its dependent Claims 11, 12, 16, and 17.  See ('020 Patent at 12:47-54; 18:4-9, 54-62). Moreover, like dependent method Claim 3, dependent apparatus Claim 16 also establishes that currency selection can be performed by the transaction program itself based upon a list of customer information.  (Id. at 18:54-58).

19

that a "menu" must *always* be a list externally "display[ed] to the user," or that the act of "selecting" must *always* be performed by the customer.  Indeed, the Federal Circuit has routinely labeled as "incorrect" any claim construction that attempts to read a limitation into "an independent claim when it is clear that a claim that depends from that independent claim does not incorporate that limitation."  Robotic Vision Systems, Inc. v. View Engineering, Inc., 189 F.3d 1370, 1376 (Fed. Cir. 1999).

Second, with respect to independent apparatus Claim 13, its elements (a) and (b) use language parallel to that of Claim 1 by reciting "means for determining a language" and "means for determining a currency."  ('020 Patent at 18:15-18).  As noted above (see, supra, p. 13), Dell acknowledges the legal requirement that when different claims in a patent use similar language, such language must be given the same construction in each claim.  Accordingly, because Dell has argued in the context of Claim 1 that the act of "selecting" must *always* be performed by the purchasing customer, it is obliged in the context of Claim 13 to assert that the recited "means" components likewise must always be equated with the purchasing customer.  (Dell Br., pp. 40, 42).  However, since "a human being cannot constitute a 'means'" (see, infra, p. 54), Dell's assertion is clearly incorrect as a matter of law, thereby demonstrating that Dell's proposed claim construction was wrong in the first instance.

Should any further claim construction analysis be required, DE Tech submits that the term "menu" ordinarily and customarily connotes any kind of "list of offerings or options," without any further restriction that such a list always be of the type "displayed to a user."  See The Merriam-Webster Dictionary 449 (New ed. 2004) (Exh. 5 to Henschke Decl.).  Notably, even the partisan dictionary definition chosen by Dell merely states that menu lists are "usually" (*i.e.*, usu.) "displayed on a screen" to a user, thereby confirming that the term "menu" is broad enough to encompass other types of lists that are not so displayed.  (Dell Br., p. 9) (*citing* Exh. 9 to Valek Decl.).  Dell points to nothing in the claim language requiring that here the normal meaning of "menu" be narrowed so as to cover only that subset of lists actually presented to a

20

customer.[17]  In fact, as noted above, dependent Claim 3 makes clear that a list of customer profile information *internal to the transaction system* (and never displayed to the user) can qualify as a "menu" from which a currency is selected.

When looking to the remainder of the intrinsic record to support its narrow reading of "menu," Dell attempts to rely upon the specification in legally impermissible ways.  (Dell Br., p. 18).  Indeed, Dell does not, as the law might allow, try to argue that the inventors acted as their own lexicographers by giving the term "menu" a special circumscribed definition, or that the inventors expressly disclaimed patent coverage over all lists that are not displayed to a customer.  (See, supra, p. 2).[18]  To the contrary, Dell misuses the specification to commit two cardinal errors of claim construction.  First, Dell seeks to read into the patent claim language a limitation applicable only to certain of the preferred embodiments described in the specification.  In other words, Dell contends that because some of the specification's preferred embodiments disclose menu lists that are "displayed to the user," the patent claims must be read as *requiring* that the recited menu lists *always* be of the type presented to customers.  (Dell Br., p. 18).  But as a matter of law, thusly importing a limitation from a "patent's description of the preferred embodiment" into its claims "is precisely… [the] type of claim construction that our prior case law counsels" against.  Comark, 156 F.3d at 1187.  Simply put, "although the specification often describes very specific embodiments of the invention," the Federal Circuit has "repeatedly

---

[17]  Dell cannot be heard to argue that within the context of the '020 patent the term "selecting" must inherently refer to conduct undertaken by a human being rather than by a computer software program.  To the contrary, here the intrinsic record frequently describes preferred embodiments in which the computer system can be performing the act of "selecting."  See, e.g., ('020 Patent at 7:34-35) (selecting freight routes and charges); (Id. at 8:7-9) (selecting revenue units); (Id. at 17:38-40) (selecting the currency); (Id. at 18:7-9) (selecting a candidate product).

[18]  Dell makes passing reference to the notion of disclaimer, but the passage it cites from the specification does not even mention the term "menu," much less contain a "clear and unmistakable" surrender by the applicant of patent coverage over all menu lists that are not displayed to customers.  (Dell Br., p. 18) (*citing* '020 Patent at 4:52-54).  In that passage, the applicant was *not* distinguishing its invention from the prior art on the basis of what type of menus were being used, or who was doing the "selecting" (*i.e.*, customer v. computer software program).  Rather, the asserted point of novelty was that their invention allowed for the selection of language *at all*, whereas the prior art disclosed domestic systems using "national configurations where the buyer and seller are restricted to a particular language and currency."  Cf. ('020 Patent at 1:21-24).

21

warned against confining the claims to those embodiments." <u>Phillips</u>, 415 F.3d at 1323.  (<u>See also</u>, <u>supra</u>, pp. 2-3) (*citing* <u>McCarthy</u>; <u>Scimed</u>; <u>E.I. DuPont</u>).

Second, Dell meanwhile asks this Court to adopt so narrow a claim construction that it would cause certain other preferred embodiments disclosed in the specification to fall outside the scope of claim coverage.  Indeed, in addition to showing preferred embodiments of the invention in which menu lists are "displayed to the user," the specification alternatively discloses other preferred embodiments in which the *computer system* (rather than the customer) does the "selecting" of languages or currencies from menu lists that are maintained *internally* by the transaction system itself.  For example, as supporting disclosure for dependent Claim 3, the specification teaches that the transaction system can compile menu lists containing all types of profile information about customers and their transactions.  See ('020 Patent at 12:47-54).  From these lists the computer system can select certain default criteria that will automatically trigger a choice of appropriate "languages and currencies."  (<u>Id.</u>).  Because adopting Dell's interpretation of the term "menu" would render the patent claims too narrow to encompass these preferred embodiments, Dell's interpretation is legally untenable.  (<u>See</u>, <u>supra</u>, p. 3) (*citing* <u>Hoechst</u>; <u>Anchor Wall</u>; <u>Vitronics</u>).

Finally, here Dell does not, and could not, even attempt to rely upon the prosecution history to support its unduly restrictive construction of the term "menu."

> **b.** **<u>Dell Misconstrues The Term "Menu" As Being Limited To Lists Of "Language Or Currency Options"</u>**

Dell also argues that independent Claim 1 requires that -- irrespective of the identity of the selector -- the choice of language must be "directly selected" from a menu comprised of a "list of language options," and that the choice of currency must be "directly selected" from a menu comprised of a "list of currency options."  (Dell Br., pp. 16-19)  Notably, however, these additional limitations do not appear anywhere in the claim language, which merely uses the word "menu" without specifying or restricting what types of information could be listed therein.  Moreover, Dell makes no effort whatsoever to tie these limitations to the ordinary and customary meaning of the word "menu," or for that matter to any other defined claim term.  As noted

above, here the term "menu" is broad enough to include lists of any type of information, so long as interaction with the menu ultimately results in the selection of a language or currency.  In any event, this Court also should summarily reject Dell's construction as incompatible with the language of dependent Claim 3, which clearly allows for *indirect* selection of a currency from menu lists comprised of *customer profile information* rather than currency options.  ('020 Patent at 17:38-42).  As DE Tech has demonstrated, an independent claim [*i.e.*, Claim 1] cannot be read as containing a limitation which is not incorporated in another claim that depends from it [*i.e.*, Claim 3].  (See, supra, pp. 19-20) (*citing* Robotic Vision; Wright Medical).

Finding no support in the claim language itself, Dell turns to the patent specification as its backdrop for once again committing the same two cardinal errors of claim construction discussed above in the context of its misguided "displayed to the user" construction.  First, Dell argues that because certain preferred embodiments in the specification disclose the direct selection of a language from a list of language options, or the direct selection of a currency from a list of currency options, such arrangements must be read into the patent claims as narrowing limitations.  (Dell Br., pp. 18-20).  As DE Tech has previously shown, however, this approach would clearly constitute legal error.  (See, supra, pp. 2-3) (*citing* Comark; Phillips; McCarthy; Scimed; E.I. DuPont).

Second, Dell argues that this Court should interpret the claim language so narrowly that it would no longer read on other preferred embodiments described in the specification which disclose the *indirect* selection of languages or currencies from lists comprised of *default criteria*. For example, the specification teaches that when implementing the patented process, "[n]ormally currency is chosen by default" rather than through direct selection from a list of currency options.  See ('020 Patent at 5:61)  One way to accomplish this is to have the customer select his country of residence (*e.g.*, Great Britain) from a list of countries, which then acts as an "automatic default" triggering the transaction system to use the currency most closely associated with the country chosen (*e.g.*, pounds).  (Id. at 5:11-23).  Another approach is to have the transaction system treat the customer's selection from a list of languages (*e.g.*, Japanese) as the

23

automatic default trigger for an appropriate currency choice (*e.g.*, yen).  (Id. at 4:33-36).

Moreover, as discussed above, in other disclosed embodiments the computer system itself selects

the language or currency by using internal lists of customer profile information as surrogate

default criteria.  (Id. at 12:47-54; 17:38-42; 18:54-58).[19]  Dell admits that its proposed claim

construction simply would not "encompass default currency selection" as described in these

various preferred embodiments.  (Dell Br., p. 20).  Accordingly, as DE Tech has already shown,

such a construction must be deemed incorrect as a matter of law.  (See, supra, p. 3) (*citing*

Hoechst; Anchor Wall; Vitronics).

Dell ultimately tries to backpedal by offering a theory as to how its proposed claim

construction could in fact be viewed as encompassing all of the patent's preferred embodiments.

Indeed, Dell notes that the specification discloses a default override feature (*i.e.*, "step 112")

whereby a customer could later change a currency selection that had originally been made by

default.  (Dell Br., p. 20) (*citing* '020 Patent at 5:62-64; 4:34-36).  Presuming without any basis

that a customer would make these changes by selecting from a list of currency options, Dell

concludes that the presence of this default override feature means that all of the preferred

embodiments would fall within the scope of its proffered claim interpretation.  (Id.).  But what

Dell fails to inform this Court is that the specification clearly discloses that this is merely an

*optional feature* of the invention -- *i.e.*, the default override provision is described as "optional

step 112."  See ('020 Patent at 6:39).[20]  Because the default override is "optional" rather than a

requirement, the specification must be read as disclosing preferred embodiments both that

include and that *exclude* such a feature.  Dell has no viable theory for explaining how its claim

construction could cover variations of the preferred embodiments from which the default

---

[19]  Notably, such customer profile information can include a list of informational items gleaned upon a customer's "initial entry into the system" (*e.g.*, an IP address) before any direct interaction has even occurred with the transaction system.  See ('020 Patent at 4:33-34).

[20]  According to common patent drafting conventions, because the default override "step 112" is merely an optional feature rather than a requirement, it is depicted in the patent drawings with broken lines (*i.e.*, dotted lines) rather than with solid lines.  See ('020 Patent at Fig. 1A).

override feature has been *excluded*, thereby rendering such a construction incorrect as a matter of law.

Were the specification not proof enough, the prosecution history dispositively confirms both that the patent claims allow for language and currency selections based upon default criteria, and that no default override provision need be present.  As the Federal Circuit has explained, the prosecution history is highly instructive for claim construction purposes because it can "often inform the meaning of claim language by demonstrating how the inventor understood the invention."  Phillips, 415 F.3d at 1317.  Here, one of the named inventors on the DE Tech patents, Ed Pool ("Pool"), submitted a Second Supplemental Declaration to the PTO in which he argued that a certain preferred embodiment of his invention satisfied all of the limitations set forth in the patent claims.  See (Exh. 4 to Henschke Decl.).  Notably, this embodiment did *not* involve directly selecting a currency from a list of currency options, but rather indirectly selecting a currency from a list of countries of residence which served as default criteria.  (Id. at Exh. 4, ¶ 5).  Moreover, Pool made no mention of there being a default override feature, indicating that he did not believe that the presence of such a feature was necessary to proving that all the requirements of the claim language had been satisfied.  (Id.).  Thus, Dell's proposed claim construction is rendered all the more illegitimate for being contrary to how the inventor understood his own invention.

### 3.   "An International Goods Classification System" ['020 Patent, Claim 1; '364 Patent, Claim 1]

The parties are in agreement that the above claim language from element (d)(ii) of Claim 1 of the '020 patent should be interpreted as follows:

> *... a system for grouping products based on common attributes used for import or export purposes such as without limitation the Harmonized Tariff System ("HTS") ... .*

Compare (DE Tech Br., pp. 18-19) with (Dell Br., p. 20).

DE Tech reiterates its understanding, however, that inclusion of the "Harmonized Tariff System" in the claim construction as a representative example is not intended to limit the scope

of claim coverage.  The patent claims would cover *any* international goods classification system

containing product (*i.e.*, commodity) codes so defined, including without limitation other

representative examples disclosed in the intrinsic record such as "harmonized tariff tables;"

"harmonized tariff tables and classification systems;" import country specific schedules with

"commodity codes different from those of the harmonized tables;" export country specific

schedules with "commodity codes different from those of the harmonized tables;" and

"Harmonized Tariff Schedules."  See, e.g., ('020 Patent at 4:7; 6:54-65; 11:1-4; 13:54-55; 13:67-

14:5).

       **4.**       **"International Shipping Information" ['020 Patent, Claim 1; '364 Patent, Claim 1]**

DE Tech did not previously provide an interpretation of the above claim term, believing

it a case where "the ordinary meaning of claim language as understood by a person of skill in the

art may be readily apparent even to lay judges, and claim construction in such cases involves

little more than the application of the widely accepted meaning of commonly understood words."

Phillips, 415 F.3d at 1314.  Accord Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001)

(elaborate interpretation unnecessary where disputed claim terms "are not technical terms of

art").  Here, the plain meaning of this claim term mandates the following construction of element

(d)(iii) of Claim 1 of the '020 patent:

> ... *any information related to shipping a product internationally from its point of origination to its point of destination ...* .

In its opening brief, Dell disagrees with the above construction by arguing for an

exceedingly restrictive definition of the term "international shipping information."  (Dell Br., pp.

20-23).  According to Dell, the only pieces of information that could possibly qualify as

"international shipping information" are those that *both*: (1) identify each individual leg of the

shipping transport route; *and* (2) identify the costs associated with each individual leg of the

shipping transport route.  (Id.).  However, none of these limitations appear in the claim language,

and Dell acknowledges that its proposed definition is not premised upon the ordinary and

customary meaning of "international shipping information," nor upon any common

understanding of this claim term as a technical "term-of-art."  (Id. at p. 21).  Instead, Dell argues that its definition is ostensibly required by what "the specification teaches."  (Id. at p. 22).

As an initial matter, this Court need look no further than that standard canon of claim construction known as the *claim differentiation doctrine* to conclude that Dell's proposed interpretation is incorrect as a matter of law.  Pursuant to the doctrine, different patent claims "are presumed to be of different scope."  Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1325 (Fed. Cir. 2001).  Consequently, any reading of claim language that would render another claim "superfluous" [*i.e.*, redundant] is deemed to be "presumptively unreasonable."  Beachcombers International, Inc. v. Wilde Wood Creative Products, Inc., 31 F.3d 1154, 1161 (Fed. Cir. 1994).  With respect to differentiating between independent and dependent claims, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  Phillips, 415 F.3d at 1315.  Applying these principles to the '020 patent, it is clear that here dependent method Claim 5 adds limitations calling for "determining at least one shipping route and calculating associated costs" therewith.  See ('020 Patent at 17:47-50).  But if, as Dell contends, the term "international shipping information" must be interpreted under element (d)(iii) of independent Claim 1 as *already requiring* an identification of each leg of the transport route and its associated costs, then dependent Claim 5 would be rendered completely superfluous in violation of the claim differentiation doctrine.[21]  Accordingly, it is clear from the start that Dell's reading of the claim language is legally untenable.

---

[21] Notably, the prosecution history clearly confirms that *none* of the patent claims -- whether independent or dependent -- require that the transport route be broken out into its individual legs, each with associated costs.  To the contrary, inventor Pool submitted to the PTO a preferred embodiment of his invention which used a "shipping lanes table" maintained by an international carriage company, DHL, to obtain a single unapportioned cost (£35.07) for moving a product from its point of origination to its final point of destination.  See (Henschke Decl. at Exh. 4, ¶¶ 7, 9 & p. 5445).  Thus, in Pool's embodiment, neither the transport route nor its costs were broken out on a per leg basis.  Moreover, the specification expressly contemplates that a vendor could offer a flat rate shipping charge (*i.e.*, a "standard transportation package") that would represent a single lump sum amount covering the entire cost of the transport route.  ('020 Patent at 7:46-49).

27

Should further analysis even be necessary, DE Tech also demonstrates below that Dell's claim construction is once again premised upon the same recurring claim construction errors coupled with significant mischaracterizations of the intrinsic record.  Contrary to Dell's interpretation, information identifying individual "legs of the transport route" is at most *one type* of "international shipping information" associated with certain preferred embodiments, and as such it cannot be read into the patent claims as a narrowing limitation.  Even farther afield, information identifying the "costs associated with each of those legs" is *nowhere* described in the specification as a subset of "international shipping information," and it in fact relates to an entirely different element of the patent claims -- *viz.*, element (e) of Claim 1.

> a.   <u>Dell Improperly Restricts The Term "International Shipping Information" To "Information Identifying Each Leg Of The Transport Route"</u>

Dell does not, and cannot, offer any proof from the intrinsic record that the inventors somehow restricted the term "international shipping information" to mean *only* those items of information that actually "identify each leg of the transport route."  To the contrary, the specification makes clear that the former is a broader category of information that subsumes the latter as a lesser included subset.  Indeed, the specification provides that international shipping information merely "*includ[es]* all options for each leg of a journey between product origination and customer destination," meaning that it is not limited thereto and presumptively includes other types of information as well.  <u>See</u> ('020 Patent at 4:13-15) (emphasis added).[22]  As the specification suggests, these other types of information might entail "shipping details," "shipping conditions," shipping [*i.e.*, freight] "options," or "shipping logistics."  <u>See</u>, <u>e.g.</u>, (<u>Id.</u> at 2:33; 4:13; 7:17, 64; 13:41-42).  For example, any of the following items -- and countless others too numerous to list -- could qualify as "international shipping information" related to moving a product from its point of origination to its point of destination: (i) information identifying

---

[22]  Even on its face, information relating to "all options for each leg of a journey" is far broader than Dell's attempted narrowing of the claim language to cover only those particularized items of information that actually "identify" each leg of a transport route.

available international carriers (*e.g.*, FedEx, UPS, DHL); (ii) information about such carriers'
policies, practices, or schedules; (iii) information concerning available modes of transport (*e.g.*,
air, land, sea); (iv) information about packaging options; or (v) information relevant to freight
insurance.

Moreover, the prosecution history further confirms that the inventors did not intend for
the term "international shipping information" to be understood so narrowly that it could only
apply to those specific items of information that identify legs of a transport route.  Instead, the
inventors suggested that "international shipping information" might encompass whatever types
of information are available from an "international carriage company's software."  (Henschke
Decl. at Exh. 4, ¶ 7).  More generally, in the prosecution history "international shipping
information" was discussed in the context of information that would permit "selecting between
shipping options," "initiating the shipping of the goods with a carrier," or the use of "shipping
schedules."  (Id. at Exh. 6, pp. 5046-48).

Finding no support for its restrictive definition of "international shipping information" in
the intrinsic record, Dell once again resorts to its two most persistent claim construction errors.
First, Dell points to a preferred embodiment in the specification in which the transaction system
makes a "determination of the discrete legs or links of the overall transport route … based upon
shipping data contained in the fifth database and processing center."  (Dell Br., p. 22) (*citing*
'020 Patent at 8:12-15).  Because the particular "shipping data" used by this preferred
embodiment arguably relates to establishing the discrete legs of a transport route, Dell contends
that the meaning of the term "international shipping information" as used in the claim language
must be restricted to *only* those items of information that actually "identify each leg of the
transport route."  (Id.).[23]  But as DE Tech has repeatedly shown, it is legal error to thusly import

_____

[23]  Claim construction errors aside, Dell's argument is logically unsound even when taken on its own terms.  The
cited passage from the specification does not *equate* "shipping data" with information "identifying each leg of the
transport route" as Dell would have it.  Rather, it merely states that a "determination" as to those discrete legs is
"based upon" such "shipping data" (the content of which is unspecified).  Had the shipping data alone been
sufficient to "identify" each leg of the transport route, then there presumably would have been no need to
subsequently make that very same "determination."

features of a preferred embodiment into the claim language so as to create additional narrowing limitations that otherwise would not exist.  (See, supra, pp. 2-3) (citing Comark; Phillips; McCarthy; Scimed; E.I. DuPont).

Second, Dell proposes reading the claim language so narrowly that it would no longer cover other preferred embodiments disclosed in the specification.  Element (d)(iii) of Claim 1 requires that the transaction system "access … international shipping information … [from] at least one local or remote database."  See ('020 Patent at 17:12-20).  If, as Dell would have it, the definition of "international shipping information" must be restricted to only those items of information that "identify each leg of the transport route," then it becomes clear that the patent specification teaches other preferred embodiments where "international shipping information" so defined is being obtained in different ways.  For example, in lieu of retrieving transport route information from a database, the transaction system can alternatively receive such information as direct inputs from a vendor and/or a customer -- i.e., discrete legs of a transport route can permissibly be "based upon a standard shipping route dictated by the vendor, the route requested by the customer, or some combination of the two."  (Id. at 8:16-18, 31-33).  Moreover, in other situations "the various discrete legs of the route are [simply] dictated by the nature of the product being shipped."  (Id. at 8:22-24).  Under Dell's proposed construction, each of these alternative embodiments would fall outside the scope of the patent claims because "international shipping information" as defined by Dell would not be obtained by accessing "at least one local or remote database" as the claim language requires.  Accordingly, as DE Tech has previously shown, such a construction that serves to exclude preferred embodiments is incorrect as a matter of law.  (See, supra, p. 3) (citing Hoechst; Anchor Wall; Vitronics).

**b.      Dell Improperly Restricts The Term "International Shipping Information" To "Information Identifying The Costs Associated With Each Leg Of The Transport Route"**

Dell's argument that the meaning of the term "international shipping information" is further restricted to only those items of information that actually "identify the costs associated with each leg of the transport route" is simply frivolous.  (Dell Br., pp. 20-23).  Here, Dell has

not cited to any passage from the intrinsic record that even arguably defines "international shipping information" in terms of transport route costs.  (Id.).  Quite to the contrary, the specification discloses that transport route costs encompass much broader categories of data of which "international shipping information" is but one small component.  As the specification explains, "the costs accompanying … each discrete leg of [a] route include[] such costs as insurance, taxes, licensing fees, handling fees, … freight … documentation fees … import/export charges, etc. … [which] are calculated to provide a total cost to obtain the selected product or products at the selected destination."  See ('020 Patent at 8:32-51).  Thus, Dell's proposed claim construction would turn the specification completely on its head.  Rather than transport route costs being an aspect of "international shipping information" as Dell has suggested, precisely the opposite is true -- viz., "international shipping information" [e.g., freight charges] is merely one of a multitude of factors from which total transport route costs are ultimately calculated.

Even more fundamentally, the disclosures in the '020 patent about transport route costs are actually encompassed by element (e) of Claim 1 ("calculating costs involved in moving such product"), and not by element (d)(iii) ("international shipping information") as Dell has suggested.  Indeed, whereas "international shipping information" is accessed in connection with "step 132" in the specification, the calculation of costs accompanying each discrete leg of the transport route is performed only later in connection with a separate and different "step 134."  See ('020 Patent at 8:13-52).  Tellingly, in its opening brief Dell analyzes "step 134" in connection with element (e) of Claim 1, and acknowledges that all determinations as to costs -- including "costs of shipping" -- are likewise made in connection with element (e) rather than element (d)(iii).  (Dell Br., pp 25, 23).  In essence then, Dell is simultaneously trying to argue that the very same determination of transport route costs is a required aspect of both element (d)(iii) and element (e) of Claim 1.  But as a matter of law, where, as here, different claim elements use different language, it should be inferred that the patentee "intended his choice of different terms to reflect a differentiation in the meaning of those terms."  Innova/Pure Water, 381 F.3d at 1119-20.  Accordingly, Dell cannot properly read the "international shipping

information" language of element (d)(iii), and the "calculating costs involved in moving" language of element (e), as *both* referring to a determination of the same transport route costs. Contrary to what the law would allow, if the costs associated with legs of the transport route were already required to be identified under element (d)(iii) as Dell suggests, then element (e) which purports to require the calculation of these very same costs would be rendered superfluous.

### 5. "Calculating Costs Involved In Moving Such Product To Said Destination based Upon Said Destination And Such Product" ['020 Patent, Claim 1; '364 Patent, Claim 1]

In its opening brief, DE Tech believed that the plain meaning of the above claim language was sufficiently apparent that no interpretation by this Court was required. However, given that Dell has subsequently misconstrued these claim terms, DE Tech is now compelled to propose the following corrective claim construction of element (e) of Claim 1 of the '020 patent:

> *... determining applicable costs[24] involved in moving such product to said destination based upon said destination and such product ... .*

Dell disagrees with this construction in two significant respects. First, Dell argues that the patent claims use the word "calculating" in so narrow a sense that it can *only* possibly connote "mathematically" determining the applicable product delivery costs. (Dell Br., pp. 23-24). But as DE Tech demonstrates below, this argument is contrary to the dictionary definition that Dell itself submits, to the arguments that Dell later makes in its own brief, and to the intrinsic evidence of record. Second, Dell contends that the claim language somehow implicitly requires that every determination as to applicable delivery costs must *always* include calculating "the costs of shipping, insurance, licensing fees, handling fees, documentation fees, and taxes on these costs." (Id. at pp. 23-26). As DE Tech will show, however, this interpretation is clearly

---

[24]  There appears to be no dispute between the parties that in the claim language of the '020 and '364 patents, the term "costs" is clearly being used to refer to charges made to the customer, and *not* to whatever internal or actual costs might be incurred by a vendor or transaction systems operator. See, e.g., ('020 Patent at 3:5-17, 47-50; 6:52-53; 7:29-32; 8:30-51; 9:1-2; 12:57-58; 17:47-50). Cf. (Dell Br., pp. 24-26). Accordingly, should this Court ever deem it helpful or necessary to construe the word "costs" as used in the patent claims, that term should be defined as meaning something akin to "costs to the customer," or "charges to the customer," or "costs charged to the customer," or "price to the customer."

32

incorrect as a matter of law because it would violate the claim differentiation doctrine, as well as the rules against reading features of certain preferred embodiments into the claim language, and against excluding other alternative embodiments from claim coverage.

      a.      **Dell Misconstrues The Term "Calculating" As Being Limited To "Mathematically Determining"**

Dell argues that the ordinary and customary meaning of the word "calculating" is strictly limited to the concept of "mathematically determining." (Dell Br., pp. 23-24). But the dictionary definition that Dell submits in support of its argument actually suggests that the contrary is true. Indeed, this definition shows that the term "calculate" also encompasses many broader concepts such as "ascertain," "determine," "estimate," "interpret," and "figure out." <u>See</u> (Exh. 8 to Valek Decl.). Thus, far from requiring that the word "mathematically" be inserted into the claim language, Dell's dictionary confirms that the common understanding of "calculating" includes: "to reckon by exercise of practical judgment *rather than by strict mathematical process*." (<u>Id.</u>). Perhaps most telling of all, later in its brief when analyzing element (f) of Claim 1, Dell itself argues that the word "calculating" is synonymous and interchangeable with the word "determining" standing alone, without any need for using the more restrictive modifier "mathematically" determining. (Dell Br., pp. 26-27).

The specification confirms that element (e) of Claim 1 does not use the word "calculating" in so narrow a sense that it would require the transaction program to always perform some formal mathematical computation. Indeed, in many instances the claimed transaction program is able to ascertain a particular product delivery cost by simply retrieving the relevant information from a look-up table in a database, or by requesting the information from a third party -- such as an international carriage company -- that would have already performed any required computations. <u>See</u>, <u>e.g.</u>, ('020 Patent at 6:58; 13:68-4:5; 4:9-19). In view of this intrinsic evidence, here the most sensible approach would be to construe "calculate" as meaning "determine," which is commonly defined as follows: "to establish or ascertain definitely, as after consideration, investigation, or calculation." <u>See The American Heritage Dictionary Of The English Language</u> 495 (4th ed. 2000) (Exh. 7 to Henschke Decl.). This definition (which Dell

elsewhere embraces) would adequately capture both kinds of cost calculation scenarios contemplated in the specification -- *i.e.*, the one where the transaction program itself performs a mathematical computation, and the other where it merely ascertains the relevant costs from other sources.[25]

### b.    Dell Improperly Reads In A Particularized List of Cost Calculations From The Patent Specification

Despite broad claim language allowing the flexibility to calculate *whichever* types of product delivery costs might apply to the situation at hand, Dell argues that element (e) of Claim 1 requires that a certain *particularized list* of costs must *always* be calculated irrespective of the circumstances -- *viz.*, "the costs of shipping, insurance, licensing fees, handling fees, documentation fees, and taxes on these costs."  (Dell Br., p. 23).  This argument should be summarily rejected as violative of the claim differentiation doctrine.  As DE Tech has shown, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  (See, supra, p. 27) (*citing* Phillips, 415 F.3d at 1315).  Here, both dependent Claims 5 and 6 clearly are adding limitations that would render Dell's reading of independent Claim 1 legally untenable.  For example, Claim 5 adds a limitation calling for the calculation of shipping costs relating to a chosen transport route.  ('020 Patent at 17:47-50).  But if, as Dell contends, element (e) of Claim 1 *already requires* a shipping costs calculation to have been performed, then Claim 5 would be rendered superfluous in contravention of the law.  Similarly, Claim 6 adds a limitation calling for "calculating any applicable taxes" relating to product shipment.  (Id. at 17:51-55).  Once again, contrary to what the law would allow, Dell's interpretation of element (e) as *already requiring* this very same calculation would make Claim 6 redundant and thereby fail to differentiate its claim scope.

---

[25]  Consistent with DE Tech's proposed construction, the specification itself appears to use the words "calculating" and "determining" relatively interchangeably.  For example, as supporting disclosure for element (f) of Claim 1 which calls for "determining" the final total transaction cost, the specification provides that a mathematical computation (*i.e.*, a "calculation") is performed.  See ('020 Patent at 8:36-37) ("determining" occurs when product delivery costs "are added to the factory price of the goods at issue.").

Should further analysis even be necessary, it is clear that the intrinsic record strongly teaches away from Dell's suggestion that element (e) requires there to be a particularized list of product delivery costs that must *always* be calculated with respect to *every* international transaction. Quite to the contrary, the specification explains that "each transaction is unique in and unto itself." See ('020 Patent at 13:37-40). Accordingly, far from there being a required list, the product delivery cost "variables are never fixed" because "each product or service is of itself unique and since the buyer and seller's geographic locations can change." (Id. at 13:34-37). Thus, whereas Dell tries to argue that the transaction program must *always* calculate "insurance costs," it may well be the case that for certain international transactions no such insurance would even be contracted for. Indeed, the specification discloses preferred embodiments where insurance would be "optional," and would only occasionally be purchased "if desirable" to the customer. (Id. at 7:9, 41). Similarly, Dell's contention that "licensing fees" must *always* be calculated is belied by Appendix I to the specification which describes in detail a preferred embodiment involving an automobile sale to the Netherlands where no licensing fees are ever calculated or charged to the customer. (Id. at 14:30-16:10). In short, consistent with why the applicant chose to draft broad claim language, there can be no "one size fits all" list of required cost calculations given the endless variety of parties, contractual arrangements, geographical locations, and product categories potentially involved in international transactions.[26]

The prosecution history further confirms that the claim language cannot be read as incorporating any particularized list of required cost calculations. Indeed, the applicant repeatedly stressed to the PTO that its invention facilitates all types of international transactions which necessarily "var[y] in accordance with the terms of the sales agreement between the buyer and the seller." See, e.g., (Valek Decl. at Exh. 4, p. 24055). To illustrate the point, the applicant

---

[26] The mischief inherent in Dell's narrowing claim construction is clear. For example, imagine a scenario in which a vendor offered a deal of "free shipping on all orders of $500 or more," while still charging the customer for all other applicable taxes and duties. There, Dell would undoubtedly argue that no infringement was occurring because the calculation of customer shipping charges that element (e) supposedly *always* requires would presumably be foregone as entirely unnecessary.

submitted to the PTO as part of an information disclosure statement the industry standard "Guide To Incoterms [*i.e.*, International Commercial Terms]" that describes several of the most common contractual arrangements used in international importing and exporting.  See (Exh. 8 to Henschke Decl.).  For example, one such arrangement called a CIF contract -- *i.e.*, a "Cost, Insurance And Freight" contract -- requires the seller to ultimately bear all shipping and insurance costs for delivery of the product to its port of destination.  (Id. at Exh. 8, p. 5221).  Contrary to Dell's proposed claim construction, under this preferred embodiment of the invention there would simply be no calculation of shipping and insurance costs because by contract the buyer [*i.e.*, the customer] is never charged for these items.  Similarly, with respect to many of the types of contractual arrangements disclosed in "Guide To Incoterms," many of the cost calculations that Dell characterizes as *requirements* would not be performed at all.  See (Pritts Decl. at Exh. A, pp. 5135-5284).

In the final analysis, the state of the intrinsic record shows that Dell is once again relying upon its two favorite claim construction errors.  First, Dell argues that because certain preferred embodiments calculate the various costs that Dell has listed, the contents of this list must be read into the claim language as narrowing limitations.  (Dell Br., pp. 24-25).[27]  This is legal error. (See, supra, pp. 2-3) (*citing* Comark; Phillips; McCarthy; Scimed; E.I. DuPont).  Second, Dell reads the claim language so narrowly that it would no longer cover certain preferred embodiments disclosed in the intrinsic record, such as those discussed above where there are no calculations of insurance or license fee charges, or where a CIF contract is used.  The law does not condone such an approach.  (See, supra, p. 3) (*citing* Hoechst; Anchor Wall; Vitronics).

Dell's last tack is to argue that in both the U.S. and counterpart European prosecution histories, DE Tech purportedly surrendered coverage over any transaction systems that fail to calculate the tax costs associated with product delivery.  (Dell Br., pp. 25-26).  But in the passage

---

[27]  The passages that Dell cites from the specification repeatedly use phrases like "such as" to suggest that the listed costs are not intended as *requirements*, but rather as *representative examples* of what may need to be calculated depending on the circumstances.  See (Dell Br., pp. 24-25) (*citing* '020 Patent at 8:38-50).

quoted from the U.S. prosecution history, the applicant did not "clearly and unmistakably" argue that tax cost calculations are *always* required.  Rather, the applicant merely asserted that the inventive system encompassed use of at least one method of tax calculation that had not been disclosed in the prior art.  (Id.).[28]  With respect to the passage quoted from the European prosecution history, Dell simply disregards the binding legal principle that prosecution histories for a patent other than the patent-in-suit can potentially lend support to a disclaimer argument only where the two patents share "the same claim language."  ResQNet.Com, Inc. v. Lansa, Inc., 346 F.3d 1374, 1383 (Fed. Cir. 2003) (*citing* Advanced Cardiovascular System, Inc. v. Medtronic, Inc., 265 F.3d 1294, 1305 (Fed. Cir. 2001)).  Accordingly, the European prosecution history cited by Dell is legally irrelevant because, unlike here, the patent claim at issue there contained language *expressly requiring* "calculating all … international taxes and duties." (Valek Decl. at Exh. 21, pp. 24530, 24524).

> **6.      "Determining A Total Cost Of The Transaction That Includes The Price Of The Product" ['020 Patent, Claim 1]**

DE Tech does not understand the parties to be in serious disagreement as to the meaning of the above claim language.  Compare (DE Tech Br., pp. 19-20) with (Dell Br., pp. 26-27). Indeed, Dell's only criticism of DE Tech's proposed claim construction is that it supposedly reads the word "determining" out of the claim, which was certainly never intended.  (Dell Br., p. 27).  To address this criticism, and to counteract other interpretative errors made by Dell, DE Tech now slightly modifies its previous construction of element (f) of Claim 1 of the '020 as follows:

---

[28]  The specification makes clear that this particular method of tax calculation merely relates to one preferred embodiment of the patented invention.  Whereas such a method could be used "[i]n many places" that international transactions are conducted, it presumably could not be used in others.  See ('020 Patent at 8:51).

*... determining a total cost[29] of the transaction for obtaining a selected product at a selected destination that includes a price of the product ... .*

Despite the parties being substantially in accord, this Court should be careful to reject at least two aspects of the alternative claim construction proposed by Dell. First, Dell urges without explanation that the word "determining" that appears in the claim language should be replaced with the word "calculating." (Dell Br., pp. 26-27). This despite the fact that Dell provides a dictionary definition for the word "determining" which seems perfectly well suited to the situation at hand. (Id. at p. 26). Moreover, Dell argues that here "the transaction program must obtain [cost] information," which directly borrows from the definition of "determining" which it has offered. (Id. at p. 27). Given the fact that Dell earlier tried to narrowly define the word "calculating" in a way that would only encompass *mathematical computations* -- and *not* the mere "obtaining' of information -- it would inject unnecessary ambiguity and confusion into the claim language to substitute the word "calculating" for the word "determining" in element (f). (See, supra, pp. 33-34).

Second, Dell's proposed use of the term "all costs" is likewise problematic. The claim language calls for the determination of but a single cost -- *i.e.*, the "total cost" -- and *not* for a determination of the individual component costs which comprise this "total cost." Indeed, Dell admits that many of those component costs were already required to be "calculated in the previous process step" recited in element (e) of Claim 1 (Dell Br., p. 26), and therefore a failure to properly differentiate claim language would arise if element (f) could be read as redundantly requiring that such costs be determined again. See Innova/Pure Water, 381 F.3d at 1119-20. Moreover, Dell improperly reads out of the claim language the phrase "of the transaction," which modifies and limits the term "total cost." The presence of that phrase makes it clear that the

---

[29] As noted above, DE Tech understands the parties to be in agreement that the patent claims unambiguously use the term "cost" to refer to a charge to the customer, as opposed to whatever internal or actual costs might be incurred by a vendor or transaction systems operator. (See, supra, p. 32 n.24). Should Dell ever suggest hereafter that it does *not* share such an understanding, however, then this Court would need to construe the term "cost" for purposes of both elements (e) and (f) of Claim 1. Any such construction should be consistent with what DE Tech as proposed above. (Id.).

"total cost" needing to be determined is the one relating to delivering a selected product to a selected destination.  See, e.g., ('020 Patent at 7:6-11; 8:36-37, 46-51).  But once that phrase is removed, Dell's "all costs" construction could conceivably be misread as encompassing other types of costs unrelated to the "total cost" of an international transaction to the customer.

### 7.     "Upon Confirmation Of Availability Of Said Funds, Accepting Said Order, Generating An Electronic Record" ['020 Patent, Claim 1]

In its opening brief, DE Tech believed that the meaning of the above claim language was sufficiently plain that no judicial interpretation was required.  But given Dell's subsequent misconstrual of these claim terms, it is now necessary for DE Tech to provide this Court with the following corrective claim construction of relevant portions of element (h) of Claim 1 of the '020 patent:

> ... following confirmation of availability of said funds, accepting said order, generating an electronic record ... .

Dell disagrees with the above construction in two important respects.  First, Dell argues that the word "upon" as used in the claim language must be interpreted so restrictively that it can only possibly mean "*immediately* following."  (Dell Br., pp. 27-31).  As DE Tech demonstrates below, however, this restrictive definition of "upon" is far narrower than that word's ordinary and customary meaning, and Dell offers no proof whatsoever from the intrinsic record to suggest that the inventors specially defined the term "upon" in such a limiting way, or were otherwise guilty of disclaimer.  Second, Dell contends that the *transaction program itself* must perform the processes of accepting the order and generating the electronic record.  (Id.).  But Dell's misguided notion that the claim language somehow requires the transaction program to "control and execute" the recited processes has already been thoroughly discredited above, and here the intrinsic record again confirms that no such requirement exists.[30]

---

[30]  Dell's further gratuitous assertion that, following the confirmation of customer funds, the transaction program must accept the order and generate the electronic record "without any intervening steps" is incorrect as a matter of law.  See (Dell Br., p.28).  Where, as here, a method claim is drafted with an open-ended transitional term such as "comprising," such a claim encompasses "steps in addition to those stated in the claim."  Vivid Technologies, Inc. v. American Science & Engineering, Inc., 200 F.3d 795, 811 (Fed. Cir. 1999).  Accord Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1271 (Fed. Cir. 1986) (recognizing the "general proposition that a claim employing the transitional term 'comprising' does not exclude additional, unrecited … steps").

    a.    **Dell Misconstrues The Term "Upon" As Being Limited<br>To "Immediately Following"**

Dell argues that in using the word "upon," the claim language requires that order acceptance and electronic record generation must occur "immediately following" a confirmation that customer funds are available.  (Dell Br., pp. 27-28).  Presumably recognizing that this restrictive definition of "upon" is far narrower than its ordinary and customary meaning, Dell advises this Court that all contrary dictionary definitions should simply be "disregarded because they make no sense," and that the "definition Dell relies upon is that which fits best."  (Id. at p. 29 n.11).  Even when acting as the self-appointed arbiter of what makes sense, however, Dell ultimately provides a hand-picked dictionary definition which fails to support its argument that "upon" can only mean "immediately following."  Indeed, Dell's own dictionary provides that "very soon after" is an equally appropriate alternative understanding of "upon."  (Id. at pp. 28-29) (*citing* Exh. 8 to Valek Decl.).  Because Dell simply ignores this alternative and broader connotation of "upon" (*i.e.*, "very soon after"), it is clear that Dell is improperly attempting to define this term in a way that captures something less than its full ordinary meaning.

Turning to the intrinsic record, Dell is unable to offer any evidence whatsoever to support its unusually narrow reading of the word "upon."  Indeed, Dell identifies no instances where the inventors acted as their own lexicographers by specially defining the word "upon" to mean "immediately following," or where they disclaimed patent coverage over systems that accept orders and generate electronic records in a longer than "immediate" time frame.  (See, supra, p. 2).  With respect to the specification, for example, Dell cites to only a single passage which it baldly asserts is "consistent with … [its claim] construction."  (Dell Br., p. 29) (*citing* '020 Patent at 10:15-19).  But far from endorsing Dell's concept of "immediately following," the cited passage actually is completely silent on the issue of *how soon* order acceptance and electronic record generation need to occur after customer funds have been confirmed.  Moreover, that passage makes no express reference to the subject of order acceptance at all.

With respect to the prosecution history, Dell grossly mischaracterizes the nature of the arguments that the applicant made to the PTO in its Response to the Third Office Action.  (Dell

40

Br., pp. 29-31).  According to Dell, the "applicant distinguished prior art by arguing that in the claimed invention the electronic record is generated immediately following confirmation of available funds."  (Id. at p. 29).  This characterization is false.  As even a cursory review of the applicant's arguments will demonstrate, the point of novelty that the applicant asserted to the examiner was that its invention disclosed a general *cause and effect relationship* whereby the generation of an electronic record would be "based upon" a prior confirmation of customer funds.  See (Valek Decl. at Exh. 22, pp. 24018-20).  In other words, the applicant asserted that customer funds confirmation is the precondition that "authorizes the transaction to proceed with the generation of an electronic title."  (Id.).  Contrary to Dell's arguments, there is absolutely no discussion in these passages about *how soon* electronic record generation needs to occur after customer funds are confirmed, much less a "clear and unmistakable" disclaimer by the applicant that it needs to be "immediately following."  Incidentally, there is no discussion *at all* about order acceptance and how it might fit into this chain of events.[31]

Thus, Dell's contention that the relevant language of element (h) "places a temporal limitation on the claim" may be true in only the most general and implicit sense.  (Dell Br., p. 28).  Given the nature of the general *cause and effect relationship* advocated by the applicant, it does appear that the confirmation of customer funds may usually need to occur *prior to* the generation of an electronic record.  As noted above, however, there is no discussion anywhere in the intrinsic record about *how soon* prior to, much less a commitment to *immediacy*.  Accordingly, to the extent that this Court even deems it necessary to construe the word "upon" at all, the most sensible approach would be to define it as meaning "following."  The term "following" captures the idea that funds confirmation might typically occur *before* electronic order generation, but without imposing any artificial time constraints that are unsupported by the

---

[31]  Dell's further argument that the word "upon" must be interpreted to mean "immediately following" because the applicant asserted that element (g) offers the advantage of "greatly expedit[ing] the overall process" is simply frivolous.  (Dell Br., p. 30).  As the applicant explained to the PTO, in prior art which lacked the integrated computer system of the present invention, the processes recited in element (g) "typically [took] … many days" to complete.  See (Valek Decl. at Exh. 4, pp. 35061-62).  Accordingly, there was a great deal of room in which to "expedite the overall process" without ever achieving the state of *immediacy* that Dell purports to require.

intrinsic record. Aside from being legally improper, using phrases like "immediately following" or "soon thereafter" would inject ambiguity and confusion into the claim language concerning the issues of exactly what would qualify as "immediate" or "soon."

### b. Dell Misconstrues The Claim Language As Requiring That *Only* The Transaction Program Can Accept Orders And Generate Electronic Records

Dell also baldly asserts, without any argument or support, that pursuant to element (h) of Claim 1 it must be the *transaction program itself* which accepts orders and generates electronic records. (Dell Br., p. 27). This apparently is a regurgitation of Dell's earlier misguided argument that the patent claims require the transaction program to be what "executes and controls" all recited processes. But for all the reasons DE Tech has previously provided, this argument is incorrect as a matter of law. (See, supra, pp. 11-17).

As to the particular subject matter of element (h), the intrinsic record expressly discloses that a retail vendor -- using its own external "fourth database" software program -- can permissibly perform the processes of order acceptance and electronic record generation rather than the transaction program itself. Indeed, the specification describes a preferred embodiment in which a customer's order is sent directly to the vendor where it is accepted and processed by the vendor's software program. See ('020 Patent at 7:19-21; 9:11-20). Moreover, the vendor can thereafter generate the required electronic record *on its own* instead of relying upon the transaction program to do so. (Id. at 9:31-34; 10:15-40). As the applicant argued in the prosecution history, the fact that the vendor's own software program can permissibly perform these functions in lieu of the transaction program reflects a degree of "flexibility [that] is a significant advantage of the present invention." See (Valek Decl. at Exh. 22, p. 24020). Needless to say, Dell's proposed construction is incorrect as a matter of law because it would place this preferred embodiment outside the scope of the patent claims. (See, supra, p. 3) (*citing* Hoechst; Anchor Wall; Vitronics).

### 8. "Commercial Invoice" ['020 Patent, Claim 1; '364 Patent, Claim 1]

In its opening brief, DE Tech has already provided the proper claim construction for the term "commercial invoice" used in element (h) of Claim 1 of the '020 patent as follows:

> *... a document that defines the basic terms of an international transaction including at least the description and total value[32] of the goods ... .*

See (DE Tech Br., p. 20).  The only minor modification that this Court may wish to consider is to change the word "goods" to the word "product[s]" for sake of greater consistency with the rest of the claim language.

Dell appears to disagree with the above construction in two significant respects.  First, Dell seeks to read countless additional limitations into the claim language by arguing that a "commercial invoice" as defined must contain "at least the information required by all applicable customs regulations" worldwide.  (Dell Br., p. 31).  As DE Tech demonstrates below, however, this argument rests entirely upon the false premise that it is the "commercial invoice" -- rather than the claimed "electronic record" -- that serves to facilitate the passage of selected products to their final destinations.  Once that false premise is stripped away, Dell can point to nothing in the intrinsic record to show that the inventors somehow required the recited "commercial invoice" to include information responsive to "all applicable customs regulations," either by way of a special definition or disclaimer.  Second, Dell also gratuitously argues, contrary to its own proposed claim construction, that a "commercial invoice" needs to include no less than seventeen different items of information required by certain *U.S. import regulations*.  (Dell Br., p. 33).  But as DE Tech will show, not only is such an argument unsupported by the intrinsic record, it also is facially absurd as applied to an inventive system that largely addresses *export transactions* from

_____

[32] Inclusion of the term "total value" in this construction belies Dell's argument that DE Tech has failed to distinguish an international "commercial invoice" from an "ordinary invoice" used for domestic transactions.  (Dell Br., p. 32).  As the specification explains, the "total value" figure used for export transactions reflects more than simply the factory or FOB point price of the product.  See ('020 Patent at 13:58-14:19; 8:46-65).  Indeed, "total value" also typically includes other charges relevant to moving a product to its final point of destination such as those for carriage [*i.e.*, freight], insurance, handling, import duties, value added taxes, luxury taxes, etc.  (Id.).  As a revenue generating measure, many foreign countries take advantage of the "compounding effect" that results from basing their importation taxes and fees on this comparatively larger "total value" figure disclosed in a "commercial invoice."  (Id.).  By contrast, ordinary domestic invoices need contain far less information because "American government taxation schedules are based [merely] upon FOB point prices."  (Id. at 13:63-66).  This would mean, for example, that "[i]n virtually all domestic transactions freight and insurance are not considered taxable components of the goods or services" and thus would not need to be reflected in any "total value" calculation.  (Id.).

the U.S. to destinations "almost anywhere in the world," none of which would be governed by these *U.S. import regulations*.

   a.    **Dell Misconstrues The Term "Commercial Invoice" As Requiring Information Responsive To "All Applicable Customs Regulations"**

As an initial matter, Dell appears to suffer from the serious misconception that the '020 patent requires the "commercial invoice" itself to be what satisfies the "variety of regulations around the world" that export products will encounter en route to their final destinations.  (Dell Br., p. 31).  Based upon this misconception, Dell reasons that a "commercial invoice" accordingly must contain "at least the information required by all applicable customs regulations."  (Id.).  But as the claim language of element (h) instead makes clear, it is actually the "electronic record"[33] -- and *not* the "commercial invoice" -- which performs the required function of "facilitat[ing] passage of such product to said destination."  See ('020 Patent at 17:29-33).  Indeed, rather than the "commercial invoice," the specification further confirms that it is in fact "[t]he electronic title, *modified in accordance with the customs regulations of the two respective countries* and the international carrier, [that] will provide a complete memorialization of transfer of the goods from the factory to the final destination point."  (Id. at 12:36-40) (emphasis added).[34]

Here, the intrinsic evidence clearly shows that the "electronic record" (a/k/a, "electronic title") is typically a broad collection of documentation of which a "commercial invoice" is merely a subset.  Indeed, in the prosecution history, the applicant repeatedly explained that "a person of ordinary skill in the art reading the specification would understand that the generated 'electronic title' includes the commercial invoice, but is not limited to the commercial invoice." (Valek Decl. at Exh. 4, p. 24056).  In other words, depending upon the nature of the international

---

[33]  As Dell expressly acknowledges in its opening brief, the term "electronic record" which ultimately made its way into the claim language correlates to the term "electronic title" that was used throughout the intrinsic record.  (Dell Br., p. 29 n.12).

[34]  Notably, the presence of an actual "commercial invoice" is not even a requirement of the patent claim language. See ('020 Patent at 17:29-33).  Rather, the only requirement is that the typical content of a "commercial invoice" be somewhere included in the overall "electronic record."

transaction at issue, the "electronic record" may "require considerable additional documentation" beyond a "commercial invoice."  (Henschke Decl. at Exh. 9, ¶ 7).  This additional documentation might include, for example, bills of lading, export packing lists, export licenses, transport documents, or insurance lists.  See ('020 Patent at 10:61-64; 11:14-19, 60-62; 12:20-21) (Henschke Decl. at Exh. 9, ¶ 6).  In fact, the U.S. government maintains an official website portal which provides a long laundry list of the types of documents *over and above* "commercial invoices" that will often comprise the "electronic record" used to facilitate an international export transaction.  See (Exh. 10 to Henschke Decl.).[35]

Thus, even if Dell were generally correct in arguing that an international transaction needs to satisfy "all applicable customs regulations" (which DE Tech does not concede), there is no requirement that it do so by way of the "commercial invoice" itself.  To the contrary, some or all of the information responsive to customs regulations can permissibly appear in other types of documents contained elsewhere in the broader "electronic record."[36]  Indeed, this is precisely why the claim language clearly recites that it is the "electronic record," and *not* the "commercial invoice," which plays the role of "facilitat[ing] passage of such product to said destination." ('020 Patent at 17:29-33).  Tellingly, Dell acknowledges these points later in its own brief when addressing the term "authorization data," which it defines as information that is added to the broader "electronic record" for use in satisfying customs officials.  See, e.g., (Dell Br., p. 35) (the "specification describes including in the electronic record data that would ordinarily be provided to customs"); (Dell Br., p. 53) ("The electronic record must be in a form so as to facilitate passage of the selected product to the selected destination.").

---

[35] These other documents that comprise the overall "electronic record" can include, for example, shipper's export declarations; dual use export controls and licenses; defense trade export controls and licenses; certificates of origin; bills of lading; insurance certificates; export packing lists; import licenses; consular invoices; air way bills; inspection certificates; dock receipts; warehouse receipts; destination control statements; etc.  See (Exh. 10 to Henschke Decl.).

[36] Cf. (Valek Decl. at Exh. 4, p. 24054) (applicant characterizes "hard evidence of … government/regulatory compliance" as information distinct from the content of "commercial invoices").

Further confirmation of these points can be found in the industry standard "Guide to Incoterms" that the applicant submitted to the PTO.  Far from indicating that a "commercial invoice" would alone be sufficient to satisfy "all applicable customs regulations," the Guide shows that additional documentation would typically be needed to complete the "electronic record."  By way of limited example, with respect to a so-called CFR contract -- *i.e.*, a "Cost And Freight" contract -- the seller's "commercial invoice" would need to be further accompanied by "transport documents," "export licenses," and potentially other "documents needed for transit of the goods through another country or for import clearance."  (Henschke Decl. at Exh. 8, pp. 5211-12).  Similarly, in describing the CFR seller's "other obligations," the Guide states that seller must provide "every assistance in obtaining any [other] documents … issued or transmitted in the country of shipment and/or of origin which the buyer may require for the importation of the goods."  (Id. at p. 5217).  Clearly, if Dell were correct in arguing that by definition a "commercial invoice" itself must already satisfy "all applicable customs regulations," none of this other documentation would ever be necessary.

Once Dell's improper conflating of the terms "commercial invoice" and "electronic record" has been unraveled, it is left with no intrinsic evidence to support its proposed claim construction.  Indeed, Dell's attempt to argue that the inventors acted as their own lexicographers by specially defining "commercial invoice" to require information  responsive to "all applicable customs regulations" is wholly unpersuasive.  (Dell Br., p. 32). Inventor Pool did not, as the law would require, make a "clear statement" that a "commercial invoice" alone must *always* satisfy "all applicable customs regulations."  (Id.).  Rather, he merely observed that it can serve "as a document used by governments to control imports."  (Id.).  Moreover, the exhibit that Pool attached to his declaration simply states that some governments "often" (but not always) use "commercial invoices … to determine the value of goods," and that these governments "often" (but not always) will specify the content of such invoices.  (Id.).  In any event, Pool expressly stated that his attached exhibit was intended to provide only a representative example of "a typical" commercial invoice.  (Id.).  As such, it qualifies as nothing more than a preferred

embodiment, and its features cannot permissibly be read into the claim language as narrowing limitations.  (See, supra, pp. 2-3) (citing Comark; Phillips; McCarthy; Scimed; E.I. DuPont).  Even if they could be, Dell does not, and cannot, show that these features include information responsive to "all applicable customs regulations" as its claim construction would require.

        **b.**       **Dell Improperly Seeks To Read U.S. Import Regulations Into Claim Language Applicable To All International Transactions**

        In explaining the rationale for its "all applicable customs regulations" construction, Dell initially asserts that "[b]ecause the contents of a commercial invoice vary from country to country, different information must be included depending on which countries are involved in the international shipment."  (Dell Br., p. 31).  Later in the brief, however, Dell gratuitously argues that the term "commercial invoice" should be interpreted as always requiring no less than seventeen different items of information borrowed from the laws of a single country -- viz., the U.S. import regulations statute.  (Id. at pp. 31, 33) (citing 19 C.F.R. § 141.86-89).  Needless to say, this argument contradicts both the claim construction that Dell itself proposes, and the above rationale that underlies it.  Moreover, aside from the fact that Dell offers no intrinsic evidence to support such a proposition, it clearly is absurd on its face as applied to an inventive system designed to facilitate all manner of international transactions.  As each of the stated objects of the invention suggest, one of the principal intended uses of the invention is to coordinate export transactions made from the U.S. to customers located "almost anywhere in the world."  ('020 Patent at 2:60-3:37).  Indeed, Appendix I to the specification discloses precisely this type of export sale of an automobile made from Norfolk, Virginia to the Netherlands.  (Id. at 14:20-29).  Dell simply offers no justification whatsoever for why the claim language should be read as requiring that the "commercial invoices" used in these export transactions would somehow need to satisfy U.S. import regulations that do not even apply to them.  For all of these reasons, Dell's gratuitous argument should be summarily rejected.

**B.**   **Dell Has Misconstrued Each Of The Additional Disputed Claim Terms Appearing In The Dependent Method Claims Of The '364 Patent**

DE Tech demonstrates below that each of Dell's proposed constructions for Claims 2, 3, and 4 of the '364 patent are incorrect as a matter of law.

**1.**   **"Moving Said Electronic Record Via EMF Communications Links From Point To Point" ['364 Patent, Claim 2]**

Having not previously addressed element (f) of Claim 2 of the '364 patent, DE Tech now proposes the following claim construction:

> *... transmitting the electronic record electronically where feasible between or among two or more points along a route of passage to said destination for said selected products ... .*

The above construction is somewhat similar to the interpretation proposed by Dell with two potentially significant exceptions.  Cf. (Dell Br., pp. 33-34).  First, the '364 patent specification expressly contemplates situations in which the government entities controlling various points along the transport route may still be using antiquated conventional systems that require hard copies of the "electronic record" documents in lieu of accepting electronic copies. See ('364 Patent at 12:11-30).  For these preferred embodiments, the specification teaches that it is appropriate for "[p]aper copies of the title or commercial invoice … [to] be generated from the electronic original … for presentation to entities requiring [such] hard copies." (Id. at 12:11-14). See also (Id. at 14:7-9) (electronic record "can be provided either as an electronic document or a hard copy can be generated and provided").  DE Tech has properly accounted for such circumstances by using the phrase "where feasible" in its proposed claim construction.  By contrast, however, Dell's interpretation appears to *always require* electronic transmission of the "electronic record," even to those points along the transport route where it would be impossible to do so because electronic documents are neither permitted nor accepted.  As such, Dell departs from standard rules of claim construction by reading the claim language so narrowly that it would no longer cover those preferred embodiments where the use of hard copies might sometimes be necessary.  (See, supra, p. 3) (*citing* Hoechst; Anchor Wall; Vitronics).

48

Second, Dell's construction also would require that the "electronic record" always be transmitted "to each of a plurality of points." (Dell Br., p. 33). This implies that the claim language cannot be satisfied unless there are at least two or more points along the transport route *in addition to* a product's point of origination. But as DE Tech has previously shown, the patent claims do not require that every transport route be broken up into multiple individual legs. (See, supra, p. 27 n.21). To the contrary, a transport route can properly consist of only two points in total -- *viz*., a point of origination and a final point of destination. (Id.). Under that scenario, the "electronic record" would only need to be transmitted to a single point (*i.e.*, from A to B), and *not* to a "plurality of points" as Dell's interpretation purports to require. Moreover, Dell also tries to improperly insert the word "each" into the claim language without any proffered justification. This would cause the patent claims not to read on situations where the "electronic record" is sent to some, but not all, of a plurality of points (*e.g.*, situations where certain points do not accept electronic copies). Thus, whereas Dell once again excludes certain preferred embodiments from coverage under the patent claims, DE Tech instead proposes use of the phrase "between or among two or more points" which would properly encompass all relevant types of transport routes.

As a final caveat, DE Tech emphasizes its understanding that by accepting Dell's use of the term "electronically" as part of the claim construction, it has in no way limited the scope of the original claim language which actually reads "via EMF communications links." Indeed, the specification makes clear that the term "EMF communications links" broadly encompasses all types of electromagnetic (*i.e.*, electromotive) force wave communications links including, without limitation, the Internet, intranets, radio waves, light pulses, telephone lines, satellite links, dedicated data lines, etc. See, e.g., ('364 Patent at 3:39-42; 4:28-31; 5:6-8; 11:49-54).

## 2.    "Authorization Data" ['364 Patent, Claim 3]

DE Tech for the first time proposes a claim construction for relevant portions of element (g) of Claim 3 of the '364 patent as follows:

> ... *data relevant to obtaining authorized passage through a point ...* .

49

In its opening brief, Dell has cited the passage from the parent specification which appears to be the most directly relevant to construing the term "authorization data." <u>See</u> (Dell Br., pp. 35-36) (*citing* '020 Patent at 11:59-12:15). <u>Cf.</u> ('364 Patent at 13:57-14:15). However, Dell simply over reads this passage by concluding that such data is "required" in order to receive authorized passage through a point on a transport route. While it may be fair to assume that whatever additional data the international carrier has added to the "electronic record" is somehow *relevant to obtaining* authorized passage from customs officials, such data is nowhere described as a "requirement." (<u>Id.</u>). To the contrary, the cited passage describes an alternative approach in which the international carrier would *not* make use of any such data, and would instead rely upon a freight forwarding company such as FedEx or UPS to secure authorization from customs officials. (<u>Id.</u>). Obviously, the very existence of this alternative approach demonstrates that such data is not always a "requirement" for obtaining authorized passage through customs.

### 3. **"Transfer Of Payment" ['364 Patent, Claim 4]**

DE Tech initially proposes a claim construction for relevant portions of Claim 4 of the '364 patent as follows:

> *… data enabling the electronic record to facilitate payment … .*

Dell disagrees with the above construction only in that it would substitute the word "effect" for the word "facilitate." (Dell Br., pp. 36-37). But that would make no sense. Given that the "electronic record" is merely a collection of documents, the "electronic record" itself is not what actually "effects" payment. Rather, the "electronic record" merely contains information that "facilitates" the *computer system* in making payments. Indeed, throughout the specification, it is clear that payments are "effected" by the computer system, which in turn relies upon the contents of the "electronic record" for information concerning the details and timing of such payments. <u>See</u>, <u>e.g.</u>, ('364 Patent at 14:12-33, 60-63). Similarly, as the applicant explained in the parent prosecution history, the "electronic record" is "sent to official passage points (such as

borders and customs stations) to *facilitate* the payment of duties," as opposed to literally making those payments itself.  (Valek Decl. at Exh. 20, p. 23946) (emphasis added).

**C.    Dell Has Misconstrued Each Of The Means-Plus-Function Claim Terms Appearing In The Independent Apparatus Claims Of The '020 Patent**

The parties agree that independent apparatus Claim 13 of the '020 patent (and each claim that depends therefrom) contains means-plus-function limitations that are required to be interpreted under 35 U.S.C. § 112(6).  (DE Tech Br., pp. 8-9) (Dell Br., p. 37).  Moreover, the parties further agree that a proper § 112(6) analysis involves a two-step process.  (DE Tech Br., p. 21) (Dell Br., pp. 37-38).  First, for each claim element, a court must identify its associated function as recited in the claim language.  (Id.).  Second, a court must identify from the specification the corresponding structure(s) that are necessary for performing each claim element's recited function.  (Id.).  These corresponding structures "and equivalents thereof" then establish the scope of claim coverage.  (Dell Br., p. 37).  Finally, as part of this two-step process for interpreting means-plus-function claims, DE Tech also concurs with Dell that because the law requires that similar claim terms be "construed consistently throughout the patent[]," all similar language appearing in "claim 13 should be given the same meaning it has [previously been given] in claim 1."  (Id. at pp. 28 n.10, 39).

Despite these areas of general agreement, however, DE Tech demonstrates below that Dell has repeatedly committed at least three interpretative errors that render its means-plus-function constructions incorrect as a matter of law.  First, Dell attempts to assign functions to various claim elements that are contrary to those expressly set forth in the claim language.  But as a matter of law, the § 112(6) "statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim."  Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999).  Accord Generation II Orthotics, Inc. v. Medical Technology, Inc., 263 F.3d 1356, 1364-65 (Fed. Cir. 2001) ("When construing the functional statement in a means-plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim.").  Indeed, misconstrual of a recited function at the outset can lead

to a chain reaction of further errors -- *i.e.*, an "error in identification of the function can improperly alter the identification of structure in the specification corresponding to that function … [which may cause a court to] erroneously overlook[] alternative embodiments of the invention." <u>Micro Chemical</u>, 194 F.3d at 1258.

Second, when identifying corresponding structure from the specification, Dell typically tries to narrow the scope of the claim language so as to cover only those structural features associated with a particular preferred embodiment of its choosing.  However, such an approach is forbidden by Federal Circuit law.  Indeed, "[w]hen multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments." <u>Micro Chemical</u>, 194 F.3d at 1258-59 (*citing* <u>Serrano v. Telular Corp.</u>, 111 F.3d 1578, 1583 (Fed. Cir. 1997) (under a means-plus-function analysis, "[d]isclosed structure includes that which is described in a patent specification, including any alternative structures identified.")).

Finally, depending on what suits its purposes, Dell flip-flops back and forth between reading either too much or too little structural detail into the claim language.  Needless to say, neither of these approaches is legally permissible.  On the one hand, too much structural detail violates the maxim that "under § 112, ¶ 6, a court may not import … [additional] structural limitations from the written specification that are unnecessary to perform the claimed function." <u>Wenger Mfg., Inc. v. Coating Machines Systems, Inc.</u>, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (*citing* <u>Micro Chemical</u>, 194 F.3d at 1258 (the "statute does not permit … incorporation of structure from the written description beyond that necessary to perform the claimed function.")).  On the other hand, Dell sometimes goes to the opposite extreme by arguing that the specification contains insufficient structural detail to satisfy § 112(6).  But the Federal Circuit has set a very low bar with respect to the level of structural detail needed to satisfy § 112(6), holding that "[a]ll one needs to do in order to obtain the benefit of … [the statute] is to recite *some structure* corresponding to the means in the specification." <u>Atmel Corp. v. Information Storage Device, Inc.</u>, 198 F.3d 1374, 1382 (Fed. Cir. 1999) (emphasis added).  Moreover, far from needing to be

52

elaborate or even express, the "'structure corresponding to a means-plus-function limitation may be [merely] implicit in the written description if it would have been clear to those skilled in the art what structure must perform the function recited.'"  Id. at 1380 (*quoting* PTO Supplemental Examining Guidelines).[37]

For the sake of brevity, DE Tech restricts the following discussion to identifying the legal errors contained in Dell's means-plus-function claim constructions.  By contrast, DE Tech's own § 112(6) interpretations are fully set forth in Exhibit 1 to the Henschke Declaration.  These interpretations have occasionally been modified in minor ways since the filing of DE Tech's opening brief so as to maintain consistency with the analysis of Claim 1 set forth above, and to clarify and correct the misconceptions put forth in Dell's opening brief.

1.   **"Means For Running A Transaction Program" ['020 Patent, Claim 13]**

The function that Dell attributes to the above "means" component is incorrect as a matter of law because it differs from the function "explicitly recited in the claim" as properly construed. (Dell Br., p. 39).  (See, supra, p. 51) (*citing* Micro Chemical; Generation II).  Indeed, Dell seeks to impose unrecited functional limitations such as "*a single* computer program" and "controls and executes" that are borrowed from its faulty analysis of parallel language from Claim 1, and accordingly they must be rejected for all the same reasons that DE Tech has previously demonstrated above.  (See, supra, pp. 4-17).

Moreover, Dell's identification of corresponding structure is unsupported insofar as it can be read to suggest that the claimed "means" component could be a single stand-alone computer unconnected to any other computer by way of a network or otherwise.  (Dell Br., p. 39).  Dell points to nowhere in the specification that would evidence such a proposition.

---

[37] Cf. MPEP § 2106, p. 2100-9 (8th ed. 2004) (disclosure of structure sufficient to satisfy § 112(6) "may be express, implicit or inherent.") (Exh. 11 to Henschke Decl.).

2.      **"Means For Determining A Language Or Currency" ['020 Patent, Claim 13]**

The parties agree on how to characterize the functions associated with the above "means" components recited in elements (a) and (b) of Claim 13 of the '020 patent.  See (Dell Br., pp. 40, 42) (Exh. 1 to Henschke Decl.).

With respect to identifying corresponding structure, however, Dell's position that the recited "means" components are "*a customer* accessing a website or private site" is necessarily incorrect as a matter of law.  (Dell Br., pp. 40, 42) (emphasis added).  Indeed, the Federal Circuit has clearly held that for purposes of a § 112(6) claim, a "human being cannot constitute a 'means'."  Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1300 (Fed. Cir. 2005) (*citing* In re Prater, 415 F.2d 1393, 1398 (CCPA 1969)).  See also Davies v. United States, 31 Fed. Cl. 769, 778-79 (Fed. Cl. Crt. 1994) (means-plus-function "claims do not cover structures in which a human being substitutes for part of the claimed structure.").[38] Notably, Dell has been forced into this legally untenable position in order to remain consistent with its earlier (and equally incorrect) arguments that under elements (a) and (b) of Claim 1, the selection of languages or currencies ostensibly can *only* be made by the customer and cannot be made by the computer system.  (See, supra, pp. 19-22).

Consistent with DE Tech's alternative and proper construction, here the law requires that the "means" component be one or more computer software program[s] adapted to receive customer input as to language or currency selections.  See (Exh. 1 to Henschke Decl.).  Moreover, because corresponding structure must embrace all of the multiple embodiments

---

[38]  Cf. MPEP § 2105, p. 2100-5 (8th ed. 2004) ("If the broadest reasonable invention as a whole encompasses a human being, then a rejection under 35 U.S.C. 101 must be made indicating that the claimed invention is directed to nonstatutory subject matter.") (Exh. 11 to Henschke Decl.).

disclosed in the specification, this "means" component must include structure relevant to *both direct and default*[39] selections of languages or currencies.  (Id.).

3.    **"Means For Receiving A Selection Of A Product" ['020 Patent, Claim 13]**

As a preliminary matter, DE Tech has previously shown that element (c) of Claim 13 contains an obvious printing error relating to the inadvertent addition of the phrase "and a product to be purchased" during the patent publication process.  See (DE Tech Br., pp. 23-25).  This Court has the power to correct such an "administrative error" so long as it is "apparent from the face of the patent," and its status as an error is "not contradicted by the prosecution history."  Hoffer v. Microsoft Corp., 405 F.3d 1326, 1331 (Fed. Cir. 2005).  In its opening brief, Dell addresses only the first prong of this test, arguing that here no error is facially apparent from an examination of the patent claims and specification standing alone.  (Dell Br., pp. 45-47).  But this argument strains credulity.  Addition of this extra phrase renders the claim language nonsensical by ostensibly requiring that a computer software program (*i.e.*, the "means for receiving …") must somehow physically receive a product.  Moreover, whereas the claim language would otherwise differentiate the "means for receiving" from the "destination" to which a product will be shipped, adding this extra phrase would serve to improperly equate the "means" with the "destination."  (Cf., supra, p. 31) (*citing* Innova/Pure Water).  As another point of comparison, element (c) of Claim 13 was designed as an analogue to element (c) of Claim 1 which does not contain such erroneous extra language.  Finally, it is universally clear throughout

---

[39]  With respect to scenarios involving default selections of languages or currencies made by a computer software program itself, an additional database structure (or its equivalent) may be required in those situations where the menu list is comprised of stored customer profile information, albeit perhaps *not* in other situations where, for example, the menu list is comprised of information gleaned merely from a customer's initial entry into the transaction system.  Compare ('020 Patent at 12:47-54) with (Id. at 4:33-34).

the specification that it is the *customer* who receives the product, *not* any claimed computer software program.[40]

As to the second part of the test which Dell simply ignores, the prosecution history dispositively confirms that the additional phrase at issue was a printing error.  The final amendments to the claim language that the applicant submitted to the PTO on February 13, 2002 contained no such superfluous language.  See (Sorenson Decl. at Exh. 16, p. 4).[41]  Moreover, the PTO then adopted wholesale the language of these final amendments in issuing its Notice of Allowance.  See (Valek Decl. at Exh. 6, p. 24172) ("This communication is responsive to [the applicant's] 2/13/02" submission).  Accordingly, there can be "no reasonable debate" that the additional phrase "and a product to be purchased" is an "obvious administrative error" that this Court should correct by deleting it from element (c).  Hoffer, 405 F.3d at 1331.

In its opening brief, Dell seeks to exploit the printing error by using it as a basis for misstating the function associated with the above "means" component, thereby allowing it to further conclude that no corresponding structure can be identified from the specification.  (Dell Br., p. 44).  However, once this erroneous language has been properly deleted, it becomes clear that the specification does in fact disclose structure for "receiving a selection of a product … and a destination" -- *viz.* , one or more of the computer software programs that reside on the transaction system.  (Exh. 1 to Henschke Decl.).

---

[40]  Dell's reliance on the Group One case is misplaced.  See (Dell Br., pp. 45-47) (*citing* Group One Ltd. v. Hallmark Cards, Inc., 407 F.3d 1297 (Fed. Cir. 2005)).  Indeed, Group One presented the opposite problem than the one at issue here in that a printing error resulted in language being *omitted* from a patent claim.  Id. at 1302.  The court declined to correct the claim because it could not "discern what language is missing simply by reading the patent," and accordingly would need "to guess at what was intended."  Id. at 1303.  By contrast, here it is easy to identify what extra language was mistakenly *added* to the claim -- *viz.*, "and a product to be purchased" -- because it can readily be verified that there is no supporting disclosure in the specification about a computer software program somehow physically receiving a product.

[41]  As used herein, the term "Sorenson Decl." is a reference to the Declaration Of Christopher J. Sorenson In Support Of DE Technologies, Inc.'s Opening Claim Construction Brief.

4.    **"Means For Accessing At Least One Local Or Remote Database"**
      **['020 Patent, Claim 13]**

The parties agree on how to characterize the function associated with the above "means" component recited in element (d) of Claim 13 of the '020 patent.  See (Dell Br., p. 47) (Exh. 1 to Henschke Decl.).

With respect to identifying corresponding structure, Dell argues that only the transaction program itself can possibly qualify based upon the false premise that the "specification discloses only the transaction program for accessing databases."  (Dell Br., p. 48).  To the contrary, however, the specification teaches that other software programs residing on the transaction system -- such as the "third database" software program -- can access separate databases to obtain product code information per element d(ii) of Claim 13.  See ('020 Patent at 6:63-65). Accordingly, because corresponding structure must be read broadly enough to encompass all preferred embodiments, here it would be improper as a matter of law to restrict such structure to *only* the transaction program.  (See, supra, p. 52) (*citing* Micro Chemical; Serrano).

5.    **"Means For Calculating Costs Involved In Moving Such Product"**
      **['020 Patent, Claim 13]**

The function that Dell attributes to the above "means" component of element (e) of Claim 13 of the '020 patent is incorrect as a matter of law because it differs from the function "explicitly recited in the claim" as properly construed.  (Dell Br., pp. 48-49).  (See, supra, p. 51) (*citing* Micro Chemical; Generation II).  Indeed, Dell seeks to impose unrecited functional limitations -- such as making *mathematical* determinations about a *particularized list of costs* -- that are borrowed from its faulty analysis of parallel language from Claim 1, and accordingly they must be rejected for all the same reasons that DE Tech has previously demonstrated above. (See, supra, pp. 32-37).  Here, the claimed function is simply to determine (whether mathematically or otherwise) whichever costs might be applicable to moving a particular product to its final destination.  (Exh. 1 to Henschke Decl.).

Dell also pursues the legally impermissible tack of identifying far greater structural detail than would be necessary for performing the properly construed function.  (See, supra, p. 52) (*citing* Wenger; Micro Chemical).  Indeed, of the seven different software algorithm steps that

57

Dell tries to characterize as required structure, only one of them -- *viz.*, step (134) -- can even

arguably be described as directly corresponding to the calculation of product delivery costs.

(Dell Br., pp. 49-51) (*citing* '020 Patent at 7:11-8:50).  For example, step (125) has nothing to do

with the actual process of cost calculation, and instead relates to verifying whether a retail

vendor has certain items in stock.  (Id. at 7:17-20).  Moreover, step (126), which involves a

customer inputting the shipping destination for a product, at most could comprise structure

relevant to element (c) of Claim 13 rather than to element (e).  (Id. at 7:29-31).  Steps (127)

through (129) all relate to a special "simplified operation of the inventive process" principally

applicable to *domestic* transactions.  (Id. at 7:34-67).  As such, they represent an alternative

embodiment rather than general structural requirements applicable to the *international*

transactions to which the invention is specifically directed.  Finally, step (132) pertains to

determining the discrete legs of a transport route which DE Tech has shown is not a mandatory

component of calculating product delivery costs.  (See, supra, p. 27 n.21).

> **6.** **"Means For Receiving An Order" ['020 Patent, Claim 13]**

The parties agree on how to characterize the function associated with the above "means"

component recited in element (f) of Claim 13 of the '020 patent.  See (Dell Br., p. 51) (Exh. 1 to

Henschke Decl.).

However, Dell then goes on to mis-identify the corresponding structure for performing

the function of receiving a product order.  (Dell Br., pp. 51-52).  According to Dell, this structure

consists of a particular type of display screen -- *i.e.*, a "menu screen" -- that is sometimes

presented to a customer by the transaction program.  But such a display screen does not

"receive" a customer order in any meaningful sense.  Rather, a customer merely inputs

information about product selections into a display screen, and that information then needs to be

transmitted to a computer software program where it will first be understood and interpreted as a

product order.  See ('020 Patent at 9:7-21).  Tellingly, if the information input by a customer on

a menu screen was never sent to a computer software program at all, no product order would

ever have been "received."  Thus, it is a computer software program, rather than merely the

display screen which it uses as a customer interface, that actually "receives" a product order. Moreover, the specification expressly discloses that the types of computer software programs capable of receiving such orders are not limited to *only the transaction program* as Dell would have it, but also can include other programs such as the "fourth database" software program owned and operated by a retail vendor.  (<u>Id.</u>).

      **7.**      <u>**"Upon Confirmation Of Availability Of Funds, Means For**</u>
                    <u>**Generating An Electronic Record" ['020 Patent, Claim 13]**</u>

The function that Dell attributes to the above "means" component of element (g) of Claim 13 of the '020 patent is incorrect as a matter of law because it differs from the function "explicitly recited in the claim" as properly construed.  (Dell Br., p. 52) (<u>See</u>, <u>supra</u>, p. 51) (*citing* <u>Micro Chemical</u>; <u>Generation II</u>).  Indeed, Dell seeks to impose unrecited functional limitations -- *e.g.*, the word "immediately" and the suggestion that *only* the transaction program can generate the electronic record -- that are borrowed from its faulty analysis of parallel language from Claim 1, and accordingly they must be rejected for all the same reasons that DE Tech has previously demonstrated above.  (<u>See</u>, <u>supra</u>, pp. 39-42).  Moreover, Dell wrongly describes "accepting the order" as part of the recited function when in fact the claim language of element (g) does not even mention such a process at all.  (Dell Br., p. 52).

With respect to identifying corresponding structure, Dell argues that the only structure disclosed in the specification for generating an electronic record is step (165) from the transaction program's software algorithm.  (Dell Br., pp. 53-54).  But that argument is demonstrably false.  The specification expressly teaches that, as an alternative to the transaction program generating the electronic record, such a record can instead be generated by a retail vendor using its own "fourth database" software program.  <u>See</u> ('020 Patent at 10:24-28).  <u>See also</u> (Valek Decl. at Exh. 22, p. 24020).  Accordingly, Dell's identification of corresponding structure is incorrect as a matter of law because it is too narrow to encompass the "multiple embodiments in the specification [that] correspond to the claimed function."  (<u>See</u>, <u>supra</u>, p. 52) (*citing* <u>Micro Chemical</u>; <u>Serrano</u>).

8.     **"Means For Authorizing Electronic Payment Of Expenses Required Along A Selected Shipping Route" ['020 Patent, Claim 14]**

The function that Dell attributes to the above "means" component of Claim 14 of the '020 patent is incorrect as a matter of law because it differs from the function "explicitly recited in the claim" as properly construed.  (Dell Br., p. 54).  (See, supra, p. 51) (*citing* Micro Chemical; Generation II).  Indeed, without any explanation or justification, Dell simply replaces the word "selected" which modifies the term "shipping route" with the alternative word "said."  But here the term "said" makes no sense because it lacks any antecedent basis in either the remaining language of Claim 14, or in the language of Claim 13 from which it depends.  In short, because no *particular* shipping route has previously been identified, use of the word "said" is meaningless and inappropriate.

With respect to identifying corresponding structure, Dell argues that the only structure disclosed in the specification for authorizing electronic payments along a transportation route is step (188) from the transaction program's software algorithm.  (Dell Br., pp. 54-55).  But this argument is easily disproved.  The specification expressly teaches that, in lieu of the transaction program authorizing all electronic payments, certain of these payments can instead be made by retail vendors who have computer software "systems in place to handle such tasks" as "paying the local taxes, local transport cost, insurance, packaging, etc."  See ('020 Patent at 11:28-36).  Accordingly, once again Dell's identification of corresponding structure is incorrect as a matter of law because it is too narrow to encompass the "multiple embodiments in the specification [that] correspond to the claimed function."  (See, supra, p. 52) (*citing* Micro Chemical; Serrano).

9.     **"Means For Storing And Analyzing Data Based Upon Each Customer Accessing The System" ['020 Patent, Claim 17]**

The parties agree on how to characterize the function associated with the above "means" component recited in Claim 17 of the '020 patent.  See (Dell Br., p. 55) (Exh. 1 to Henschke Decl.).

With respect to identifying corresponding structure, however, Dell makes the inexplicable argument that the specification purportedly discloses no structure at all relating to the function of storing and analyzing customer profile information.  (Dell Br., pp. 55-57).  Such

an argument is hard to fathom given that Dell readily admits that in the specification "the transaction program collects customer information used to create a profile" and then "load[s] [it] into the 7th database."  (Id. at p. 56).  Indeed, this can happen both at the time when a customer gains initial entry into the transaction system, and again later after an order has been entered. See ('020 Patent at 4:33-34; 12:47-54).  Dell's contention appears to be that the specification does not expressly identify what structure would then be used to "analyze" this customer profile data.  But here it is clear that the transaction program must be performing an analysis because the specification explains that it is able to use such profile data to guide customers to certain catalogues, products, languages, and/or currencies.  (Id.).  In any event, identification of the transaction program as relevant structure is at least "implicit in the written description" because it "would have been clear to those skilled in the art" that the transaction program would be capable of analyzing such information.  (See, supra, p. 52-53) (citing Atmel).  Nothing more is required.  With respect to the question of disclosing sufficient structure, the "law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art," such as the obvious fact that a software program can analyze data.  S3 Inc. v. Nuidia Corp., 259 F.3d 1364, 1371 (Fed. Cir. 2001).

Finally, were Dell correct in arguing that the specification discloses no corresponding structure at all, the consequences would be to render Claim 17 invalid for "indefiniteness" under 35 U.S.C. §112(2).  See, e.g., Default Proof, 412 F.3d 1291.  Given the severity of these consequences, the law would require Dell to prove that Claim 17 is "lacking structural support" under the heightened evidentiary standard of "clear and convincing evidence."  Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376-77 (Fed. Cir. 2001).  Needless to say, this Court should be very reluctant to find that such a heightened standard has been met.  See, e.g., Exxon Research and Engineering Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("If the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.").

**III.**
**CONCLUSION**

For the foregoing reasons, DE Tech respectfully requests that this Court adopt each of its proposed claim constructions in their entirety, and concomitantly reject Dell's alternative claim constructions to the extent that they are in any way inconsistent therewith.


Dated:  September 2, 2005                        Respectfully submitted,

                                                 DE TECHNOLOGIES, INC.

                                                 By its attorneys,


                                                 s/ Marc N. Henschke
                                                 Christopher P. Sullivan (*pro hac vice*)
                                                 David E. Marder (*pro hac vice*)
                                                 Marc N. Henschke (*pro hac vice*)
                                                 Jonathan D. Mutch (*pro hac vice*)
                                                 ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                                                 800 Boylston Street, 25th Floor
                                                 Boston, MA 02199
                                                 Telephone: (617) 267-2300
                                                 Fax: (617) 267-8288

                                                 Dirk D. Thomas (*pro hac vice*)
                                                 ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                                                 1801 K Street N.W., Suite 1200
                                                 Washington, DC 20006
                                                 Telephone: (202) 775-0725
                                                 Fax: (202) 223-8604

                                                 William B. Poff (VSB No. 03477)
                                                 Matthew P. Pritts (VSB No. 34628)
                                                 WOODS ROGERS PLC
                                                 10 Jefferson Street, Suite 1400
                                                 Roanoke, VA 24038-4125
                                                 Telephone: (540) 983-7649
                                                 Fax: (540) 983-7711

35025770

## <u>CERTIFICATE OF SERVICE</u>

I, Marc N. Henschke, hereby certify that on September 2, 2005, I caused a true and correct copy of the attached *Reply Brief Of DE Technologies, Inc. In Opposition To Dell Inc.'s Opening Claim Construction Brief* to be served by overnight Federal Express (and electronically to CM/ECF participants)\* upon Defendant's counsel of record at the following addresses:

William R. Rakes, Esq.*
GENTRY LOCKE RAKES & MOORE, LLP
800 SunTrust Plaza
10 Franklin Road S.E.
P.O. Box 40013
Roanoke, VA 24022-0013

Willem G. Schuurman, Esq.
Roderick B. Williams, Esq.
H. Kenneth Prol, Esq.
Christopher V. Ryan, Esq.*
Michael A. Valek, Esq.
Matt Wermager, Esq.
VINSON & ELKINS, LLP
The Terrace 7
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568

John M. Faust, Esq.*
VINSON & ELKINS, LLP
1455 Pennsylvania Ave., N.W., Suite 600
Washington, D.C. 20004-1008

Dated:  September 2, 2005          s/ Marc N. Henschke
                                   Marc N. Henschke