CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 1 4 2006

JOHN F. CORCORAN, CLERK
BY: _____
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DE TECHNOLOGIES, INC.,              )
                                    )
          Plaintiff,                )     Civil Action No. 7:04CV00628
                                    )
v.                                  )     **MEMORANDUM OPINION**
                                    )
DELL, INC.,                         )     By: Hon. Glen E. Conrad
                                    )     United States District Judge
          Defendant.                )

DE, Inc. ("DE") brought this patent infringement action against Dell, Inc. ("Dell"). DE alleges that Dell implements the technology described and claimed by DE in U.S. Patent No. 6,460,020 ("the '020 Patent") and U.S. Patent No. 6,845,364 ("the '364 Patent"). The case is currently before the court for claim construction. The parties briefed their respective positions, and the court conducted a Markman[1] hearing on November 9 and 10, 2005. This Memorandum Opinion sets forth the court's interpretation of the disputed claim language and phrases.

At the Markman hearing, the court granted both sides an additional opportunity to focus their arguments as to the constructions required under Claim 1. It was also determined that the court would give the parties a longer period of time to develop their Claim 13 arguments. Since the time of the Markman hearing, the defendant has filed a motion for partial summary judgment of invalidity as to Claims 13-15 and 17 for indefiniteness. The court will issue a second opinion at a later time ruling on the defendant's motion and construing the terms of Claims 13, 14, 15, and 17 as may be necessary.

---

[1]Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

## BACKGROUND

The patents at issue in this case relate to a computer system for facilitating international computer-to-computer commercial transactions by integrating certain functions which enable international purchases of goods over the Internet. The '020 Patent and '364 Patent are assigned to DE. DE brought the instant lawsuit, alleging that Dell implements the technology described in the '020 Patent and '364 Patent in conducting its international import and export business.

## DISCUSSION

### I.     Legal Principles of Claim Construction

In a patent infringement case, federal courts must follow a two-step process. First, the court must construe the meaning and scope of the patent claims asserted to be infringed as a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). Second, the court must compare the construed claim to the alleged infringing product. Id.

When construing a patent claim, a court must first consider the intrinsic evidence: the claims themselves, the specification, and the prosecution history. Id. The court can also consider extrinsic evidence, such as expert testimony, dictionaries, and treatises, although extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Phillips v. AWH Corp., 415 F.3d 1303, 1319 (Fed. Cir. 2005) (en banc).

The words of a claim should generally be given their ordinary and customary meaning. Phillips, 415 F.3d at 1312 (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning of a term is "the meaning that the term

2

would have to a person of ordinary skill in the art in question ... as of the effective filing date of the patent application." Id. at 1313. A person of ordinary skill in the art would read the claim term in context of the entire patent, including the specification. Id. at 1314.

The specification is the "single best guide to the meaning of a disputed term." Id. at 1315 (quoting Vitronics, 90 F.3d at 1582). If the specification indicates that the patentee defined the term differently from the generally accepted meaning or the inventor disavowed the claim scope, the inventor's definition is dispositive. Id. at 1317.

Courts should also consider the patent's prosecution history. See Markman, 52 F.3d at 980. If the inventor limited the invention during the prosecution, the scope of the claim will be narrowed from its ordinary meaning. Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir. 2003).

In some cases, extrinsic evidence, all evidence outside of the patent and prosecution history, can be considered by the court. Extrinsic evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317. The court has found it unnecessary to consider this less reliable source for claim construction in this case, as the patent and prosecution history provide sufficient support for the court's claim construction.

## II.   Construction of the Disputed Phrases

### A.      '020 Patent, Claim 1

The parties dispute several terms found in Claim 1 of the '020 Patent, which discloses:

A computer implemented process for carrying out an international commercial transaction comprising:
running a transaction program on a computer system so as to integrate processes including:

3

(a) selecting a language from a menu in which to view cataloge [sic] information on products;

(b) selecting a currency from a menu in which to obtain price information;

(c) selecting a product to be purchased and a destination for shipping such product to be purchased;

(d) accessing at least one local or remote database for obtaining

    (i) price information for the product to be purchased; and

    (ii) a product code for an international goods classification system pertinent to such product; and

    (iii) international shipping information related to an origination point of such product and said destination;

(e) calculating costs involved in moving such product to said destination based upon said destination and such product;

(f) determining a total cost of the transaction that includes a price of the product;

(g) receiving an order for such product thereby triggering an electronic process for confirming existence of available funds; and

(h) upon confirmation of availability of said funds, accepting said order, generating an electronic record, such record including the content of a commercial invoice, to facilitate passage of such product to said destination.

'020 Patent, col. 17, ll. 2-33.

### 1. Running a transaction program on a computer system so as to integrate processes[2]

The parties dispute whether this term is limited to a single computer program, and whether the transaction program must control and execute the recited processes. DE defines the term as "running one or more than one transaction-related software program[s] on a computer system so as to combine the recited processes (a) to (h) into a functional system for carrying out international commercial transactions." Dell contends that the phrase should be construed as "combining the recited process steps into a unified whole by running a single computer program that controls and executes the recited processes."

---

[2]This term is also used in Claim 1 of the '364 Patent.

4

DE contends that the phrase should not be limited by requiring a single transaction program to integrate the processes because the indefinite article "a" raises a presumption of multiple programs. In response, Dell contends that statements in the specification limit the scope of the claims to preclude the use of multiple transaction programs.

The court concludes that both the specification and the prosecution history demonstrate that the inventions actually described and claimed by the '020 and '364 patents use one transaction program to integrate the recited processes, although the invention may make use of other transaction programs. The use of the indefinite article "a," in combination with the word "comprising," "creates the presumption that the article is construed to mean one or more elements, unless there is evidence of clear intent to limit the claims." Scanner Tech. Corp. v. Icos Vision Sys. Corp. N.V., 365 F.3d 1299, 1305-06 (Fed. Cir. 2004). This presumption can be overcome, however, if the patentee "evinces a clear intent" to limit the article in the claim language or the specification. KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000) (internal citations omitted).

The language of the claim and the specification suggest that one program must integrate the recited processes. The patents claim a process comprising "running a transaction program on a computer system so as to integrate processes including [steps (a) through (h)] ...." '020 Patent, col. 17, ll. 4-5. The claim language therefore indicates that there must be one transaction program that integrates the processes; a program that integrates only some of steps (a) through (h) is not described by the claim language.

Usually, the specification is "the single best guide to the meaning of a disputed term." Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting Vitronics

5

Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In this case, the specification does not describe an invention broader than the single transaction program described in the claim language. See Toro Co. V. White Consol. Indus., Inc., 199 F.3d 1295, 1301-02 (Fed. Cir. 1999) (distinguishing between situations in which preferred embodiments are used to limit broader claims, which is impermissible in claim construction, and situations where the specification's narrow description support narrow claim language). The following are illustrative examples from the specification. The Summary of the Invention describes an object of the invention as "consolidat[ing] all the disparate components of an international sale into one program whereby a buyer can go shopping by computer almost anywhere in the world." '020 Patent, col. 2, ll. 60-63 (emphasis added). The Summary of the Invention also reveals that "[t]he process is initiated by accessing an [I]nternet web site or private site controlled by the international transaction program." Id. at col. 3, ll. 40-43 (emphasis added). In the Detailed Description of the Preferred Embodiments section, the patent states that "[a]ll of the interactions between the various external databases and the transaction program are controlled by transaction program." Id. at col. 3, l. 66 to col. 4, l. 2 (emphasis added). That section also informs that "[c]ommunications between the transaction program, the customer and the various databases can be carried out using any of electromagnetic force (EMF) wave communications ...." Id. at col. 4, ll. 23-25 (emphasis added). The specification consistently refers to the invention as involving a single transaction program, and the prosecution history is also consistent with the description of a single transaction program. The court therefore will not broaden the term to encompass the use of multiple transaction programs to integrate the recited processes, although the invention may make use of other transaction programs.

6

The prosecution history also indicates that the recited processes must be integrated by a single transaction program. In his Fifth Office Action, the Patent Examiner rejected certain claims in view of the prior art, Schell and Cahn. The Examiner found that:

> [t]he process described by Schell and Cahn is implemented by EDI [electronic data interchange] ... an inter-company computer-to-computer communications system. Claim 1 [of the '020 Patent] cites that the business steps are implemented on the Internet ... Similar to EDI, the Internet is a collection of computers that are linked. It is the position of the examiner, that to take a series of business steps implemented by EDI and perform these identical business steps employing the Internet would be an obvious use of current technology.

Prosecution History Files for Patent '020, at DET05379. In response, DE amended the phrase "[a] computerized process for carrying out an international transaction comprising the steps," Id. at DET05318, to "[a] computer implemented process for carrying out an international commercial transaction comprising: running a transaction program on a computer system so as to integrate processes ...." Id. at DET05403. The Examiner agreed that the limitation "running a transaction program on a computer system so as to integrate processes ..." would be allowable because the prior art does not teach the process with this limitation. Id. at DET05398. The court finds that the prosecution history illustrates what DE gave up in response to the Examiner's objections. See Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 978 (Fed. Cir. 1999). DE "clearly and unambiguously disclaimed or disallowed" the interpretation that more than one transaction program could integrate the recited processes in order to obtain claim allowance. See Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1344 (Fed. Cir. 2005). The prosecution history supports the court's construction that a single transaction program must integrate the recited processes.

7

The court also finds that the language of the claim, the specification, and the prosecution history are consistent with the plain and ordinary meaning of "integrate," which is "to combine different processes or components into one functional system." Words are presumed to take their ordinary and customary meaning unless there is "an express intent to impart a novel meaning to the claim terms." Brookhill-Wilk 1 v. Intuitive Surgical, Inc., 334 F.3d 1294, 1298 (Fed. Cir. 2003). In this case, the presumption that "integrate" should take its ordinary and customary meaning is supported by the descriptions in the specification. The '020 Patent first uses the word "integrate" to describe "cooperation" to "create an efficient data flow." '020 Patent, col. 2, ll. 25-28. The specification also states that "[a]s components change and improve via technological advances a person ... will be able to integrate these new systems .... Some examples of changes are systems that will allow the electronic transfer of required documentation, electronic currency that is acceptable to the banking communities world wide to satisfy obligations thereby eliminating complex documentary credits, electronic tracking systems for logistics, digitilization of Harmonized Tariff Schedules ...." Id. at col. 13, ll. 45-56. Dell's proposed construction, which would require the program to "control and execute" the recited processes, is too narrow and inconsistent with the language of the claims and specification, as the external systems described in the patent could not be controlled or executed by the transaction program in question. The prosecution history further supports the construction of "integrate" as "to combine different processes or components into one functional system."

Accordingly, the court relies on the language of the claim, the specification, and the prosecution history, and finds that the disputed term must be construed as "running a single

8

transaction program which utilizes and communicates with such additional programs, databases, and systems as are necessary to enable the transaction program to integrate the recited processes (a) to (h) into one functional system for carrying out international commercial transactions."

### 2. Selecting a language from a menu and selecting a currency from a menu

Claim terms should be construed consistently throughout a claim and claims of the same patent. See Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001). The court therefore finds that these phrases should be construed in the same manner. The proper constructions of these terms are "choosing a language after presentation of a language menu and consideration of user input," and "choosing a currency after presentation of a currency menu and consideration of user input."[3]

DE contends that the phrase should be construed as "direct selection of a currency by a customer from a list of currency options, or default selection of a currency by a customer and/or by a computer system from a list of information other than currency options." Dell contends that the construction should be "choosing a currency from a list of currency options displayed to the user."

In attempting to limit the construction to a direct user selection, Dell relies upon the specification. For example, the Summary of the Invention provides that "[t]he customer also selects the currency in which to pay for the products to be bought." '020 Patent, col. 3, ll. 44-46. The preferred embodiments section describes that, "[t]his second database provides a 'real time' conversion from the currency of the country in which the catalogue originates to that

---

[3]For the purposes of this discussion, the proper construction of the currency term will be described. As noted above, however, the resulting construction is applicable to the language term.

selected by the customer." Id. at col. 5, ll. 65-67. Although the summary of invention and preferred embodiments refer to customer selection of a currency, that method of selecting a currency is not necessarily exclusive. As Dell notes in its brief, a default currency can be chosen based upon the customer's selection of a language or a country. See Dell's Supplemental Claim Construction Brief and Proposed Conclusions of Law, at 13 (citing '020 Patent, col. 4, ll. 43-45 ("[t]he selection of language operates a default to select the most likely currency of the customer unless the customer indicates otherwise"); id. at col. 5, ll. 16-21 ("[t]he downloading of the country of origin of the selected catalogue also triggers an automatic access of the translation database ... to provide the specific currency conversion between that of the original catalogue country and that of the customer as selected by the automatic defaults")).

The default selection of a currency can be overriden by the user. As the preferred embodiments provide, "[t]he selection of language operates a default to select the most likely currency of the customer unless the customer indicates otherwise." '020 Patent, col. 4, ll. 43-45 (emphasis added). Similarly, the preferred embodiments section states that "[n]ormally currency is chosen by default ... [h]owever, the customer has the option of selecting a particular currency (step 112) in which he wants the catalogue price of the selected products." Id. at col. 5, ll.60-63. This override step requires a list of currencies to be presented to the user.

DE contends that default override step 112 is merely an optional feature of the invention, demonstrated by the dotted line used in Figure 1A, and the description of the override step as "optional step 112." See '020 Patent, col. 6, l. 38. The plain language of the preferred embodiments clearly indicate, however, that the description of step 112 as "optional" refers to the fact that the customer does not need to override the default selection if the currency chosen

10

by default is satisfactory. The preferred embodiments section describes that "[n]ormally currency is chosen by default ... [h]owever the customer has the option of selecting a particular currency (step 112) in which he wants the catalogue price of the selected products." Id. at col. 5, ll. 60-63. This step, in which the customer is given an option to override the default currency selection, requires that the customer be presented with a currency menu.

The plaintiff is attempting to broaden the construction and the defendant is seeking to limit the construction. The court therefore construes the phrase in accordance with the claim language and specification. The court's construction is broad enough to allow for the default possibilities suggested by DE, but requires that a list of currencies always be presented to the user, so that the user can override such a default selection if the user so chooses.

The court adopts the following construction of the phrase, which uses the plain meaning of the claim terms and specification. The term "selecting a language from a menu" means "choosing a language after presentation of a language menu and consideration of user input." The term "selecting a currency from a menu" means "choosing a currency after presentation of a currency menu and consideration of user input."

### 3. International shipping information[4]

DE proposes that "international shipping information" be construed as "any information related to shipping a product internationally from its point of origination to its point of destination." Dell contends that the term means "information identifying all shipping options for each leg of the transport route."

---

[4]This term is also used in Claim 13 of the '020 Patent and Claim 1 of the '364 Patent.

11

Dell observes that the Detailed Description of the Preferred Embodiments section describes "[t]he transaction system contains or interacts with various databases, including ... shipping information, including all options for each leg of a journey between product origination and customer destination." '020 Patent, col. 4, ll. 13-15. This reference to the shipping information is similar to the language of the claim itself. The specification also describes that "[a]t step 132 a determination of the discrete legs or links of the overall transport route are determined based upon shipping data contained in the fifth data base and processing center." Id. at col. 8, ll. 32-35. This determination is based upon a standard shipping route, which can be determined by the vendor, "requested by the customer," or decided by some combination of the two. Id. at col. 8, ll. 36-37. In the example described, the customer "has options of how the [product being shipped] will be taken from the warf [sic], through U.S. Customs, and to the final destination." Id. at col. 8, ll. 27-29. The specification explains that, "[t]hus, between the vendor and the customer each discrete leg of the transport route is determined (step 132), as well as the costs accompanying each of those discrete legs of the journey (step 134)." Id. at col. 8, ll. 30-33. As the specification describes, the customer's options are based upon the database of international shipping information, which must contain at least shipping options and associated costs. Although it is a recognized principal of claim construction that a preferred embodiment "cannot limit broader claims that are supported by the written description," the court does not attempt to do so in this case. Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1301 (Fed. Cir. 1999) (emphasis added). The court merely construes the claim term, "international shipping information," in the context of the specification. No broader concept of "international shipping information," without shipping options and associated costs, was described as

12

embodying the invention. See id. (citing Adams v. United States, 383 U.S. 39, 49 (1966) ("it is fundamental that claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the inventions").

The court therefore construes "international shipping information" as "any information, including at least shipping options and associated costs, related to shipping a product internationally from its point of origination to its point of destination."

### 4. Calculating costs involved in moving such product to said destination based upon said destination and such product[5]

DE maintains that the phrase means "determining applicable costs involved in moving such product to said destination based upon said destination and such product." Dell contends that the phrase should be construed as "mathematically determining the costs of moving the selected product including the costs of shipping, insurance, licensing fees, handling fees, documentation fees, and taxes on these costs."

Dell's construction, defining "calculating," as "mathematically determining," improperly imports a limit into the specification, because not all of the calculations of costs involve mathematical computation. For example, when the customer is able to determine the real price of his transaction, the code for the product is obtained by accessing a database "containing look-up tables of the harmonized international tariff tables and classification system, as well as the formats for any necessary import-export data, and administrative requirements for all countries

---

[5]This term is also used in Claim 13 of the '020 Patent and Claim 1 of the '364 Patent.

involved in possible transactions." '020 Patent, col. 6, ll. 56-60. The court therefore finds that the word "calculating," shall be construed, in accordance with its plain meaning, as "determining."

In addition, Dell's construction requires certain costs to always be included in the cost calculation, such as transportation, insurance, duties, tariffs, and taxes. The court agrees with Dell's construction to the extent that it requires the determination of all <u>actual</u> underlying costs of shipping the product. <u>See id.</u> at col. 15, ll. 22-23 ("calculating costs involved in moving such product to said destination based upon said destination and such product"). These costs can include "the cost of all freight for each leg of the journey, insurance (if desirable), sales taxes, handling charges, document generation and forwarding charges, import/export duties, and 'value added' taxes as well as luxury taxes (if applicable)." <u>Id.</u> at col. 7, ll. 7-11. Dell's listing of costs improperly constrains the specification, however. The specification recognizes that the illustrative flowchart in the Appendix "show[s] many of the variables which will ultimately determine the final transaction price <u>but in no way should this chart be construed to mean the only or all encompassing variables</u>. Since each product or service is of itself unique and since the buyer and sellers [sic] geographic location can change, the variables are never fixed." <u>Id.</u> at col. 13, ll. 30-35 (emphasis added). Although all costs of a transaction must be determined at this step, the actual costs involved will vary depending upon the type of transaction. As Dell observes, a potential customer must have "the full cost of a foreign transaction displayed in front of him before the transaction is actually carried out." <u>Id.</u> at col. 9, ll. 1-3. The court bases its construction on the fundamental precept that a customer must be presented with all actual costs of moving a product.

14

Accordingly, the court finds that "calculating costs involved in moving such product to said destination based upon said destination and such product," must be construed as, "determining all applicable costs of moving the selected product to said destination."

5.      **Determining a total cost of the transaction that includes a price of the product**[6]

DE contends that "determining a total cost of the transaction that includes a price of the product" means "determining a total cost of the transaction for obtaining a selected product at a selected destination that includes a price of the product." Dell asserts that the phrase means "calculating all costs, including the price of the product." As the parties recognized at the Markman hearing, they are generally in agreement on the meaning of this term. See Hearing Tr. vol 2, 119, Nov. 9, 2005.

The court cannot broaden or narrow claims in a way that gives the patentee a different claim than he has set forth. Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n, 988 F.2d 1165, 1171 (Fed. Cir. 1993). The court therefore rejects Dell's replacement of the word "determining," with "calculating."

Dell also proposes that all costs must be determined at this step; DE stresses that while the total cost must be determined, all component costs do not have to be determined at this stage. DE recognizes that such a determination would render element (f) of Claim 1, "determining a total cost of the transaction that includes a price of the product," superfluous because element (e), "calculating costs involved in moving such product to said destination," would have involved the determination of some of these costs. The court must presume that all

---

[6]This term is also used in Claim 13 of the '020 Patent.

claim terms have some meaning in a claim, and therefore declines to adopt Dell's construction. See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1119 (Fed. Cir. 2004).

The court agrees with DE's construction, and construes this phrase as "determining the total cost of the transaction borne by the buyer for obtaining a selected product at a selected destination that includes the price of the product."

### 6. Upon confirmation of availability of said funds, accepting said order, generating an electronic record[7]

DE argues that the phrase means "following confirmation of availability of said funds, accepting said order, generating an electronic record." Dell contends that the correct construction is "immediately following confirming that funds are available the transaction program accepts the order and generates the electronic record."

Dell's use of the word "immediately" is based upon a dictionary definition of "upon," but this use of extrinsic evidence, as noted in Phillips v. AWH, carries the danger of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." 415 F.3d 1303, 1321 (Fed. Cir. 2005). Dell also relies upon the prosecution history, claiming that the applicant tried to distinguish the '020 Patent from prior art during the prosecution by stating that "the initiation of electronic title generation upon confirmation of available funds greatly expedites the overall process, thereby overcoming one of the major disadvantages inherent to conventional international transactions." Prosecution History Files for Patent '020, at DET05098. Dell contends that this statement clearly indicates

---

[7]This term is also used in Claim 1 of the '364 Patent.

16

that DE intended for "upon" to be construed as "immediately following," otherwise the process would not be "greatly expedited." If this were the case, DE could not argue for a broader temporal limitation because it would have narrowed the claim term during prosecution to distinguish the invention from prior art. See Spectrum Int'l v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998). DE contends that the point of novelty was the cause and effect relationship, however, where generation of a record would be based upon confirmation of funds, rather than the timing of the electronic record. The prior art, which lacked an integrated system, took many days to complete the generation of an electronic record. The process could still be expedited, therefore, without generation of a record "immediately following" the confirmation of available funds. The court finds DE's interpretation of the prosecution history to be consistent with the language of the claim and the specification, and does not find that the applicant "clearly and unambiguously disclaimed or disavowed any interpretation during prosecution in order to obtain claim allowance." Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1344 (Fed. Cir. 2005). The court therefore declines to adopt a construction that requires the generation of a record to immediately follow the confirmation of available funds.

The other area of dispute is whether the transaction program itself must accept the order and generate an electronic record. The words of the specification support DE's claim that a retail vendor can use an external program to accept the order. See '020 Patent, col. 7, ll. 19-21; col. 9, ll. 31-34 ("[t]he same processing center can then send a confirmation for the respective customer order to the vendor ... by accessing the vendor order system."). As Dell suggests, however, the transaction program must be used to either generate an electronic record automatically or the vendor will use the system to generate an electronic record. This meaning

17

is supported by the specification, which provides that "[o]nce electronic funds (or other authorization) are transferred to the vendor (step 161) from a local clearing house, the vendor will utilize a connection to the transaction system of the present invention to generate an electronic title." '020 Patent, col. 10, ll. 15-27.

Based on the foregoing, the court construes the phrase, "upon confirmation of availability of said funds, accepting said order, generating an electronic record," to mean "following determination that the funds are available, confirming acceptance of the order and generating an electronic record."

### 7. Commercial invoice[8]

DE contends that "commercial invoice" means "a document that defines the basic terms of an international transaction including at least the description and total value of the product." Dell contends that the term should be construed as "an international shipping document that contains at least the information required by all applicable customs regulations."

The specification does not assist the court in determining the ordinary meaning of "commercial invoice," and the court must therefore consult the prosecution history. Dell contends that the prosecution history supports its reading of the claim language. The inventor described a commercial invoice, which "serves as a document used by governments to control imports .... In contrast, an invoice used in domestic trade is nothing more than a bill for the goods from the seller to the buyer." Prosecution History Files for Patent '020, at DET05338. If the information specified was not included as part of the commercial invoice, the documents could not be used to control imports and exports, and would be no different from the

---

[8]This term is also used in Claim 13 of the '020 Patent and Claim 1 of the '364 Patent.

18

distinguished "invoice" used in domestic transactions, which is "nothing more than a bill for the goods from the seller to the buyer." Id. In contrast, a typical commercial invoice was described by the inventor as including "information about the exporter, consignee, intermediate consignee, forwarding agent, bill of lading number, [and] export references." Id. Based upon these statements, the applicant "clearly and unambiguously disclaimed or disavowed" a broad construction of "commercial invoice" during prosecution history. See Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1344 (Fed. Cir. 2005). In order for a "commercial invoice" to be differentiated from an invoice used in domestic transactions, the term must encompass more than merely a bill.

The court therefore finds that "commercial invoice" must be construed as "an international shipping document that contains at least the information in the form required under the applicable laws of the jurisdiction[s] through which the selected product travels."

**B.     '364 Patent**

**1.     Moving said electronic record via EMF communications links from point to point**

The first disputed term is found in Claim 2 of the '364 Patent, which discloses: "The process of claim 1, further comprising the process of: (f) moving said electronic record via EMF communications links from point to point along a route of passage to said destination for said selected products." '364 Patent, col. 16, ll. 3-7.

DE contends that this phrase should be construed as "transmitting the electronic record electronically where feasible between or among two or more points along a route of passage to said destination for said selected products." Dell proposes the construction, "transmitting the electronic record electronically to a each of a plurality of points."

19

The primary conflict between the parties' constructions concerns whether an electronic transmission is necessary. DE claims that there are certain instances, such as where a government system is incapable of using electronic records, when hard copies will have to be used and electronic transmission could not be required. See '364 Patent, col. 12, ll. 10-14; col. 14, ll. 7-9. Dell refers to the plain meaning of the term and the specification, arguing that "point to point" requires that transmission occur from at least one point to another point. As the specification describes the invention, it "provides a comprehensive point-to-point cost analysis for any international transaction." Id. at col. 14, ll. 55-56.

The court generally agrees with Dell that this term should be given its plain and ordinary meaning, and that "point to point" would require transmission from at least one point to another point. As DE has recognized, however, the specification refers to situations in which a particular destination could not accept the electronic record, and provides that "[p]aper copies of the title or commercial invoice can also be generated from the electronic original for archival purposes or for presentation to entities requiring hard copies to further process the title or commercial invoice." Id. at col. 12, ll. 10-14.

Accordingly, the court finds that the phrase "moving said electronic record via EMF communications links from point to point" means "transmitting the electronic record electronically to at least one point and, where necessary and where feasible, between or among other points along the route of passage for the selected product."

20

### 2. Authorization data

This term is found in Claim 3 of the '364 Patent, which discloses: "The process of claim 2, further comprising the process of: (g) providing authorization data at selected ones of said points along said route of passage by means of said electronic record." '364 Patent, col. 16, ll. 8-12.

DE proposes that "authorization data" should be construed as "data relevant to obtaining authorized passage through a point." Dell contends that it should be construed as "information required to authorize passage through a point."

DE claims that the data is not required to receive authorized passage through a point, and that the specification provides an alternative approach for obtaining an authorized passage through customs. The specification provides that "rather than providing a hard copy of a commercial invoice, an electronic copy with the authorization of the international carrier can be provided either as an electronic document or a hard copy can be generated and provided ...." '020 Patent, col. 12, ll. 7-10.

The court agrees with DE, and construes "authorization data" to mean "data relevant to obtaining authorized passage through a point."

### 3. Transfer of payment

Claim 4 of the '364 Patent discloses: "The process of claim 3, wherein said process (g) of providing authorization data comprise the transfer of payment." '364 Patent, col. 16, ll. 13-15.

21

DE contends that "transfer of payment" means "data enabling the electronic record to facilitate payment." Dell contends that the phrase means "data enabling the electronic record to effect payment."

The language of the specification indicates that the transaction system "can arrange for the funds to be provided to the international carrier ... when the commercial title, bill of lading, etc. are presented so that the goods can clear national customs." '364 Patent, col. 14, ll. 16-18. The specification also provides that, "[t]he present system is capable of arranging payments with local carriers." Id. at col. 14, l. 25.

Accordingly, the court finds that the plain meaning of the phrase, "transfer of payment," is "data enabling the electronic record to authorize payment."

## CONCLUSION

The court has based its constructions primarily upon the claim language and the specification, and has not considered any extrinsic evidence. The plain meanings of most of the disputed terms are clear from the claim language and specification, and are further informed by the prosecution history. In several cases, the court has relied upon the prosecution history when the plain meaning of a term was not apparent after consultation of the claim language and specification. An appropriate order setting forth the court's claim constructions shall be entered this day.

ENTER: This ___14th___ day of February, 2006.

_____

United States District Judge

22