## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

DE TECHNOLOGIES, INC.,    )
      **Plaintiff,**      )      **Civil Action No.: 7:04cv00628**
                )
v.                   )      **<u>MEMORANDUM OPINION</u>**
                )
**DELL INC.,**           )      By: Pamela Meade Sargent
      **Defendant**     )      United States Magistrate Judge

The plaintiff, DE Technologies, Inc., ("DE Tech"), filed its Complaint, (Docket Item No. 1), and its First Amended Complaint, (Docket Item No. 21), against the defendant, Dell Inc., ("Dell"), alleging patent infringement by Dell. This matter is before the court on Dell Inc.'s Motion For Rule 11 Sanctions For Failure To Conduct A Pre-Filing Investigation Of Dell's Procurement Systems, ("Motion for Sanctions"), (Docket Item No. 113). Jurisdiction over this matter is based upon a federal question. *See* 28 U.S.C.A. § 1331 (West 1993). The motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(A).

### *I. Factual Background*

DE Tech sells to large corporations, small and medium-size enterprises, ("SMEs"), the United States Government and general consumers a computer system to conduct international commercial transactions for the selling and purchase of goods over the Internet, intranet and other computer-to-computer systems. Between 1996 and 2000 DE Tech created a proof of concept and integration testing website under the name "Ushop." This website was accessed by numerous individuals and others interested in performing international commercial transactions over the Internet and

other computer-to-computer systems. DE Tech alleges that this website was accessed by Dell between 1997 and 2000. After this development effort by DE Tech, Dell began to utilize the Internet for international commercial transactions using software indiscernible to the ultimate purchaser. This software was acquired either from third-party software providers and then customized for Dell's own computer system or developed by Dell. DE Tech was issued U.S. Patent Number 6,460,020, ("the'020 patent"), on October 1, 2002.[1] It was issued U.S. Patent Number 6,845,364, ("the '364 patent"), on January 18, 2005.[2] DE Tech alleges that from Dell's U.S. and foreign websites, Dell purchases, markets and sells its products and services directly to international buyers. It further alleges that Dell procures parts, subassemblies and finished goods directly from foreign suppliers utilizing a computer-implemented process for carrying out international commercial transactions and redistributes finished goods utilizing a computer-implemented process for carrying out international commercial transactions. Allegedly, Dell initiates the international commercial computer sales transactions and procurements through a combination of

---

[1]"The '020 patent claims a computer system for facilitating international computer-to-computer commercial transactions by integrating certain complex functions enabling for international purchase of goods over the Internet. Those functions include determining a total cost of the particular transaction including, when applicable (determined by the agreed upon international point of sale), carriage, duties, foreign taxes, and other governmental charges. The invention of the '020 Patent calculates charges for transport and international shipment of goods, creates complex import and export documents (both commercial and governmentally regulated), exercises reasonable care in complying with international trade laws and verifies authorization of funds for payment." (First Amended Complaint at 11.)

[2]"The '364 Patent claims a computer system for facilitating international computer-to-computer commercial transactions by integrating certain complex functions enabling for international purchases of goods over the Internet. Those functions include determining a total cost of the particular transaction including, when applicable (determined by the agreed upon international point of sale), carriage, duties, foreign taxes, and other governmental charges. The invention of the '364 Patent calculates charges for transport and international shipment of goods, creates complex import and export documents (both commercial and governmentally regulated), exercises reasonable care in complying with international trade laws and verifies authorization of funds for payment." (First Amended Complaint at 13.)

Case 7:04-cv-00628-GEC-PMS   Document 173   Filed 02/28/06   Page 2 of 26   Pageid#: 3303

software programs that integrate a number of complex processes, which are unique to international transactions.[3] In its Complaint, filed on October 27, 2004, and its First Amended Complaint, filed on January 20, 2005, DE Tech alleges that Dell implements the technology described in the '020 and '364 patents in conducting international business, both import and export. It further alleges that Dell had knowledge of DE Tech and its international commercial transaction technologies by accessing the Ushop website between 1997 and 2000.

Thereafter, on December 6, 2005, Dell filed its Motion for Sanctions, alleging that DE Tech failed to conduct an adequate pre-filing investigation of its patent infringement claims against Dell before filing its Complaint and First Amended Complaint. On January 9, 2006, the Opposition Of DE Technologies, Inc. To Dell Inc.'s Motion For Rule 11 Sanctions, ("DE Tech's Opposition"),[4] was filed. On January 23, 2006, Dell's Reply To DE Tech's Opposition To Dell's Rule 11 Motion, ("Dell's Reply"), (Docket Item No. 142), was filed. Finally, on January 31, 2006, the Response Of DE Technologies, Inc. To Dell Inc.'s Reply Brief Re Rule 11 Sanctions, ("DE Tech's Response"), (Docket Item No. 156), was filed.

---

[3]Among these integrated tasks are: 1) selecting a foreign country and currency; 2) providing a menu of products; 3) accessing databases that include prices, government-mandated product code, duties tariff schedules, taxes, shipping and handling costs and the like; 4) calculating costs of moving products to point of sale destination; 5) calculating the cost of the transaction to provide the buyer a delivered duty paid price, including the price of the product; 6) receiving an order for the product; 7) confirming the availability of funds to pay for the product; 8) generating an electronic record including contents of a commercial invoice to facilitate passage of products to the destination; and 9) producing the contents of a commercial invoice.

[4]Although a Motion To File Material Under Seal Pursuant To Standing Order No. 2005-3, (Docket Item No. 128), and a Cover Letter dated January 9, 2006, noting the enclosure of DE Tech's Opposition along with various attachments, (Docket Item No. 130), were filed with the court, there is no separate docket entry for DE Tech's Opposition.

Case 7:04-cv-00628-GEC-PMS   Document 173   Filed 02/28/06   Page 3 of 26   Pageid#: 3304

*II. Analysis*

Dell has filed a Motion for Sanctions under Federal Rule of Civil Procedure 11(b)(3).[5] Rule 11(b)(3) provides as follows:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, – ... the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. ...

Additionally, pursuant to Rule 11(c):

> If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

Thus, Rule 11 requires that an attorney conduct a reasonable investigation of the factual and legal basis for a claim prior to filing a complaint. *See Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991) (citing *Cleveland Demolition Co., Inc. v. Azcon Scrap Corp.*, 827 F.2d 984, 987 (4th Cir. 1987)). Moreover, the pre-filing investigation must be objectively reasonable, meaning that the pre-filing factual investigation "must uncover some information to support the allegations in the complaint." *Brubaker*, 943 F.2d at 1373. Only when there is *no* factual basis for a

---

[5]Although DE Tech also alleges that the websites, systems and processes that Dell uses to sell products to customers also infringe the patents-in-suit, Dell's Motion for Sanctions is directed solely at DE Tech's allegation that Dell's procurement systems infringe the patents-in-suit.

party's allegations, does the complaint violate the requirements of Rule 11. *See Brubaker*, 943 F.2d at 1373 (emphasis in original).

In the context of a patent infringement suit, as here, the Court of Appeals for the Federal Circuit applies "the law of the pertinent regional circuit when reviewing the imposition of Rule 11 sanctions." *Antonious v. Spalding & Evenflo Cos., Inc.*, 275 F.3d 1066, 1072 (Fed. Cir. 2002) (applying Fourth Circuit law to determine whether allegations of patent infringement warranted sanctions under Rule 11(b)(2) or 11(b)(3)). As noted in DE Tech's Opposition, the Fourth Circuit has held that "[i]f an attorney's conduct appears to fall within the scope of Rule 11, the court must ... examine the actions at issue according to a standard of objective reasonableness." *Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir. 1987). Specifically, this inquiry focuses only on "whether a reasonable attorney in like circumstances could believe his actions to be factually and legally justified." *Cabell*, 810 F.2d at 466. DE Tech further correctly notes in its Opposition that this objective reasonableness standard has proven to be rather forgiving when used to assess potential violations of Rule 11(b)(3). For instance, an attorney's factual allegations will be found to meet the requirements of Rule 11(b)(3) as long as they are supported by "any information" whatsoever. *Brubaker*, 943 F.2d at 1373 (stating that "[a] complaint containing allegations unsupported by *any* information obtained prior to filing violates the required pre-filing factual investigation.") (emphasis in original). "For Rule 11 purposes, the allegation merely must be supported by *some* evidence," and unless it is determined that "plaintiffs had *no* factual basis for their allegation," it cannot be held that "plaintiffs violated Rule 11's factual inquiry requirement." *Brubaker*, 943 F.2d at 1377 (emphasis in original).

Furthermore, in order to satisfy Rule 11(b)(3), it has been held that an attorney

Case 7:04-cv-00628-GEC-PMS    Document 173    Filed 02/28/06    Page 5 of 26    Pageid#: 3306

need not even rely upon direct evidence to support his factual allegations. Instead, as long as an attorney possesses information from which it is possible to at least "draw an inference," even a "weak one," an attorney's factual allegations are placed beyond the reach of Rule 11 sanctions. *Brubaker*, 943 F.2d at 1377. Also, in the context of a patent infringement suit, Rule 11 requires a party to construe and then apply the claims of the patent-in-suit to each accused system or process and then conclude that there is a reasonable basis for a finding of infringement of at least one claim. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300-01 (Fed. Cir. 2004)*; see also View Eng'g, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 986 (Fed. Cir. 2000). The court in *View Eng'g* held that "[t]he presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11." 208 F.3d at 986. That court further held that, "[i]n bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement." *View Eng'g*, 208 F.3d at 986. Moreover, if the patent holder is unwilling or unable to do so, the district court should exercise its broad discretion and impose Rule 11 sanctions, absent sound excuse or considerable mitigating circumstances. *See View Eng'g*, 208 F.3d at 986. In *Q-Pharma*, 360 F.3d at 1302, the court held that "an infringement analysis can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter."

Some courts have held that one factor to be considered in determining whether a patentee has met its Rule 11 obligations, is whether the accused device was reverse engineered in order to compare it to the patent-in-suit. *See Hoffman-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1363-64 (Fed. Cir. 2000); *see also Judin v. United States*, 110 F.3d 780, 784-85 (Fed. Cir. 1997). Reverse engineering consists of the

Case 7:04-cv-00628-GEC-PMS   Document 173   Filed 02/28/06   Page 6 of 26   Pageid#: 3307

accused product or subject matter being essentially deconstructed in order to compare it to the patent-in-suit.

In *Judin*, 110 F.3d at 784-85, the court held that a patent holder cannot satisfy its Rule 11 obligation to conduct a pre-filing factual investigation by discovering facts after the suit is filed. In *Judin*, the court stated that because "Rule 11 [was] not about after-the-fact investigation, [plaintiff and his counsel's] violation of Rule 11 was not cured by the fact that, after filing the complaint, [plaintiff] consulted with an expert and was able to make 'colorable' arguments in response to a motion for summary judgment of noninfringement." 110 F.3d at 785. In other words, a party's failure to make a reasonable effort to ascertain whether the accused device satisfied key claim limitations *prior* to filing suit is grounds for Rule 11 sanctions. *See* 110 F.3d at 784-85. Thus, in *Q-Pharma*, 360 F.3d at 1302, the court found that Rule 11 sanctions were inappropriate where the patent owner had, prior to filing suit, obtained a sample of the accused product, a lotion, reviewed the manufacturer's advertising and labeling statements and compared the claims of the patent with the accused product. The court so held despite the fact that Q-Pharma later voluntarily dismissed its patent infringement suit against Andrew Jergens Co. after conducting additional discovery. *See Q-Pharma*, 360 F.3d at 1298. The court noted that "it is not for us to determine whether Q-Pharma's pre-filing interpretation of the asserted claims was correct, but only whether it was frivolous." *Q-Pharma*, 360 F.3d at 1301 (citing *Antonious*, 275 F.3d at 1073).

Dell alleges in its Motion for Sanctions that, at the time DE Tech filed its Complaint and its First Amended Complaint, DE Tech lacked any evidentiary basis for its allegations that the systems and processes Dell uses to purchase or procure parts and products, (hereinafter "Dell's procurement systems"), infringe the asserted claims

of the '020 and '364 patents. Therefore, Dell argues that both DE Tech and its attorneys violated Rule 11. Specifically, Dell argues that both DE Tech's former lead counsel, the law firm of Merchant & Gould, P.C., ("Merchant & Gould"), and its current lead counsel, the law firm of Robins, Kaplan, Miller & Ciresi, L.L.P., ("Robins Kaplan"), violated Rule 11.[6] Dell seeks attorneys' fees and costs both in connection with defending DE Tech's allegations that Dell's procurement systems infringe the patents-in-suit and in connection with filing and arguing the Motion for Sanctions. Dell also asks the court to require DE Tech to withdraw its allegations that Dell's procurement systems infringe the patents-in-suit.

The primary issue before this court is whether DE Tech and its attorneys violated Rule 11(b)(3) by failing to conduct an adequate pre-filing investigation before filing its infringement suit regarding Dell's procurement systems. For all of the reasons that follow, I find that DE Tech and its attorneys conducted an objectively reasonable pre-filing investigation of the alleged infringement by Dell's procurement systems to the patents-in-suit such that DE Tech's obligations under Rule 11 were satisfied. That being the case, I find it unnecessary to address the peripheral issues relating to sanctions raised by the parties in their various pleadings.

I first note that this patent infringement case, dealing with somewhat intangible intellectual concepts and business methods and processes is quite different in some

---

[6]Merchant & Gould initially represented DE Tech in this patent infringement case, performed an independent pre-filing infringement analysis and was responsible for the filing of the Complaint and the First Amended Complaint. However, on July 29, 2005, Merchant & Gould filed with the court its notice of withdrawal as DE Tech's lead trial counsel. (Docket Item No. 73.) Subsequent to that date, Merchant & Gould had no further involvement with this case. In the meantime, by letter dated July 22, 2005, DE Tech informed the court that it had retained Robins Kaplan as is new lead trial counsel. (Docket Item No. 63.) Robins Kaplan had no involvement with the case prior to that date.

aspects than the leading cases dealing with patent infringement in the Rule 11 context to date. Specifically, here, there is no tangible product, device or equipment that DE Tech could have attempted to obtain in order to "reverse engineer" in an effort to determine whether Dell's procurement systems infringe the patents-in-suit. For instance, the patent at issue in *View Engineering* dealt with three-dimensional vision technology primarily used for scanning computer chips to insure the proper alignment of leads. This technology had been reduced to an actual, tangible piece of equipment or machinery. *See View Eng'g*, 208 F.3d at 985. In reaching its decision, the court noted that the machine at issue was never actually inspected, but that Robotic's counsel instead relied on publicly available literature and View Engineering's literature in determining that a claim for infringement existed against View Engineering. *See View Eng'g*, 208 F.3d at 985. The court also noted that Robotic's counsel could have filed immediately for the protective order that eventually resulted in discovery, could have appointed an outside expert to review View Engineering's machines and could have talked to Robotic's sales staff to determine what it knew of View Engineering's machines. *See View Eng'g*, 208 F.3d at 986. Based on all of the foregoing, the Federal Circuit held that "little inquiry, much less a reasonable one, was undertaken by [Robotic's counsel] in the instant case." *View Eng'g*, 208 F.3d at 986.

Similarly, in *Judin*, the patentee alleged infringement by the United States Government of its patented micro-optical imaging. Specifically, Judin alleged infringement by the United States Postal Service through its use of bar code scanners. *See Judin*, 110 F.3d at 781. Again, unlike here, the accused device or subject matter consisted of an actual, tangible piece of equipment or machinery. The court noted that "[s]ometime prior to the filing of the complaint, Judin observed bar code scanners in use at a post office." *Judin*, 110 F.3d at 781. Judin "also attended a scanning industry exhibition and was familiar with trade publications, technical specifications, and

Case 7:04-cv-00628-GEC-PMS   Document 173   Filed 02/28/06   Page 9 of 26   Pageid#: 3310

commercial literature, some of which suggested that [g]overnment agencies were purchasing bar code scanners." *Judin*, 110 F.3d at 781. Nonetheless, the court noted that Judin never asked the Postal Service for a sample of the device nor did he otherwise try to obtain one in order to reverse engineer it. *See Judin*, 110 F.3d at 781. Thereafter, Judin informed his counsel who merely "observed from a distance the accused devices in use in a post office." *Judin*, 110 F.3d at 781. Only after the complaint was filed did Judin's counsel contact an expert, a physicist and patent attorney, who analyzed whether the accused devices infringed the patent-in-suit. *See Judin*, 110 F.3d at 782. After this expert analyzed the literature, the patent's file history and information from Judin's pre-filing inquiry, Judin filed an interim infringement analysis and then a final claims chart. *See Judin*, 110 F.3d at 782.

The court concluded that there was no evidence that Judin or his counsel compared the accused device with the patent claims prior to filing the complaint, as required by Rule 11. *See Judin*, 110 F.3d at 784. The court further noted that no adequate explanation was offered by either Judin or his counsel why they failed to obtain or attempted to obtain a sample of the accused device from the Postal Service or a vendor so that its actual design and functioning could be compared with the claims of the patent-in-suit. *See Judin*, 110 F.3d at 784. Thus, for these reasons, the court concluded that Judin failed to meet the minimum obligations imposed by Rule 11 and that Judin's counsel acted unreasonably by giving "blind deference" to Judin and assuming that Judin had knowledge not disclosed to his counsel. *Judin*, 110 F.3d at 784. The court noted that Judin's and his counsel's Rule 11 violation was not cured by the fact that, after filing the complaint, Judin consulted with an expert and was able to make colorable arguments in response to a motion for summary judgment of noninfringement because Rule 11 is not about "after-the-fact" investigation. *Judin*, 110 F.3d at 785.

Likewise, in *Q-Pharma*, the plaintiff accused Jergen's Curel ® CoQ10 lotion of infringing the patent-in-suit, in which CoQ10 was the "principal active ingredient." 360 F.3d at 1298. Although Q-Pharma obtained a sample of the lotion, it did not chemically analyze the sample. *See Q-Pharma,* 360 F.3d at 1302. In other words, it did not attempt to reverse engineer the lotion in order to compare it to the patent-in-suit. Instead, based only on Jergens's advertisements touting the therapeutic benefits of CoQ10, Q-Pharma asserted that the accused product contained a "therapeutically effective amount" of CoQ10. *Q-Pharma,* 360 F.3d at 1302. Q-Pharma interpreted the patent as reading on[7] any lotion containing a "therapeutically effective amount" of the compound. *Q-Pharma,* 360 F.3d at 1302. However, Q-Pharma dropped the suit after learning that the accused product contained no more than 0.00005% of CoQ10 by weight. *See Q-Pharma,* 360 F.3d at 1298. After reviewing the patent claims, Q-Pharma's attorney interpreted the principal active ingredient limitation of claim 1 of the patent-in-suit to read on any "effective therapeutic use of $CoQ_{10}$ in a skin lotion." *Q-Pharma,* 360 F.3d at 1301. Therefore, the attorney believed it would read on a lotion containing any amount of CoQ10 "sufficient to have a therapeutic benefit." *Q-Pharma,* 360 F.3d at 1301. The court held that the pre-filing claim interpretation was not frivolous for the following reasons: (1) although Q-Pharma's claim interpretation was rather broad, it was sufficient because it followed the standard canons of claim construction and was reasonably supported by the intrinsic evidence; (2) Q-Pharma's counsel stated in a declaration that he interpreted and analyzed the patent by reviewing its claims, written description and prosecution history to interpret the individual claim terms; and (3) although Q-Pharma's counsel did not prepare a claim chart, this is not a requirement of a pre-filing infringement analysis because the owner, inventor and/or

---

[7]A patent holder's patent "reads on" an accused device if every element of the claim is present in the accused device. *See* Peter Brown, *What Every Litigator Must Know About Intellectual Property,* 757 PLI/Pat 191, 204 (2003).

drafter of a patent ought to have a clear idea of what the patent covers without the formality of a claim chart. *See Q-Pharma,* 360 F.3d at 1301-03.

Moreover, although Q-Pharma had a sample of the Jergens lotion and could have chemically analyzed it or reverse engineered it before filing its infringement suit to learn that the lotion contained only 0.00005% by weight of CoQ10, Q-Pharma relied on advertisements and the product packaging for its belief that the accused product contained a "therapeutically effective amount" of CoQ10 as the principal active ingredient. *Q-Pharma,* 360 F.3d at 1302. Nevertheless, the court rejected Andrew Jergens Co.'s argument that *View Engineering* "makes clear that reliance on advertising as a basis for filing an infringement suit is not sufficient under Rule 11." *Q-Pharma*, 360 F.3d at 1302. However, the court distinguished *View Engineering* on the ground that, in that case, the patentee had not conducted *any* independent infringement analysis. *See Q-Pharma*, 360 F.3d at 1302 (emphasis added). In *View Engineering*, the court faulted the attorneys both for failing to conduct any independent infringement analysis and for failing to conduct a reasonable factual inquiry into the accused products. *See* 208 F.3d at 986. It found the factual investigation frivolous because it was based solely on the inventor's belief that the products infringed the patents, which, in turn, was based on "View's advertising and the statements View made to its own customers." *View Eng'g*, 208 F.3d at 985. However, the court in Q-Pharma de-emphasized this aspect of the case, stating that "[i]mportantly, we held that sanctions were warranted because the patentee had not performed any claim construction analysis or infringement analysis prior to filing its counterclaim." *Q-Pharma*, 360 F.3d at 1302.

The *Q-Pharma* court further stated that "[i]n the present case, Q-Pharma did not file suit based solely on Jergens' advertising; critically, it also relied on its own

comparison of the asserted claims with the accused product." *Q-Pharma*, 360 F.3d at 1302. Yet, the Q-Pharma attorneys did not chemically analyze the product to determine whether it contained a "therapeutically effective" amount of CoQ10. Instead, they looked at the product packaging and concluded that it must, because the packaging "listed the product's ingredients and repeatedly touted the therapeutic effects of CoQ$_{10}$." *Q-Pharma*, 360 F.3d at 1302. This suggests that, to the *Q-Pharma* court, the independent claim analysis is the key feature of a pre-filing investigation. The *Q-Pharma* court seemed to conclude that, for Rule 11 purposes, if it is reasonable to construe the claims broadly, it is reasonable to rely on advertising or other indirect sources.

The *Q-Pharma* court also distinguished *Judin* based on the fact that Q-Pharma did obtain a sample of the lotion and compared that product with the asserted claims. Nevertheless, Q-Pharma read the product label instead of conducting a relatively inexpensive chemical analysis that would have revealed the actual amounts of CoQ10 in the product. In the end, however, Q-Pharma's actions were judged to be better than Judin's because of its broad and nonfrivolous reading of the patent claims.

Here, I find the fact that DE Tech did not and, arguably, could not, reverse engineer the accused subject matter, specifically, Dell's procurement systems, is not dispositive of a finding that its pre-filing investigation was inadequate under Rule 11. Instead, as mentioned previously, it is the infringement analysis that plays the key role in determining the reasonableness of a pre-filing inquiry in a patent infringement case under Rule 11. *See View Eng'g*, 208 F.3d at 986. Here, DE Tech alleges that, after its own and Merchant & Gould's extensive investigation and review, Merchant & Gould arrived at a reasonable construction of DE Tech's patent claims and undertook an infringement analysis that involved an element-by-element comparison of the

-13-

construed claims to the Dell computer systems used for both customer sales and for procurement. (Declaration of Bruce K. Lagerman In Opposition To Dell Inc.'s Motion For Rule 11 Sanctions, ("Lagerman Decl."), at 11), (Declaration of Thomas J. Leach In Opposition To Dell Inc.'s Motion For Rule 11 Sanctions, ("Leach Decl."), at 5-6.)

I first note that, although DE Tech specifies several activities undertaken by both itself and Merchant & Gould, it does not appear that a claim chart was produced during the period of the pre-filing investigation. However, I further note that it has been held that the preparation of a claim chart is not a prerequisite to finding that a pre-filing infringement analysis was objectively reasonable under Rule 11. *See Q-Pharma*, 360 F.3d at 1301 (stating that "a claim chart is not a requirement of a pre-filing infringement analysis, as the owner, inventor, and/or drafter of a patent ought to have a clear idea of what the patent covers without the formality of a claim chart.") Thus, in order to determine whether DE Tech's pre-filing investigation passes muster under Rule 11, this court must examine the various other investigative activities undertaken by DE Tech and its counsel prior to the filing of the Complaint on October 27, 2004, and the filing of the First Amended Complaint on January 20, 2005. For the reasons that follow, I find that DE Tech did, in fact meet is pre-filing investigative obligations under Rule 11, therefore, I will deny Dell's Motion for Sanctions against DE Tech and its counsel.

As previously mentioned, in *Q-Pharma*, 360 F.3d at 1302, one of the most recent Federal Circuit patent infringement cases dealing with a potential Rule 11 violation, the court held that "an infringement analysis can simply consist of a good faith, informed comparison of the claims of the patent against the accused subject matter." I can find no reason to find otherwise than that DE Tech undertook a "good

faith, informed comparison of the claims of the patent against the accused subject matter." Here, it is important to note that one of the issues repeatedly raised by Dell, deals with what actually constitutes the "accused subject matter." Specifically, Dell contends that the accused subject matter relevant to its Motion for Sanctions is its procurement systems only, not its sales systems. Dell argues that DE Tech's pre-filing investigation with regard to its procurement systems was inadequate. However, DE Tech contends that Dell's computer sales systems and its computer procurement systems are so inextricably intertwined, that its investigation relevant to the potentially infringing sales systems also is relevant to the potentially infringing procurement systems. In other words, DE Tech contends that it is not possible to entirely separate the two systems for individual infringement analyses. Thus, one issue before the court becomes whether an objectively reasonable person in like circumstances as DE Tech and/or its attorneys could have determined that the sales systems and procurement systems were so inextricably intertwined so that separate infringement analyses could not be performed. I find that, given the nature of the subject matter at issue in this case, as well as DE Tech's and Merchant & Gould's rather extensive pre-filing investigative efforts with regard to both the sales systems and the procurement systems, as set out more fully below, a reasonable person in like circumstances could have believed that the systems were inextricably intertwined and that both systems infringed the patents-in-suit, thereby precluding the imposition of sanctions under Rule 11.

As noted in its Opposition, DE Tech states that DE Tech itself undertook several investigative activities regarding the potentially infringing nature of Dell's computer sales and procurement systems. More specifically, DE Tech states in its Opposition that Bruce K. Lagerman, DE Tech's General Counsel and President, personally supervised a team of DE Tech employees over a 10-month period during

which searches were conducted of publicly available materials relating to how Dell was conducting international electronic-commerce, or "e-commerce," over the Internet/extranet regarding its sales to customers and its procurements. (Lagerman Decl. at 1-2.) DE Tech notes that, among other things, it performed a comprehensive review of Dell's website materials and public disclosures, a review of industry and scholarly books and articles about Dell, searches conducted at university and public libraries and numerous Internet searches and discussions with individuals working in the area of international trade. (Lagerman Decl. at 2-3.) DE Tech further states that these investigatory activities were focused on at least the following subjects: Dell's history, how Dell does business over the Internet in the United States and abroad, which vendors it chose to establish its web-based infrastructure to conduct international e-commerce and which suppliers it works with throughout the world and how they integrate with Dell. (Lagerman Decl. at 2.) DE Tech alleges that much of the information uncovered through these investigative activities consisted of information directly related to the computer systems used by Dell for procurement purposes. DE Tech further alleges that, from this information, it was able to draw at least the following conclusions and inferences:

1. The computer systems Dell uses for procurement purposes are inextricably intertwined with those that it uses for making sales to customers. (Lagerman Decl. at 9.) Dell routinely touts the fact that a complete "virtual integration" exists among all of its computer systems. (Lagerman Decl. at 3-4.)

2. Dell's procurement systems and its customer sales systems overlap by sharing use of some of the exact same computers and software applications. For example, Dell makes procurements from suppliers that have direct access into the Dell Order Management System, ("DOMS"), which is the centerpiece of Dell's customer sales systems. (Lagerman Decl. at 9.)

3. According to Dell's public pronouncements, its procurement systems operate in much the same manner as its customer sales systems. (Lagerman Decl. at 9.) Dell's founder, Michael Dell, has stated that "[t]he idea is to connect with your suppliers in much the same way you connect with your customers." (Lagerman Decl. at 3.)

4. So closely connected are Dell's procurement systems and its customer sales systems that when a customer places a purchase order on Dell's website over the Internet, that order will oftentimes be directly filled by one of Dell's suppliers rather than by Dell itself. (Lagerman Decl. at 5.); and

5. The acceptance of a U.S.-generated purchase order by Dell's customer sales computer system is what oftentimes actually triggers an associated computerized procurement of required products or components from Asian suppliers. (Lagerman Decl. at 9.)

In addition to DE Tech's own pre-filing investigative activities into the potentially infringing nature of Dell's procurement systems, Merchant & Gould also conducted several pre-filing investigatory activities. DE Tech states in its Opposition that it commissioned Merchant & Gould to undertake an "extensive pre-suit investigation" into whether Dell was infringing the patents-in-suit. (Lagerman Decl. at 9-10.) DE Tech notes that it provided Merchant & Gould with all of the information and materials that it had uncovered during its own investigation. (Lagerman Decl. at 10.) DE Tech states that its personnel worked closely with Merchant & Gould in assisting them with their investigation. (Lagerman Decl. at 10.) DE Tech notes in its Opposition that Merchant & Gould assigned a team of at least five attorneys to conduct its pre-filing investigation and retained an outside expert in the area of international commercial trade. (Leach Decl. at 2.) DE Tech states that Merchant & Gould conducted a detailed analysis of DE Tech's patents, their file histories and all cited prior art references. (Leach Decl. at 2.) Merchant & Gould also conducted prior art searches as part of a validity analysis of DE Tech's patents.

(Leach Decl. at 2.) Finally, Merchant & Gould reviewed and analyzed all of the information and materials provided by DE Tech in addition to undertaking extensive Internet and literature searches of its own in an effort to gather all the facts that were publicly available in order to determine how Dell's sales and procurement systems operated. As a result of these pre-filing investigative activities, DE Tech contends that Merchant & Gould was able to successfully identify many of the software applications that Dell purchases from third parties to use as part of its procurement computer systems. For instance, DE Tech states that Merchant & Gould learned that important components of Dell's procurement systems were software applications it purchased from Vastera known as "TradeSphere Exporter and Importer."[8] (Leach Decl. at 3-4.) Merchant & Gould also obtained product brochures relating to these software applications that provided significant details about their functionality, much of which DE Tech contends was directly relevant to performing an infringement analysis under DE Tech's patent claims. (Leach Decl. at 3-4.)

DE Tech further notes in its Opposition that Merchant & Gould directed DE Tech to place an international order from Canada on Dell's website for the purchase of a computer and accompanying peripherals. (Lagerman Decl. at 10) (Leach Decl. at 2.) DE Tech printed out the web pages it encountered during this transaction and reviewed the documentation received from Dell as a result of this transaction. As a result thereof, DE Tech contends that Merchant & Gould was able to strongly confirm the infringing nature of the computer systems Dell uses for customer sales. (Lagerman Decl. at 10-11.) DE Tech further contends that it also was confirmed that Dell's procurement computer systems had been implicated by this transaction given that the computer keyboard and mouse that DE Tech later received from Dell had

_____

[8]DE Tech notes that TradeSphere is also known at EMS 2000.

Case 7:04-cv-00628-GEC-PMS   Document 173   Filed 02/28/06   Page 18 of 26   Pageid#: 3319

originated in China, Taiwan and/or Thailand. (Leach Decl. at 2.) Nonetheless, DE Tech alleges that when both it and Merchant & Gould repeatedly contacted Dell to request underlying documentation that would show how Dell had effectuated the procurement of such peripherals, Dell refused to disclose this information by stating in writing that "these documents you are looking for are confidential to [D]ell and we do not share these with the public." (Leach Decl. at 3.)

DE Tech contends in its Opposition that, based upon its extensive investigation and review, Merchant & Gould was able to arrive at a reasonable construction of DE Tech's patent claims and to undertake an infringement analysis that involved an element-by-element comparison of the construed claims to the Dell computer systems used both for customer sales and for procurement. (Leach Decl. at 5-6.) Merchant & Gould shared the results of these efforts with DE Tech and expressly advised DE Tech that a good faith basis existed for asserting patent infringement against Dell's customer sales and procurement systems under at least one claim of each of the patents-in-suit based upon direct evidence and/or reasonable inferences. (Leach Decl. at 6.) DE Tech contends that it directly relied upon this advice in deciding to file suit against Dell for patent infringement. (Lagerman Decl. at 11.) With DE Tech's authorization, Merchant & Gould drafted and filed the Complaint and the First Amended Complaint. (Lagerman Decl. at 11.)

In Dell's Reply, Dell asserts that Leach states in his declaration that he merely *assumed* that Dell's procurement systems operate like Dell's sales systems and, therefore, only inferred infringement. Dell quotes the following language from Leach's declaration:

In analyzing Dell's procurement systems, Merchant & Gould inferred

-19-

from the information uncovered in its pre-suit investigation that Dell's Internet customer sales system was integrated with its procurement system, and thus Dell's procurement system likely infringed at least one claim of both the '020 and '364 patents.

(Leach Decl. at 6.) Dell argues that merely inferring that a system is likely to infringe a patent, without carrying out an investigation that shows the system meets each of the claim limitations, is a facially inadequate investigation. I disagree. As noted above, the requirements of Rule 11 will be met as long as an attorney's factual allegations are supported by any information. *See Brubaker*, 943 F.2d at 1373, 1377. Also, as previously mentioned, an attorney need not rely upon direct evidence to support his factual allegations. Instead, as long as an attorney possesses information from which it is possible to at least "draw an inference," even a "weak one," an attorney's factual allegations are placed beyond the reach of Rule 11 sanctions. *Brubaker*, 943 F.2d at 1377. Here, it appears that after a rather extensive investigation, Merchant & Gould was able to reasonably infer that Dell's computer procurement systems infringed the patents-in-suit, thereby placing DE Tech's and Merchant & Gould's actions outside of the scope of Rule 11.

Moreover, as the court noted in *Q-Pharma*, it is not for the court to determine whether a pre-filing interpretation of the asserted claims was *correct*, but only whether it was *frivolous*. *See* 360 F.3d at 1301 (citing *Antonious*, 275 F.3d at 1073) (emphasis added). Given the somewhat intangible nature of the subject matter at issue here, as well as the arguably inextricably intertwined nature of Dell's computer sales systems and its procurement systems, as evidenced above, I find that DE Tech's extensive pre-filing investigative activities cannot be said to be inadequate, thereby triggering sanctions under Rule 11. Instead, I find that, especially without the benefit of further discovery, it would have been nearly impossible, if not impossible, for DE Tech to

separate with specificity Dell's computer sales systems and its computer procurement systems in order to determine whether they infringe the patents-in-suit with certainty. That being the case, I cannot find that DE Tech's pre-filing interpretation of the asserted claims was frivolous, even if it eventually were to be determined to be incorrect. I find that an objectively reasonable person in DE Tech's and/or Merchant & Gould's position could have concluded that Dell's computer procurement systems infringed on the patents-in-suit, such that sanctions under Rule 11 are not appropriate.

Dell argues that the numerous references cited in DE Tech's Opposition relate to Dell's sales systems and programs and provide no evidence whatsoever on which an objectively reasonable person could determine whether DE Tech's claims apply to Dell's procurement systems. Dell states in its Reply that it uses a system called Glovia to purchase components for manufacturing. It states that Glovia is a procurement system and parts inventory system that allows Dell to order the parts and products it needs to manufacture computers and other products. (Declaration of Curtis Johnson, ("Johnson Decl."), at 1) (Ex. A. To Dell's Reply). Dell contends that it explained that Glovia was its procurement system in its responses to DE Tech's Interrogatory No. 18 on April 19, 2005.[9] Finally, Dell alleges that Glovia cannot possibly infringe DE Tech's claims because, as an objectively reasonable person would expect of a procurement system, Glovia does not trigger an electronic check on Dell's credit. (Johnson Decl. at 2.) I find Dell's argument regarding its Glovia procurement system unpersuasive. As conceded by Dell, it did not inform DE Tech that Glovia was its procurement system until tendering its responses to DE Tech's

---

[9]Dell further notes that, in the same response, it disclosed that it used a system named Ariba to buy office supplies, not for manufacturing components. Thus, Dell notes that DE Tech's allegations in its Complaint and First Amended Complaint that allege only that Dell's procurement of "parts, subassemblies and finished goods directly from foreign suppliers" constitute infringing activity are not supported by any allegations regarding the Ariba program.

interrogatories on April 19, 2005. This was nearly five months *after* the filing of the Complaint and nearly three months *after* the filing of the First Amended Complaint. As the case law clearly mandates, and as emphasized by Dell itself, it is the pre-filing investigation that must be deemed objectively reasonable. As long as that pre-filing investigation is so deemed, information obtained *after* the filing of the complaint simply is not relevant to the issue of the imposition of sanctions. Thus, I find it unnecessary to address Dell's argument regarding its Glovia procurement system in any further detail.

Dell further argues that DE Tech's focus on Dell's Malaysia Direct Ship, ("MDS"), program is misplaced because MDS is not a computer program, network or system. Instead it is the program whereby Dell builds laptops in Malaysia and then ships them to the United States to fulfill customer orders. Thus, Dell contends that it cannot be said to infringe the patents-in-suit. In a section of its Opposition entitled "Infringement by Dell's MDS-Related Procurement Systems," DE Tech cites extensively to Exhibit 15 to the Declaration of Marc N. Henschke In Opposition To Dell Inc.'s Motion For Rule 11 Sanctions, ("Henschke Decl."). This exhibit is a collection of screen shots from an order placed by DE Tech for a Dell server. However, MDS ships laptops, not servers, from Malaysia to the U.S. and then on to Dell's customers. Thus, Dell argues that this transaction in no way involved Dell's MDS program. Despite this argument by Dell, I note that the transaction, nonetheless, still goes to the arguably inextricably intertwined nature of Dell's sales systems and its procurement systems in that some of the peripheral equipment ordered with the server, including the mouse and keyboard, originated in China, Thailand and/or Taiwan. Also, as noted in DE Tech's Opposition, the steps it went through in placing the international order for the server certainly appeared to consist of the set of integrated tasks as set forth in claim 1 of both the '020 patent and the '364 patent.

Thus, I find that DE Tech could reasonably have inferred that Dell's procurement systems infringed both the '020 patent and the '364 patent. Moreover, despite Dell's contention that its MDS program is not part of its procurement systems and, therefore, no infringement evidence exists relative to any portion of its procurement systems, it appears that, as DE Tech argues, Dell completely disregards its own definition of "procurement systems" supplied in its brief accompanying its Motion for Sanctions. In that brief, Dell stated that its procurement computer systems included all the systems it uses to "purchase or procure parts and products." DE Tech argues that it has shown that Dell uses its MDS-related computer systems to procure fully assembled laptop products from Malaysia and, accordingly, it clearly meets the definition of "procurement systems" that Dell has been advancing. I find that this is an objectively reasonable inference given the information DE Tech was able to garner through its pre-filing investigation.

Dell next contends that the remainder of DE Tech's evidence of infringement is too general to serve as the basis for a claim-by-claim, limitation-by-limitation infringement analysis. However, I find that, given the somewhat intangible nature of the accused subject matter and the arguably inextricably intertwined nature of Dell's sales and procurement systems, a claim-by-claim, limitation-by-limitation infringement analysis, as suggested by Dell, simply would not be a reasonable expectation. I find that, from the sum of all of the information garnered through DE Tech's and Merchant & Gould's extensive pre-filing investigations, that a person in DE Tech's and/or Merchant & Gould's circumstances could have objectively reasonably inferred that Dell's procurement systems likely infringed the patents-in-suit.

Finally, Dell argues that, contrary to DE Tech's contention, DE Tech never

requested any documents or information from Dell regarding its procurement systems prior to filing suit. Instead, Dell states that the documents that DE Tech was refused were shipping documents specific to the server that it bought from Dell's online store and had shipped to Canada. Thus, these documents related to Dell's sales systems and, even if DE Tech had received them, they would have nothing to do with the procurement systems Dell uses to purchase components from its suppliers. However, again, I note that because a reasonably objective person could have concluded that Dell's procurement systems and its sales systems are so inextricably intertwined, at least without having the advantage of further discovery, that Dell's argument fails.

In conclusion, I find that it is much more difficult, if not impossible, to "reverse engineer" an accused device or subject matter dealing with somewhat intangible intellectual concepts or business methods or processes, as is the case here. Thus, DE Tech cannot be expected to determine with specificity whether Dell's procurement systems infringe on the patents-in-suit with the same level of specificity as a patentee might be expected to do with a tangible machine or device. That being said, given DE Tech's and Merchant & Gould's rather extensive pre-filing investigative activities, and the fact that Dell's procurement systems and its sales systems appear to be rather inextricably intertwined, as alleged by DE Tech, I find that an objectively reasonable person could have determined that Dell's procurement systems infringed the '020 and '364 patents, thereby precluding the imposition of sanctions under Rule 11. Given that DE Tech's and Merchant & Gould's pre-filing inquiries were sufficient under Rule 11, I find it unnecessary to address in any detail Dell's argument that Robins Kaplan, which entered the case well *after* the filing of the Complaint and the First Amended Complaint and, therefore, after the time for the performance of any pre-filing inquiry, violated Rule 11. I further find it unnecessary to address the remainder of Dell's arguments.

# FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Based on the above-stated reasons, the court makes the following factual findings and conclusions of law:

1)  DE Tech holds U.S. Patent No. 6,460,020 and U.S. Patent No. 6,845,364, both of which relate to the facilitation of international computer-to-computer commercial transactions by integrating certain complex functions enabling the international purchase of goods over the Internet;

2)  Rule 11(b)(3) requires that an attorney conduct a reasonable investigation of the factual and legal basis for a claim prior to filing a complaint;

3)  In the patent infringement context, the pre-filing investigation must be objectively reasonable, meaning that the pre-filing factual investigation must uncover some information to support the allegations in the complaint;

4)  Both DE Tech and Merchant & Gould undertook a rather extensive pre-filing investigation into the potentially infringing nature of Dell's computer sales systems and its computer procurement systems;

5)  Given the somewhat intangible nature of the accused subject matter, Dell's procurement systems, it would have been rather difficult, if not virtually impossible, for DE Tech to reverse engineer Dell's procurement systems;

6)  The key factor in determining the objective reasonableness of a pre-filing investigation is the presence of an adequate infringement analysis;

7)  An infringement analysis consists of a good faith, informed comparison of the claims of the patent against the accused subject matter;

8)  The rather extensive pre-filing investigation performed by DE Tech and Merchant & Gould lead to a reasonable inference that Dell's sales systems and its procurement systems were rather inextricably

intertwined;

9)    Given the somewhat intangible nature of the subject matter and the reasonable inference that Dell's sales systems and its procurement systems were inextricably intertwined, it was objectively reasonable for DE Tech, Merchant & Gould and/or Robins Kaplan to infer that Dell's procurement systems infringed the patents-in-suit; and

10)   Neither DE Tech, Merchant & Gould nor Robins Kaplan is subject to sanctions under Rule 11.

## CONCLUSION

Based on the above-stated reasons, the court will deny Dell's Motion for Sanctions.


DATED:    February 28, 2006.


/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE